GARY H. GREENBERG, ESQ. (GG 1614)
666 Fifth Avenue, 27th Floor
New York, NY 10103
(212) 765-5770
and
ANTHONY OSTLUND & BAER, P.A.
John B. Orenstein
3600 Wells Fargo Building
90 South Seventh Street
Minneapolis, MN  55402
(612) 349-6969

ATTORNEYS FOR PLAINTIFFS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WHITEBOX CONVERTIBLE ARBITRAGE PARTNERS, L.P., HFR RVA COMBINED MASTER TRUST, GUGGENHEIM PORTFOLIO COMPANY XXXI, LLC, INVESTCORP SILVERBACK ARBITRAGE MASTER FUND LTD., OTA LLC, ZAZOVE AGGRESSIVE GROWTH FUND, L.P. and ZAZOVE HIGH YIELD CONVERTIBLE SECURITIES FUND, L.P., | No.: 08 Civ. 497 (DAB)(MHD)  ECF CASE  **AMENDED COMPLAINT** |
| Plaintiffs, | |
| v. | |
| FAIRFAX FINANCIAL HOLDINGS, LTD., | |
| Defendant. | |

Plaintiffs, Whitebox Convertible Arbitrage Partners, L.P., HFR RVA Combined Master

Trust, Guggenheim Portfolio Company XXXI, LLC, Investcorp Silverback Arbitrage Master

Fund Ltd., OTA LLC, Zazove Aggressive Growth Fund, L.P. and Zazove High Yield

Convertible Securities Fund, L.P., by their attorneys, Anthony, Ostlund & Baer, P.A. and Gary H. Greenberg, Esq., for their Amended Complaint against Fairfax Financial Holdings Ltd., allege as follows:

## THE PARTIES

1.    Plaintiff Whitebox Convertible Arbitrage Partners, L.P. ("Whitebox Convertible") is a limited partnership organized under the laws of the British Virgin Islands.  Its principal place of business is in Minneapolis, Minnesota.

2.    Plaintiff HFR RVA Combined Master Trust ("HFR") is a unit trust organized under the laws of Bermuda with its principal office in Chicago, Illinois.

3.    Plaintiff Guggenheim Portfolio Company XXXI, LLC ("Guggenheim") is a limited liability company organized under the laws of Delaware, with its principal office in New York, New York.

4.    Plaintiff Investor Silverback Arbitrage Master Fund Ltd. ("Silverback") is incorporated under the laws of the Cayman Islands with its principal place of business in Chapel Hill, North Carolina.

5.    Plaintiff OTA LLC ("OTA") is a limited liability company organized under the laws of Delaware with its principal place of business in Purchase, New York.

6.    Plaintiffs Zazove Aggressive Growth Fund, L.P. ("Zazove Growth") and Zazove High Yield Convertible Securities Fund, L.P. ("Zazove High Yield") are limited partnerships organized under the laws of the Cayman Islands with their principal office in Incline Village, Nevada.

7.    Defendant, Fairfax Financial Holdings Ltd. ("Fairfax" or "the Company"), is a financial services holding company which, through its subsidiaries, is engaged in property and

casualty insurance and reinsurance, investment management and insurance claims management. Fairfax is incorporated under the laws of Canada, with its corporate headquarters in Toronto, Ontario.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship and the amount in controversy exceeds the value of $75,000, exclusive of interest and costs.

9.      Pursuant to 28 U.S.C. §1391(a), venue is proper in the Southern District of New York, because Fairfax is subject to personal jurisdiction in this District, and there is no district in which this action may otherwise be brought.

## FACTS

10.      On July 14, 2003, Fairfax completed an offering of US$150 million of 5% convertible senior debentures due July 15, 2023 (the "Notes").  The Notes were sold on a private placement basis in the United States in reliance upon Rule 144A of the Securities Act of 1933 (the "Securities Act").  The Notes subsequently were registered under a registration statement filed July 25, 2003.  The Notes are governed by an Indenture dated as of July 14, 2003 (the "Indenture"), entered into between Fairfax and The Bank of New York as Trustee.  (A copy of the Indenture is annexed as Exhibit A hereto.)  Fairfax and the Trustee entered into the Indenture for the express benefit of the holders of the Notes.

11.      The Notes are convertible into subordinate voting shares ("Shares") of Fairfax under certain conditions.  The number of Shares that a holder of the Notes receives per $1,000

Note upon exercising the conversion right is the Conversion Rate, a term defined more

specifically in the Indenture.  The initial Conversion Rate provided in the Indenture was 4.7057.

12.    The Indenture provides that the Conversion Rate is increased in certain

circumstances, including cash dividends to Shareholders that exceed $3.00 (Can.) within a 12-

month period:

> In case the Company shall, by dividend or otherwise, distribute to all holders of
> its Shares cash (regardless of whether such dividend or distribution is received
> and accepted by any holder of outstanding Shares) … to the extent that the
> aggregate amount of any such cash distributions and dividends in any 12-month
> period exceeds, with respect to the period:
>
> > (A) prior to July 15, 2008, Cdn$3.00 per Share (or if such distribution or
> > dividend is declared in U.S. dollars, as determined using the noon buying
> > rate in The City of New York for cable transfers in Canadian dollars as
> > certified for customs purposes by the Federal Reserve Bank of New York
> > on the date such distribution or dividend is declared); or
> >
> > (B) on or after July 15, 2008, 4.0% of the Current Market Price (as defined
> > in Section 10.3(g)) of the Shares,
>
> *in each case as determined on the Record Date for such distribution or dividend*,
> then, in such case, the Conversion Rate shall be increased ….

(Ex. A, § 10.3(f) (emphasis added).)  As the highlighted clause after (B) states, the 12-month

period is determined by the Record Date.  The Indenture defines the Record Date with respect to

cash dividends as "the date fixed for determination of shareholders entitled to receive such cash,

securities or other property (whether such date is fixed by the Board of Directors or by statute,

contract or otherwise)."  (*Id.*, § 10.3(g)(iii).)

13.    An increase in the Conversion Rate – even one that would otherwise be required

under section 10.3(f) – is made only if "such adjustment would require an increase … of at least

one percent (1%) in such rate."  (*Id.*, § 10.3(i).)  Increases that are not made because they are

below the 1% threshold are carried forward and included in the next calculation.  (*Id.*)

4

14.     On or about January 4, 2007, Fairfax declared an annual dividend of US$2.75 per share on its "outstanding multiple voting and subordinate voting shares" (including the Shares). It declared a Record Date of January 25, 2007.  (Ex. B hereto.)

15.     On or about January 2, 2008, Fairfax declared an annual dividend of US$5.00 per share on its "outstanding multiple voting and subordinate voting shares" (including the Shares). It declared a Record Date of January 14, 2008, less than 12 months after the Record Date of the annual dividend declared in 2007.  (Ex. C hereto.)

16.     The combination of the foregoing annual dividends exceeds $3.00 (Can.) a Share as well as the 1% threshold under 10.3(i).

17.     An increase in the Conversion Rate is required under section 10.3(f).  Per the formula contained in that section of the Indenture, the Conversion Rate should be increased to at least 4.7967.

18.     The Company has refused to make the required Conversion Rate increase.

19.     On January 2, 2008, Fairfax announced that the conditions under which Notes could be converted into Shares under the Indenture had been met.  (Ex. D hereto.)

20.     On January 9, 2008, Fairfax announced that it had called all of the Notes for redemption.  (Ex. E hereto.)  The announcement said that holders of the Notes could exercise their conversion rights at the initial Conversion Rate of 4.7057 through February 12, 2008 (the business day preceding the redemption date).  (*Id.*)  The announcement thus made clear that the required adjustment under section 10.3(f) would not be made.

21.     On January 10, 2008, counsel for Plaintiffs wrote to Fairfax on Plaintiffs' behalf and requested that the Company increase the Conversion Rate.  (Ex. F hereto.)  The Company denied the request.  (Ex. G hereto.)

22.     On the date of the original Complaint in this action, Whitebox Convertible owned $35,122,000 (face amount) of the Notes.  HFR owned $1,630,000 (face amount) of the Notes. Guggenheim owned $3,993,000 (face amount) of the Notes.  Silverback owned $5,633,000 (face amount) of the Notes.

23.     OTA owns $16,184,000 (face amount) of the Notes.  Zazove Growth owns $2,190,000 (face amount) of the Notes.  Zazove High Yield owns $3,050,000 (face amount) of the Notes.

24.     Plaintiffs have an "absolute and unconditional" right to bring this action for the enforcement of their rights to convert.  (Ex. A, § 10.10.)

## FIRST CAUSE OF ACTION:
## BREACH OF CONTRACT

25.     Paragraphs 1-24 of the Complaint are incorporated as if fully stated herein.

26.     Fairfax has breached the Indenture by offering conversion terms that do not comply with the Indenture and refusing to increase the Conversion Rate as provided in the Indenture.  Fairfax has informed all holders, and Plaintiffs specifically, that when they convert their Notes, holders will receive fewer Shares per Note than the Indenture requires.

27.     Plaintiffs Whitebox Convertible, HFR, Guggenheim and Silverback have surrendered their Notes for conversion.  They have not yet received Shares from Fairfax in exchange.  Plaintiffs OTA, Zazove Growth and Zazove High Yield intend to convert their Notes. All plaintiffs are entitled to (a) the difference between the number of Shares they receive upon conversion and the number of Shares that Fairfax is required to distribute to them under the Indenture terms or, alternatively, (b) damages in an amount sufficient to compensate Plaintiffs for the failure of the Company to issue the correct amount of Shares, such amount in no event to be less than $1,500,000.

## SECOND CAUSE OF ACTION:
## DECLARATORY JUDGMENT

28.     Paragraphs 1-27 of the Complaint are incorporated as if fully stated herein.

29.     An actual controversy exists between Plaintiffs and Defendant.  The declaratory relief sought in this action will clarify and settle the legal relations between the parties and afford relief from the uncertainty and controversy that exist at present with respect to the parties' respective rights and duties under the Indenture.

30.     The controversy is now ripe for determination, because Fairfax has forced a conversion of its Notes but provided notice that it will not honor the conversion of any holder at the Conversion Rate required under the Indenture.

31.     Pursuant to 28 U.S.C. §2201, Plaintiffs are entitled to a declaration that an increase in the Conversion Rate is required under the Indenture per the formula contained in section 10.3(f).  Plaintiffs are entitled to further necessary or proper relief based on the declaration pursuant to 28 U.S.C. § 2202.

WHEREFORE, Plaintiffs request an order and judgment from the Court as follows:

1.     Declaring and determining that Fairfax has breached section 10.3(f) of the Indenture;

2.     Requiring Fairfax to issue to each Plaintiff the correct number of Shares as provided in section 10.3(f) of the Indenture; or, alternatively,

3.     Awarding damages to each Plaintiff in the amount of the damages sustained as a result of the failure of Fairfax to issue the correct number of Shares as provided in section 10.3(f) of the Indenture, in an amount to be determined at trial, but believed to be in excess of $1,500,000 in total; and

4.    Awarding Plaintiffs interest, costs and reasonable attorney's fees, together with such further and other relief as the Court deems just and proper.

Dated: New York, New York
        January 25, 2008

**GARY H. GREENBERG (GG 1614)**


___s/_____
666 Fifth Avenue, 27th Floor
New York, NY 10103
Telephone:  (212) 765-5770
Facsimile:  (212) 765-5787
garygreenberg@verizon.net

and

**ANTHONY OSTLUND & BAER, P.A.**
John B. Orenstein
3600 Wells Fargo Building
90 South Seventh Street
Minneapolis, MN  55402
Telephone:  (612) 349-6969
Facsimile:  (612) 349-6996
jorenstein@aoblaw.com

**ATTORNEYS FOR PLAINTIFF**

I certify that on January 28, 2007, a true copy of the annexed Amended Complaint dated

January 25, 2008, was served upon Defendant Fairfax Financial Holdings, Ltd. ("Fairfax") by

leaving a copy of same with CT Corporation System ("CT"), 111 8th Avenue, 13th Floor, New

York, NY 10011.  CT was designated and appointed by Fairfax as its authorized agent for

service.  A copy of same was also mailed to Eric P. Salsberg, VP, Corporate Affairs, at the

Fairfax principal office in Toronto Canada:  Suite 800, 95 Wellington Street West, Toronto,

Ontario, Canada M5J 2N7.

Dated: New York, New York
       January 28, 2008

                              _____s/_____
                              Gary Greenberg (GG 1614)
                              Attorney for Plaintiffs
                              666 Fifth Avenue, 26th floor
                              New York, New York 10103
                              (212) 765-5770
                              Facsimile (212) 765-5787
                              garygreenberg@verizon.net

```
<DOCUMENT>
<TYPE>EX-7.1
<SEQUENCE>6
<FILENAME>t10299exv7w1.txt
<DESCRIPTION>INDENTURE DATED JULY 14, 2003
<TEXT>
<PAGE>
```

EXHIBIT 7.1

EXECUTION COPY

FAIRFAX FINANCIAL HOLDINGS LIMITED

Up to US$200,000,000 Aggregate Principal Amount of

5% Convertible Senior Debentures due 2023

------------------------------------------------------------

INDENTURE

Dated as of July 14, 2003

------------------------------------------------------------

The Bank of New York

TRUSTEE

------------------------------------------------------------

```
<PAGE>
```

TABLE OF CONTENTS

```
<TABLE>
<CAPTION>
```

PAGE
```
<S>
<C>
```

ARTICLE I DEFINITIONS AND INCORPORATION BY
REFERENCE..................................................................1

        Section 1.1.
Definitions..................................................................
......1
        Section 1.2.    Other
Definitions..................................................................
.5
        Section 1.3.    Incorporation by Reference of Trust Indenture
Act......................................6
        Section 1.4.    Rules of
Construction...............................................................7
        Section 1.5.    Acts of
Holders....................................................................7

ARTICLE II THE
SECURITIES................................................................
...................8

        Section 2.1.    Form and
Dating.....................................................................8
        Section 2.2.    Execution and
Authentication..............................................................9
        Section 2.3.    Registrar, Paying Agent, Conversion Agent and
Calculation Agent.......................10
        Section 2.4.    Paying Agent to Hold Money and Securities in
Trust.........................................10
        Section 2.5.    Securityholder
Lists.....................................................................10
        Section 2.6.    Transfer and
Exchange...................................................................11
        Section 2.7.    Replacement
Securities..................................................................12
        Section 2.8.    Outstanding Securities; Determinations of Holders'
Action.............................13
        Section 2.9.    Temporary
Securities..................................................................13
        Section 2.10.
Cancellation................................................................
......14
        Section 2.11.    Persons Deemed
Owners.....................................................................14
        Section 2.12.    Global
Securities..................................................................1
4
        Section 2.13.    CUSIP
Numbers..................................................................
19
        Section 2.14.
Ranking....................................................................
......19

ARTICLE III REDEMPTION AND
PURCHASES..................................................................
......19

Section 3.1.      Company's Right to Redeem; Notices to Trustee.......................................19
Section 3.2.      Selection of Securities to Be Redeemed.............................................20
Section 3.3.      Notice of Redemption.................................................................20
Section 3.4.      Effect of Notice of Redemption......................................................21
Section 3.5.      Deposit of Redemption Price.........................................................21
Section 3.6.      Securities Redeemed in Part.........................................................22
Section 3.7.      Purchase of Securities by the Company at Option of the Holder.......................22
Section 3.8.      Offer to Purchase of Securities upon Change of Control..............................24
Section 3.9.      Company's Right to Elect Manner of Payment of Redemption Price, Purchase Price,
                  Change of Control Purchase Price for Payment or Principal
                  Amount at Stated Maturity...........................................................28
Section 3.10.     Effect of Notice of Redemption, Purchase Notice, Change of Control Purchase
                  Notice or Payment Notice at Stated Maturity.........................................34
Section 3.11.     Deposit of Redemption Price, Purchase Price or Change of Control Purchase Price.....35
Section 3.12.     Securities Purchased in Part........................................................36
</TABLE>

i

<PAGE>

<TABLE>
<S>
<C>
Section 3.13.     Covenant to Comply With Securities Laws Upon Purchase of Securities..................36
Section 3.14.     Repayment to the Company...........................................................36

ARTICLE IV
COVENANTS............................................................................................37

Section 4.1.      Payment of Securities...............................................................37
Section 4.2.      SEC and Other Reports...............................................................37
Section 4.3.      Compliance Certificate..............................................................37
Section 4.4.      Further Instruments and Acts........................................................37

Section 4.5.     Maintenance of Office or
Agency.......................................................38
Section 4.6.     Delivery of Certain
Information..................................................38
Section 4.7.     Payment of Additional
Amounts......................................................38
Section 4.8.     Statement by Officers as to
Default......................................................39

ARTICLE V SUCCESSOR
CORPORATION...........................................................
.............40

Section 5.1.     When Company May Merge or Transfer
Assets.......................................................40

ARTICLE VI DEFAULTS AND
REMEDIES..............................................................
.........41

Section 6.1.     Events of
Default......................................................41
Section 6.2.
Acceleration.........................................................
......44
Section 6.3.     Other
Remedies.............................................................
44
Section 6.4.     Waiver of Past
Defaults.....................................................44
Section 6.5.     Control by
Majority.....................................................44
Section 6.6.     Limitation on
Suits........................................................45
Section 6.7.     Rights of Holders to Receive
Payment......................................................45
Section 6.8.     Collection Suit by
Trustee......................................................45
Section 6.9.     Trustee May File Proofs of
Claim........................................................45
Section 6.10.
Priorities...........................................................
......46
Section 6.11.     Undertaking for
Costs........................................................46
Section 6.12.     Waiver of Stay, Extension or Usury
Laws.........................................................47

ARTICLE VII
TRUSTEE..............................................................
....................47

Section 7.1.     Duties of
Trustee......................................................47
Section 7.2.     Rights of
Trustee......................................................48

        Section 7.3.        Individual Rights of
Trustee..........................................................50
        Section 7.4.        Trustee's
Disclaimer.......................................................50
        Section 7.5.        Notice of
Defaults.........................................................50
        Section 7.6.        Reports by Trustee to
Holders..........................................................50
        Section 7.7.        Compensation and
Indemnity........................................................50
        Section 7.8.        Replacement of
Trustee..........................................................51
        Section 7.9.        Successor Trustee by
Merger...........................................................52
        Section 7.10.       Eligibility;
Disqualification.................................................52
        Section 7.11.       Preferential Collection of Claims Against
Company......................................52
</TABLE>


                                ii

<PAGE>
<TABLE>

<S>
<C>
ARTICLE VIII DISCHARGE OF
INDENTURE........................................................................
.......52


        Section 8.1.        Discharge of Liability on
Securities...............................................52
        Section 8.2.        Repayment to the
Company..........................................................53

ARTICLE IX
AMENDMENTS...........................................................................
.....................53


        Section 9.1.        Without Consent of
Holders..........................................................53
        Section 9.2.        With Consent of
Holders..........................................................54
        Section 9.3.        Compliance with Trust Indenture
Act..............................................55
        Section 9.4.        Revocation and Effect of Consents, Waivers and
Actions...........................55
        Section 9.5.        Notation on or Exchange of
Securities...............................................56
        Section 9.6.        Trustee to Sign Supplemental
Indentures.........................................56
        Section 9.7.        Effect of Supplemental
Indentures..............................................56

ARTICLE X
CONVERSIONS..........................................................................
.....................56

Section 10.1.    Conversion Privilege..............................................................56
Section 10.2.    Conversion Procedure; Conversion Rate; Fractional Shares...........................57
Section 10.3.    Adjustment of Conversion Rate....................................................59
Section 10.4.    Effect of Reclassification, Consolidation, Merger or Sale............................67
Section 10.5.    Taxes on Shares Issued...........................................................68
Section 10.6.    Reservation of Shares, Shares to Be Fully Paid; Compliance with
                Governmental Requirements; Listing of Shares......................................68
Section 10.7.    Responsibility of Trustee.........................................................69
Section 10.8.    Notice To Holders Prior To Certain Actions........................................69
Section 10.9.    Payment of Cash in Lieu of Shares................................................70
Section 10.10.   Unconditional Right Of Holders To Convert........................................71

ARTICLE XI MISCELLANEOUS.............................................................................72

Section 11.1.    Trust Indenture Act Controls......................................................72
Section 11.2.    Notices............................................................................72
Section 11.3.    Communication by Holders with Other Holders.......................................73
Section 11.4.    Certificate and Opinion as to Conditions Precedent.................................73
Section 11.5.    Statements Required in Certificate or Opinion.....................................73
Section 11.6.    Separability Clause...............................................................73
Section 11.7.    Rules by Trustee, Paying Agent, Conversion Agent and Registrar....................73
Section 11.8.    Legal Holidays....................................................................74
Section 11.9.    GOVERNING LAW...................................................................74
Section 11.10.   Agent for Service; Submission to Jurisdiction; Waiver of Immunities.................74
Section 11.11.   No Recourse Against Others.......................................................74
Section 11.12.   Successors........................................................................74
Section 11.13.   Multiple Originals................................................................75

          Section 11.14.    Repurchase of Securities by the
Company...............................................75
</TABLE>

                                iii
<PAGE>

EXHIBIT A      Form of Global Security

EXHIBIT B      Form of Certificated Security

EXHIBIT C      Transfer Certificate


                                iv
<PAGE>




        INDENTURE dated as of July 14, 2003 between FAIRFAX FINANCIAL HOLDINGS
LIMITED, a company duly organized and existing under the laws of Canada (the
"COMPANY"), and THE BANK OF NEW YORK, a New York banking corporation (the
"TRUSTEE").

        Each party agrees as follows for the benefit of the other party and for
the equal and ratable benefit of the Holders of the Company's 5% Convertible
Senior Debentures due 2023:

                             ARTICLE I

                  DEFINITIONS AND INCORPORATION BY REFERENCE

        Section 1.1. Definitions.

        "144A GLOBAL SECURITY" means a permanent Global Security in the form of
the Security attached hereto as Exhibit A that is deposited with, and registered
in the name of, the Depositary, representing Securities sold in reliance on Rule
144A under the Securities Act.

        "ADDITIONAL INTEREST" means Additional Interest as defined in the
Registration Rights Agreement.

        "AFFILIATE" of any specified person means any other person directly or
indirectly controlling or controlled by or under direct or indirect common
control with such specified person. For the purposes of this definition,
"control" when used with respect to any specified person means the power to
direct or cause the direction of the management and policies of such person,
directly or indirectly, whether through the ownership of voting securities, by
contract or otherwise; and the terms "controlling" and "controlled" have
meanings correlative to the foregoing.

        "APPLICABLE PROCEDURES" means, with respect to any transfer or
transaction involving a Global Security or beneficial interest therein, the
rules and procedures of the Depositary for such Security, in each case to the

extent applicable to such transaction and as in effect from time to time.

"BOARD OF DIRECTORS" means either the board of directors of the Company or any duly authorized committee of such board.

"BOARD RESOLUTION" means a resolution of the Board of Directors.

"BUSINESS DAY" means each day of the year other than a Saturday or a Sunday or other day on which banking institutions in The City of New York are required or authorized by law or regulation to close.

"CALCULATION AGENT" means initially The Bank of New York and its successors and assigns.
<PAGE>

"CAPITAL STOCK" for any corporation means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) stock issued by that corporation.

"CERTIFICATED SECURITIES" means Securities that are in the form of the Securities attached hereto as Exhibit B.

"COMPANY" means the party named as the "Company" in the first Section of this Indenture until a successor replaces it pursuant to the applicable provisions of this Indenture and, thereafter, shall mean such successor. The foregoing sentence shall likewise apply to any subsequent such successor or successors.

"COMPANY REQUEST" or "COMPANY ORDER" means a written request or order signed in the name of the Company by any two Officers.

"CONVERSION PRICE" as of any date means $1,000 divided by the Conversion Rate as of such date.

"CONVERSION RATE" has the meaning set forth in Section 10.2(a) hereof.

"CORPORATE TRUST OFFICE" means the principal office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at 101 Barclay Street, Floor 21W, New York, New York 10286, Attention: Corporate Trust Trustee Administration, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as a successor Trustee may designate from time to time by notice to the Holders and the Company).

"DEFAULT" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"GLOBAL SECURITIES" means Securities that are in the form of the Securities attached hereto as Exhibit A and to the extent that such Securities are required to bear the Legend required by Section 2.6, such Securities will be in the form of a 144A Global Security.

"HOLDER" or "SECURITYHOLDER" means a person in whose name a Security is registered on the Registrar's books.

"INDENTURE" means this Indenture, as amended or supplemented from time to

time in accordance with the terms hereof, including the provisions of the TIA that are deemed to be a part hereof.

"INTEREST PAYMENT DATE" means January 15 and July 15 of each year, commencing January 15, 2004.

"INTEREST RECORD DATE" means January 1 and July 1 of each year.

2

<PAGE>

"ISSUE DATE" of any Security means the date on which such Security was originally issued or deemed issued as set forth on the face of the Security.

"MULTIPLE VOTING SHARES" means the multiple voting shares of the Company as it exists on the date of this Indenture or any other shares of Capital Stock of the Company into which such Multiple Voting Shares shall be reclassified or changed.

"NOTICE OF REDEMPTION" means notice given to the Trustee pursuant to Section 3.3.

"NYSE" means The New York Stock Exchange, Inc.

"OFFICER" means the Chairman of the Board, the Vice Chairman, the Chief Executive Officer, the President, any Vice President, the Treasurer, the Controller, or the Secretary or any Assistant Treasurer or Assistant Secretary of the Company.

"OFFICERS' CERTIFICATE" means a written certificate containing the information specified in Sections 11.4 and 11.5, signed in the name of the Company by any two Officers, and delivered to the Trustee. An Officers' Certificate given pursuant to Section 4.3 shall be signed by an authorized financial or accounting Officer of the Company but need not contain the information specified in Sections 11.4 and 11.5.

"OPINION OF COUNSEL" means a written opinion containing the information specified in Sections 11.4 and 11.5, from legal counsel. The counsel may be an employee of, or counsel to, the Company.

"PERSON" or "PERSON" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"PRINCIPAL AMOUNT" means $1,000 per Security.

"REDEMPTION DATE" or "REDEMPTION DATE" means the date specified for redemption of the Securities in accordance with the terms of the Securities and this Indenture.

"REDEMPTION PRICE" or "redemption price" has the meaning set forth in Section 5 of the Securities.

"REGISTRATION RIGHTS AGREEMENT" means the Resale Registration Rights

Agreement, dated as of the date hereof, among the Company and Banc of America Securities LLC.

"RESPONSIBLE OFFICER" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's

<div align="center">3</div>

<PAGE>

knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"RESTRICTED SECURITY" means a Security required to bear the restrictive legend set forth in the form of Security set forth in Exhibits A and B of this Indenture.

"RULE 144A" means Rule 144A under the Securities Act (or any successor provision), as it may be amended from time to time.

"SALE PRICE" means, with respect to any security on any day, the closing per share sale price, regular way, on such day or, in case no such sale takes place on such day, the average of the reported closing bid and asked prices, regular way, in each case as quoted on the NYSE consolidated tape or, if such security is not quoted or listed or admitted to trading on the NYSE consolidated tape, on the principal U.S. national securities exchange or quotation system on which such security is quoted or listed or admitted to trading or, if not quoted or listed or admitted to trading on any U.S. national securities exchange or quotation system, the average of the closing bid and asked prices of such security on the over-the-counter market on the day in question as reported by the National Quotation Bureau Incorporated, or a similar generally accepted reporting service or, if no such price is reported, as reported by the principal other non-U.S. market on which such security is traded, such price to be converted into U.S. dollars based on the Federal Reserve Bank of New York noon buying rate as reported for the exchange of U.S. dollars into Canadian dollars on such trading date, or if not so available, in such manner as furnished by any NYSE member firm selected from time to time by the Board of Directors for that purpose, or a price determined in good faith by the Board of Directors or, to the extent permitted by applicable law, a duly authorized committee thereof, whose determination shall be conclusive.

"SEC" means the United States Securities and Exchange Commission.

"SECURITIES" means any of the Company's 5% Convertible Senior Debentures due 2023, as amended or supplemented from time to time, issued under this Indenture.

"SECURITYHOLDER" or "HOLDER" means a person in whose name a Security is registered on the Registrar's books.

"SERIES 1 PREFERRED SHARES" means the Series 1 preferred shares of the Company as it exists on the date of the Indenture and any other shares of Capital Stock of the Company into which such Series 1 preferred shares shall be

reclassified of changed.

"SHARES" means the subordinate voting shares of the Company as it exists on the date of this Indenture or any other shares of Capital Stock of the Company into which such Shares shall be reclassified or changed.

"STATED MATURITY", when used with respect to any Security, means July 15, 2023.

"SUBSIDIARY" means any person of which at least a majority of the outstanding Voting Stock shall at the time directly or indirectly be owned or controlled by the Company or by one or more Subsidiaries or by the Company and one or more Subsidiaries.

4

<PAGE>

"TIA" means the United States Trust Indenture Act of 1939 as in effect on the date of this Indenture, provided, however, that in the event the TIA is amended after such date, TIA means, to the extent required by any such amendment, the TIA as so amended.

"TRADING DAY" means a day during which trading in securities generally occurs on the NYSE or, if the Shares are not listed on the NYSE, on the principal U.S. national securities exchange on which the Shares then are traded or, if the Shares are not listed for trading on a U.S. national securities exchange, on the National Association of Securities Dealers Automated Quotation System or, if the Shares are not quoted on the National Association of Securities Dealers Automated Quotation System, on the principal other market on which the Shares are then traded.

"TRUSTEE" means the party named as the "Trustee" in the first paragraph of this Indenture until a successor replaces it pursuant to the applicable provisions of this Indenture and, thereafter, shall mean such successor. The foregoing sentence shall likewise apply to any subsequent such successor or successors.

"VOTING STOCK" of a person means Capital Stock of such person of the class or classes pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors, managers or trustees of such person (irrespective of whether or not at the time Capital Stock of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

Section 1.2. Other Definitions

<TABLE>
<CAPTION>

| Term Section: | Defined in: |
|---|---|
| ------------ | ---------- |
| <S> | <C> |
| "Additional Amounts"...................................... | 4.7(a) |
| "Adjustment Event"........................................ | 10.3(k) |
| "Agent Members".......................................... | 2.12(e) |
| "Applicable Stock"....................................... | 3.8(c) |
| "beneficial owner"....................................... | 3.9(a) |
| "cash".................................................. | 3.10(a) |

```
"Cash Amount"............................................  10.9
"Cash Settlement Notice Period"..........................  10.9
"Change of Control"......................................  3.9(a)
"Change of Control Purchase Date"........................  3.9(a)
"Change of Control Purchase Notice"......................  3.9(c)
"Change of Control Purchase Price".......................  3.9(a)
"Company Notice".........................................  3.10(d)
"Company Notice Date"....................................  3.10(b)
"Controlling Shareholder"................................  6.1
"Conversion Agent".......................................  2.3
"Conversion Obligation"..................................  10.9
"Conversion Retraction Period"...........................  10.9
"Conversion Settlement Averaging Period".................  10.9
"Current Market Price"...................................  10.3(f)
</TABLE>
```

5

```
<PAGE>
<TABLE>
<S>                                                       <C>
"Depositary".............................................  2.1(a)
"Determination Date".....................................  10.3(k)
"Designated Subsidiary"..................................  6.1
"Distributed Assets".....................................  10.3(d)
"Event of Default".......................................  6.1
"Excluded Holder"........................................  4.7(a)
"Ex-Dividend Time".......................................  10.1(b)
"Exchange Act"...........................................  2.12(e)
"Expiration Time"........................................  10.3(e)
"Fair Market Value"......................................  10.3(g)
"Final Notice Date"......................................  10.9
"Fiscal Quarter".........................................  10.1(a)
"Legal Holiday"..........................................  11.8
"Legend".................................................  2.6(f)
"Market Price"...........................................  3.10(c)
"non-electing share" ....................................  10.4
"Notice of Conversion"...................................  10.2(b)
"Notice of Default"......................................  6.1
"Paying Agent"...........................................  2.3
"Purchase Date"..........................................  3.7(a)
"Purchase Notice"........................................  3.7(a)
"Purchase Price".........................................  3.7(a)
"Purchased Shares".......................................  10.3(f)
"QIBs"...................................................  2.1(a)
"Record Date"............................................  10.3(g)
"Registrar"..............................................  2.3
"Rule 144A Information"..................................  4.6
"Securities Act".........................................  2.6(f)
"Taxes"..................................................  4.7(a)
"Trigger Event"..........................................  10.3(d)
</TABLE>
```

        Section 1.3. Incorporation by Reference of Trust Indenture Act. Whenever
this Indenture refers to a provision of the TIA, the provision is incorporated
by reference in and made a part of this Indenture. The following TIA terms used
in this Indenture have the following meanings:

"COMMISSION" means the SEC.

"INDENTURE SECURITIES" means the Securities.

"INDENTURE SECURITY HOLDER" means a Securityholder.

"INDENTURE TO BE QUALIFIED" means this Indenture.

"INDENTURE TRUSTEE" or "institutional trustee" means the Trustee.

"OBLIGOR" on the indenture securities means the Company.

<center>6</center>

<PAGE>

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions.

Section 1.4. Rules of Construction. Unless the context otherwise requires:

(a) a term has the meaning assigned to it;

(b) an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect in Canada from time to time;

(c) "or" is not exclusive;

(d) "including" means including, without limitation; and

(e) words in the singular include the plural, and words in the plural include the singular.

Section 1.5. Acts of Holders. (a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Company, as described in Section 11.2. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section.

(b) The fact and date of the execution by any person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to such officer the execution thereof. Where such execution is by a signer acting in a capacity other than such signer's individual capacity, such certificate or affidavit shall also constitute sufficient proof of such signer's authority. The fact and date of the

execution of any such instrument or writing, or the authority of the person executing the same, may also be proved in any other manner which the Trustee deems sufficient.

(c) The principal amount and serial number of any Security and the ownership of Securities shall be proved by the register maintained by the Registrar for the Securities.

(d) Any request, demand, authorization, direction, notice, consent, waiver or other Act of the Holder of any Security shall bind every future Holder of the same Security and the Holder of every Security issued upon the registration of transfer thereof or in exchange

7

<PAGE>

therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Company in reliance thereon, whether or not notation of such action is made upon such Security.

(e) If the Company shall solicit from the Holders any request, demand, authorization, direction, notice, consent, waiver or other Act, the Company may, at its option, by or pursuant to a Board Resolution, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other Act, but the Company shall have no obligation to do so. If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other Act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of outstanding Securities have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other Act, and for that purpose the outstanding Securities shall be computed as of such record date; provided that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than six months after the record date.

ARTICLE II

THE SECURITIES

Section 2.1. Form and Dating The Securities and the Trustee's certificate of authentication shall be substantially in the form of Exhibits A and B, which are a part of this Indenture. The Securities may have notations, legends or endorsements required by law, stock exchange rule or usage (provided that any such notation, legend or endorsement required by usage is in a form acceptable to the Company). The Company shall provide any such notations, legends or endorsements to the Trustee in writing. Each Security shall be dated the date of its authentication.

(a) 144A Global Securities. Securities offered and sold within the United States to qualified institutional buyers as defined in Rule 144A ("QIBS") in reliance on Rule 144A shall be issued, initially in the form of a 144A Global Security, which shall be deposited with the Trustee at its Corporate Trust Office, as custodian for the Depositary (as defined below) and registered in the name of The Depository Trust Company ("DTC") or the nominee thereof (DTC, or any

successor thereto, and any such nominee being hereinafter referred to as the "DEPOSITARY"), duly executed by the Company and authenticated by the Trustee as hereinafter provided. The aggregate principal amount of the 144A Global Securities may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depositary as hereinafter provided.

(b) Global Securities in General. Each Global Security shall represent such of the outstanding Securities as shall be specified therein and each shall provide that it shall represent the aggregate amount of outstanding Securities from time to time endorsed thereon and that the aggregate amount of outstanding Securities represented thereby may from time to time

8

<PAGE>

be reduced or increased, as appropriate, to reflect exchanges, redemptions, repurchases and conversions.

Any adjustment of the aggregate principal amount of a Global Security to reflect the amount of any increase or decrease in the amount of outstanding Securities represented thereby shall be made by the Trustee in accordance with instructions given by the Holder thereof as required by Section 2.12 hereof and shall be made on the records of the Trustee and the Depositary.

(c) Book-Entry Provisions. This Section 2.1(c) shall apply only to Global Securities deposited with or on behalf of the Depositary.

The Company shall execute and the Trustee shall, in accordance with this Section 2.1(c), authenticate and deliver initially one or more Global Securities that (a) shall be registered in the name of the Depositary, (b) shall be delivered by the Trustee to the Depositary or pursuant to the Depositary's instructions and (c) shall be substantially in the form of Exhibit A attached hereto.

(d) Certificated Securities. Securities not issued as interests in the Global Securities will be issued in certificated form substantially in the form of Exhibit B attached hereto.

Section 2.2. Execution and Authentication. The Securities shall be executed on behalf of the Company by any Officer. The signature of the Officer on the Securities may be manual or facsimile.

Securities bearing the manual or facsimile signatures of individuals who were at the time of the execution of the Securities Officers shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Securities or did not hold such offices at the date of authentication of such Securities.

No Security shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Security a certificate of authentication substantially in the form provided for herein duly executed by the Trustee by manual signature of an authorized signatory, and such certificate upon any Security shall be conclusive evidence, and the only evidence, that such Security has been duly authenticated and delivered hereunder.

The Trustee shall authenticate and deliver the Securities for original

issue in an aggregate principal amount of up to US$200,000,000 upon one or more Company Orders without any further action by the Company (other than as contemplated in Section 11.4 and Section 11.5 hereof). The aggregate principal amount of the Securities due at the Stated Maturity thereof outstanding at any time may not exceed the amount set forth in the foregoing sentence.

The Securities shall be issued only in registered form without coupons and only in denominations of US$1,000 of principal amount and any integral multiple of US$1,000.

<div align="center">9</div>

<PAGE>

Section 2.3. Registrar, Paying Agent, Conversion Agent and Calculation Agent. The Company shall maintain an office or agency where Securities may be presented for registration of transfer or for exchange ("REGISTRAR"), an office or agency where Securities may be presented for purchase or payment ("PAYING AGENT") and an office or agency where Securities may be presented for conversion ("CONVERSION AGENT"). The Registrar shall keep a register of the Securities and of their transfer and exchange. The Company may have one or more co-registrars, one or more additional paying agents and one or more additional conversion agents. The term Paying Agent includes any additional paying agent, including any named pursuant to Section 4.5. The term Conversion Agent includes any additional conversion agent, including any named pursuant to Section 4.5.

The Company shall enter into an appropriate agency agreement with any Registrar, Paying Agent, Conversion Agent, Calculation Agent or co-registrar (in each case, if such Registrar, agent or co-registrar is a Person other than the Trustee). The agreement shall implement the provisions of this Indenture that relate to such agent. The Company shall notify the Trustee of the name and address of any such agent. If the Company fails to maintain a Registrar, Paying Agent or Conversion Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.7. The Company or any Subsidiary or an Affiliate of either of them may act as Paying Agent, Registrar, Conversion Agent or co-registrar.

The Company initially appoints the Trustee as Registrar, Conversion Agent, Calculation Agent and Paying Agent in connection with the Securities.

Section 2.4. Paying Agent to Hold Money and Securities in Trust. Except as otherwise provided herein, on or prior to each due date of payments in respect of any Security, the Company shall deposit with the Paying Agent a sum of money (in immediately available funds if deposited on the due date) or Shares sufficient to make such payments when so becoming due. The Company shall require each Paying Agent (other than the Trustee) to agree in writing that the Paying Agent shall hold in trust for the benefit of Securityholders or the Trustee all money and Shares held by the Paying Agent for the making of payments in respect of the Securities and shall notify the Trustee of any default by the Company in making any such payment. At any time during the continuance of any such default, the Paying Agent shall, upon the written request of the Trustee, forthwith pay to the Trustee all money and Shares so held in trust. If the Company, a Subsidiary or an Affiliate of either of them acts as Paying Agent, it shall segregate the money and Shares held by it as Paying Agent and hold it as a separate trust fund. The Company at any time may require a Paying Agent to pay all money and Shares held by it to the Trustee and to account for any funds and Shares disbursed by it. Upon doing so, the Paying Agent shall have no further liability for the money or Shares.

Section 2.5. Securityholder Lists. The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Securityholders. If the Trustee is not the Registrar, the Company shall cause to be furnished to the Trustee at least semiannually on June 1 and December 1 a listing of Securityholders dated within 15 days of the date on which the list is furnished and at such other times as the Trustee may request in writing a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Securityholders.

10

<PAGE>

Section 2.6. Transfer and Exchange. Subject to Section 2.12 hereof, (a) upon surrender for registration of transfer of any Security, together with a written instrument of transfer satisfactory to the Registrar duly executed by the Securityholder or such Securityholder's attorney duly authorized in writing, at the office or agency of the Company designated as Registrar or co-registrar pursuant to Section 2.3, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Securities of any authorized denomination or denominations, of a like aggregate principal amount. The Company shall not charge a service charge for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to pay all taxes, assessments or other governmental charges that may be imposed in connection with the transfer or exchange of the Securities from the Securityholder requesting such transfer or exchange.

At the option of the Holder, Securities may be exchanged for other Securities of any authorized denomination or denominations, of a like aggregate principal amount upon surrender of the Securities to be exchanged, together with a written instrument of transfer satisfactory to the Registrar duly executed by the Securityholder or such Securityholder's attorney duly authorized in writing, at such office or agency. Whenever any Securities are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Securities which the Holder making the exchange is entitled to receive.

The Company shall not be required to make, and the Registrar need not register, transfers or exchanges of Securities selected for redemption (except, in the case of Securities to be redeemed in part, the portion thereof not to be redeemed) or any Securities in respect of which a Purchase Notice or Change of Control Purchase Notice has been given and not withdrawn by the Holder thereof in accordance with the terms of this Indenture (except, in the case of Securities to be purchased in part, the portion thereof not to be purchased) or any Securities for a period of 15 days before the mailing of a notice of redemption of Securities to be redeemed.

(b) Notwithstanding any provision to the contrary herein, so long as a Global Security remains outstanding and is held by or on behalf of the Depositary, transfers of a Global Security, in whole or in part, shall be made only in accordance with Section 2.12 and this Section 2.6(b). Transfers of a Global Security shall be limited to transfers of such Global Security in whole or in part, to the Depositary, to nominees of the Depositary or to a successor of the Depositary or such successor's nominee.

(c) Successive registrations and registrations of transfers and exchanges as aforesaid may be made from time to time as desired, and each such registration shall be noted on the register for the Securities.

(d) Any Registrar appointed pursuant to Section 2.3 hereof shall provide to the Trustee such information as the Trustee may reasonably require in connection with the delivery by such Registrar of Securities upon transfer or exchange of Securities.

(e) No Registrar shall be required to make registrations of transfer or exchange of Securities during any periods designated in the text of the Securities or in this Indenture as periods during which such registration of transfers and exchanges need not be made.

11

<PAGE>

(f) If Securities are issued upon the transfer, exchange or replacement of Securities subject to restrictions on transfer and bearing the legends set forth on the forms of Security attached hereto as Exhibits A and B setting forth such restrictions (collectively, the "LEGEND"), or if a request is made to remove the Legend on a Security, the Securities so issued shall bear the Legend, or the Legend shall not be removed, as the case may be, unless there is delivered to the Company and the Registrar such satisfactory evidence, which shall include an Opinion of Counsel, as may be reasonably required by the Company and the Registrar and the Trustee (if not the same Person as the Trustee), that neither the Legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A or Rule 144 under the Securities Act of 1933, as amended ("SECURITIES ACT") or that such Securities are not "restricted" within the meaning of Rule 144 under the Securities Act. Upon (i) provision of such satisfactory evidence, or (ii) notification by the Company to the Trustee and Registrar of the sale of such Security pursuant to a registration statement that is effective at the time of such sale, the Trustee, at the written direction of the Company, shall authenticate and deliver a Security that does not bear the Legend. If the Legend is removed from the face of a Security and the Security is subsequently held by the Company or an Affiliate of the Company, the Legend shall be reinstated.

Section 2.7. Replacement Securities. If (a) any mutilated Security is surrendered to the Trustee, or (b) the Company and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any Security, and there is delivered to the Company and the Trustee such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Company or the Trustee that such Security has been acquired by a bona fide purchaser, the Company shall execute and upon its written request the Trustee shall authenticate and deliver, in exchange for any such mutilated Security or in lieu of any such destroyed, lost or stolen Security, a new Security of like tenor and principal amount, bearing a certificate number not contemporaneously outstanding.

In case any such mutilated, destroyed, lost or stolen Security has become or is about to become due and payable, or is about to be purchased by the Company pursuant to Article 3 hereof, the Company in its discretion may, instead of issuing a new Security, pay or purchase such Security, as the case may be.

Upon the issuance of any new Securities under this Section 2.7, the

Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Security issued pursuant to this Section 2.7 in lieu of any mutilated, destroyed, lost or stolen Security shall constitute an original additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Security shall be at any time enforceable by anyone, and shall be entitled to all benefits of this Indenture equally and proportionately with any and all other Securities duly issued hereunder.

The provisions of this Section 2.7 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

<div align="center">12</div>

<PAGE>

Section 2.8. Outstanding Securities; Determinations of Holders' Action. Securities outstanding at any time are all the Securities authenticated by the Trustee except for those cancelled by it, those paid pursuant to Section 2.7, those delivered to it for cancellation and those described in this Section 2.8 as not outstanding. A Security does not cease to be outstanding because the Company or an Affiliate thereof holds the Security; provided, however, that in determining whether the Holders of the requisite principal amount of Securities have given or concurred in any request, demand, authorization, direction, notice, consent, waiver, or other Act hereunder, Securities owned by the Company or any other obligor upon the Securities or any Affiliate of the Company or such other obligor shall be disregarded and deemed not to be outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent, waiver or other Act, only Securities which a Responsible Officer of the Trustee actually knows to be so owned shall be so disregarded. Subject to the foregoing, only Securities outstanding at the time of such determination shall be considered in any such determination (including, without limitation, determinations pursuant to Articles 6 and 9).

If a Security is replaced pursuant to Section 2.7, the replaced Security ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Security is held by a bona fide purchaser unaware that such Security has been replaced.

If the Paying Agent holds, in accordance with this Indenture, on a Redemption Date, or on the Business Day following a Purchase Date or a Change of Control Purchase Date, or on Stated Maturity, money or securities, if permitted hereunder, sufficient to pay Securities payable on that date, then immediately after such Redemption Date, Purchase Date, Change of Control Purchase Date or Stated Maturity, as the case may be, such Securities shall cease to be outstanding and interest, including additional interest, if any, on such Securities shall cease to accrue; provided, that if such Securities are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made.

If a Security is converted in accordance with Article 10, then from and after the time of conversion on the date of conversion, such Security shall cease to be outstanding and interest, including additional interest, if any, shall cease to accrue on such Security.

Section 2.9. Temporary Securities. Pending the preparation of definitive Securities, the Company may execute, and upon Company Order the Trustee shall authenticate and deliver, temporary Securities which are printed, lithographed, typewritten, mimeographed or otherwise produced, in any authorized denomination, substantially of the tenor of the definitive Securities in lieu of which they are issued and with such appropriate insertions, omissions, substitutions and other variations as the officers executing such Securities may determine, as conclusively evidenced by their execution of such Securities.

If temporary Securities are issued, the Company will cause definitive Securities to be prepared without unreasonable delay. After the preparation of definitive Securities, the temporary Securities shall be exchangeable for definitive Securities upon surrender of the temporary Securities at the office or agency of the Company designated for such purpose pursuant to Section 2.3, without charge to the Holder. Upon surrender for cancellation of any one

13

<PAGE>

or more temporary Securities the Company shall execute and the Trustee shall authenticate and deliver in exchange therefor a like principal amount of definitive Securities of authorized denominations. Until so exchanged the temporary Securities shall in all respects be entitled to the same benefits under this Indenture as definitive Securities.

Section 2.10. Cancellation. All Securities surrendered for payment, purchase by the Company pursuant to Article 3, conversion, redemption or registration of transfer or exchange shall, if surrendered to any person other than the Trustee, be delivered to the Trustee and shall be promptly cancelled by it. The Company may at any time deliver to the Trustee for cancellation any Securities previously authenticated and delivered hereunder which the Company may have acquired in any manner whatsoever, and all Securities so delivered shall be promptly cancelled by the Trustee. The Company may not issue new Securities to replace Securities it has paid or delivered to the Trustee for cancellation or that any Holder has converted pursuant to Article 10. No Securities shall be authenticated in lieu of or in exchange for any Securities cancelled as provided in this Section, except as expressly permitted by this Indenture. All cancelled Securities held by the Trustee shall be disposed of by the Trustee in accordance with the Trustee's customary procedure.

Section 2.11. Persons Deemed Owners. Prior to due presentment of a Security for registration of transfer, the Company, the Trustee and any agent of the Company or the Trustee may treat the person in whose name such Security is registered as the owner of such Security for the purpose of receiving payment of principal of the Security or the payment of any Redemption Price, Purchase Price or Change of Control Purchase Price in respect thereof, and interest thereon, for the purpose of conversion and for all other purposes whatsoever, whether or not such Security be overdue, and neither the Company, the Trustee nor any agent of the Company or the Trustee shall be affected by notice to the contrary.

Section 2.12. Global Securities. (a) Notwithstanding any other provisions of this Indenture or the Securities, (A) transfers of a Global Security, in whole or in part, shall be made only in accordance with Section 2.6 and Section 2.12(a)(i), (B) transfers of a beneficial interest in a Global Security for a Certificated Security shall comply with Section 2.6, Section 2.12(a)(ii) below

and Section 2.12(e)(1) below, and (C) transfers of a Certificated Security shall comply with Section 2.6 and Sections 2.12(a)(iii) and (iv) below.

(i) Transfer of Global Security. A Global Security may not be transferred, in whole or in part, to any person other than the Depositary or a nominee or any successor thereof, and no such transfer to any such other person may be registered; provided that this clause (i) shall not prohibit any transfer of a Security that is issued in exchange for a Global Security but is not itself a Global Security. No transfer of a Security to any person shall be effective under this Indenture or the Securities unless and until such Security has been registered in the name of such person. Nothing in this Section 2.12(a)(i) shall prohibit or render ineffective any transfer of a beneficial interest in a Global Security effected in accordance with the other provisions of this Section 2.12(a).

(ii) Restrictions on Transfer of a Beneficial Interest in a Global Security for a Certificated Security. A beneficial interest in a Global Security may not be

14

<PAGE>

exchanged for a Certificated Security except upon satisfaction of the requirements set forth below and in Section 2.12(e)(1) below. Upon receipt by the Trustee of a transfer of a beneficial interest in a Global Security in accordance with Applicable Procedures for a Certificated Security in the form satisfactory to the Trustee, together with:

    (A)   so long as the Securities are Restricted Securities, certification in the form set forth in Exhibit C;

    (B)   written instructions to the Trustee to make, or direct the Registrar to make, an adjustment on its books and records with respect to such Global Security to reflect a decrease in the aggregate principal amount of the Securities represented by the Global Security, such instructions to contain information regarding the Depositary account to be credited with such decrease; and

    (C)   if the Company so requests, an Opinion of Counsel or other evidence reasonably satisfactory to it as to the compliance with the restrictions set forth in the Legend,

then the Trustee shall cause, or direct the Registrar to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Registrar, the aggregate principal amount of the Securities represented by the Global Security to be decreased by the aggregate principal amount of the Certificated Security to be issued, shall issue such Certificated Security and shall debit or cause to be debited to the account of the person specified in such instructions a beneficial interest in the Global Security equal to the principal amount of the Certificated Security so issued.

(iii) Transfer and Exchange of Certificated Securities. When Certificated Securities are presented to the Registrar with a request:

```
        (y) to register the transfer of such Certificated Securities; or

        (z) to exchange such Certificated Securities for an equal principal
            amount at maturity of Certificated Securities of other authorized
            denominations,
```

the Registrar shall register the transfer or make the exchange as requested if
its reasonable requirements for such transaction are met; provided, however,
that the Certificated Securities surrendered for transfer or exchange:

```
        (1) shall be duly endorsed or accompanied by a written instrument of
            transfer in form reasonably satisfactory to the Company and the
            Registrar, duly executed by the Holder thereof or his attorney duly
            authorized in writing; and

        (2) so long as such Securities are Restricted Securities, such
            Securities are being transferred or exchanged pursuant to an
            effective registration statement under the Securities Act or
            pursuant to clause (A), (B) or (C)
```

                                    15
<PAGE>

```
        below, and are accompanied by the following additional information
        and documents, as applicable:

            (A) if such Certificated Securities are being delivered to the
                Registrar by a Holder for registration in the name of such
                Holder, without transfer, a certification from such Holder to
                that effect; or

            (B) if such Certificated Securities are being transferred to the
                Company, a certification to that effect; or

            (C) if such Certificated Securities are being transferred
                pursuant to an exemption from registration, (i) a
                certification to that effect (in the form set forth in
                Exhibit C, if applicable) and (ii) if the Company so
                requests, an opinion of counsel or other evidence reasonably
                satisfactory to it as to the compliance with the restrictions
                set forth in the Legend.
```

        (iv) Restrictions on Transfer of a Certificated Security for a
Beneficial Interest in a Global Security. A Certificated Security may not
be exchanged for a beneficial interest in a Global Security except upon
satisfaction of the requirements set forth below.

        Upon receipt by the Trustee of a Certificated Security, duly endorsed or
accompanied by appropriate instruments of transfer, in form satisfactory to the
Trustee, together with:

```
        (I) so long as the Securities are Restricted Securities, certification,
            in the form set forth in Exhibit C, that such Certificated Security is
            being transferred to a QIB in accordance with Rule 144A; and
```

(II) written instructions directing the Trustee to make, or to direct the Registrar to make, an adjustment on its books and records with respect to such Global Security to reflect an increase in the aggregate principal amount of the Securities represented by the Global Security, such instructions to contain information regarding the Depositary account to be credited with such increase,

then the Trustee shall cancel such Certificated Security and cause, or direct the Registrar to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Registrar, the aggregate principal amount of Securities represented by the Global Security to be increased by the aggregate principal amount of the Certificated Security to be exchanged, and shall credit or cause to be credited to the account of the person specified in such instructions a beneficial interest in the Global Security equal to the principal amount of the Certificated Security so cancelled. If no Global Securities are then outstanding, the Company

<div align="center">16</div>

<PAGE>

shall issue and the Trustee shall authenticate, upon Company Order, a new Global Security in the appropriate principal amount at maturity.

(b) Subject to the succeeding paragraph, every Security shall be subject to the restrictions on transfer provided in the Legend including the delivery of an opinion of counsel, if so provided. Whenever any Restricted Security is presented or surrendered for registration of transfer or for exchange for a Security registered in a name other than that of the Holder, such Security must be accompanied by a certificate in substantially the form set forth in Exhibit C, dated the date of such surrender and signed by the Holder of such Security, as to compliance with such restrictions on transfer. The Registrar shall not be required to accept for such registration of transfer or exchange any Security not so accompanied by a properly completed certificate.

(c) The restrictions imposed by the Legend upon the transferability of any Security shall cease and terminate when such Security has been sold pursuant to an effective registration statement under the Securities Act or transferred in compliance with Rule 144 under the Securities Act (or any successor provision thereto) or, if earlier, upon the expiration of the holding period applicable to sales thereof under Rule 144(k) under the Securities Act (or any successor provision). Any Security as to which such restrictions on transfer shall have expired in accordance with their terms or shall have terminated may, upon a surrender of such Security for exchange to the Registrar in accordance with the provisions of this Section 2.12 (accompanied, in the event that such restrictions on transfer have terminated by reason of a transfer in compliance with Rule 144 or any successor provision, by an Opinion of Counsel having substantial experience in practice under the Securities Act and otherwise reasonably acceptable to the Company, addressed to the Company and in form acceptable to the Company, to the effect that the transfer of such Security has been made in compliance with Rule 144 or such successor provision), be exchanged for a new Security, of like tenor and aggregate principal amount, which shall not bear the restrictive Legend. The Company shall inform the Trustee of the effective date of any registration statement registering the Securities under the Securities Act. The Trustee shall not be liable for any action taken or

omitted to be taken by it in good faith in accordance with the aforementioned opinion of counsel or registration statement.

(d) As used in the preceding two paragraphs of this Section 2.12, the term "transfer" encompasses any sale, pledge, transfer, loan, hypothecation, or other disposition of any Security.

(e) The provisions of clauses (1), (2), (3) and (4) below shall apply only to Global Securities:

(1) Notwithstanding any other provisions of this Indenture or the Securities, a Global Security shall not be exchanged in whole or in part for a Security registered in the name of any person other than the Depositary or one or more nominees thereof, provided that a Global Security may be exchanged for Securities registered in the names of any person designated by the Depositary in the event that (i) the Depositary has notified the Company that it is unwilling or unable to continue as Depositary for such Global Security or such Depositary has ceased to be a "clearing agency"

17

<PAGE>

registered under the Securities Exchange Act of 1934, as amended (the "EXCHANGE ACT"), and a successor Depositary is not appointed by the Company within 90 days or (ii) an Event of Default has occurred and is continuing with respect to the Securities. Any Global Security exchanged pursuant to clause (i) above shall be so exchanged in whole and not in part, and any Global Security exchanged pursuant to clause (ii) above may be exchanged in whole or from time to time in part as directed by the Depositary. Any Security issued in exchange for a Global Security or any portion thereof shall be a Global Security; provided that any such Security so issued that is registered in the name of a person other than the Depositary or a nominee thereof shall not be a Global Security.

(2) Securities issued in exchange for a Global Security or any portion thereof shall be issued in definitive, fully registered form, without interest coupons, shall have an aggregate principal amount equal to that of such Global Security or portion thereof to be so exchanged, shall be registered in such names and be in such authorized denominations as the Depositary shall designate and shall bear the applicable legends provided for herein. Any Global Security to be exchanged in whole shall be surrendered by the Depositary to the Trustee, as Registrar. With regard to any Global Security to be exchanged in part, either such Global Security shall be so surrendered for exchange or, if the Trustee is acting as custodian for the Depositary or its nominee with respect to such Global Security, the principal amount thereof shall be reduced, by an amount equal to the portion thereof to be so exchanged, by means of an appropriate adjustment made on the records of the Trustee. Upon any such surrender or adjustment, the Trustee shall authenticate and deliver the Security issuable on such exchange to or upon the order of the Depositary or an authorized representative thereof.

(3) Subject to the provisions of clause (5) below, the registered Holder may grant proxies and otherwise authorize any person, including Agent Members (as defined below) and persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Indenture or the Securities.

(4) In the event of the occurrence of any of the events specified in clause (1) above, the Company will promptly make available to the Trustee a reasonable supply of Certificated Securities in definitive, fully registered form, without interest coupons.

(5) Neither any members of, or participants in, the Depositary (collectively, the "AGENT MEMBERS") nor any other persons on whose behalf Agent Members may act shall have any rights under this Indenture with respect to any Global Security registered in the name of the Depositary or any nominee thereof, or under any such Global Security, and the Depositary or such nominee, as the case may be, may be treated by the Company, the

18

<PAGE>

Trustee and any agent of the Company or the Trustee as the absolute owner and holder of such Global Security for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee or any agent of the Company or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depositary or such nominee, as the case may be, or impair, as between the Depositary, its Agent Members and any other person on whose behalf an Agent Member may act, the operation of customary practices of such Persons governing the exercise of the rights of a holder of any Security.

Section 2.13. CUSIP Numbers. The Company may issue the Securities with one or more "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use CUSIP numbers in notices of redemption as a convenience to Holders; provided that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Securities or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Securities, and any such redemption shall not be affected by any defect in or omission of such numbers. The Company will promptly notify the Trustee of any change in the CUSIP numbers.

Section 2.14. Ranking. The indebtedness of the Company arising under or in connection with this Indenture and every outstanding Security issued under this Indenture from time to time constitutes and will constitute a senior unsecured general obligation of the Company, ranking equally with other existing and future senior unsecured Indebtedness of the Company and ranking senior in right of payment to any future Indebtedness of the Company that is expressly made subordinate to the Securities by the terms of such Indebtedness. For purposes of this Section 2.14 only, "Indebtedness" means, without duplication, the principal or face amount of (i) all obligations for borrowed money, (ii) all obligations evidenced by debentures, notes or other similar instruments, (iii) all obligations in respect of letters of credit or bankers acceptances or similar instruments (or reimbursement obligations with respect thereto), (iv)

all obligations to pay the deferred purchase price of property or services, except trade accounts payable arising in the ordinary course of business, (v) all obligations as lessee which are capitalized in accordance with generally accepted accounting principles, and (vi) all Indebtedness of others guaranteed by the Company or any of its Subsidiaries or for which the Company or any of its Subsidiaries is legally responsible or liable (whether by agreement to purchase indebtedness of, or to supply funds or to invest in, others).

ARTICLE III

REDEMPTION AND PURCHASES

Section 3.1. Company's Right to Redeem; Notices to Trustee. Prior to July 15, 2008, the Company, at its option, may redeem the Securities in accordance with the provisions of Section 5(a) and Section 7 of the Securities. If the Company elects to redeem Securities pursuant to Section 5(a) of the Securities, it shall notify the Trustee in writing of the Redemption Date, the Principal Amount at Maturity of Securities to be redeemed and the Redemption Price payable on the Redemption Date.

19

<PAGE>

On or after July 15, 2008, the Company, at its option, may redeem the Securities in accordance with the provisions of Section 5(b) and Section 7 of the Securities. If the Company elects to redeem Securities pursuant to Section 5(b) of the Securities, it shall notify the Trustee in writing of the Redemption Date, the Principal Amount at Maturity of Securities to be redeemed and the Redemption Price payable on the Redemption Date.

In the event that the Company elects to redeem the Securities on a date that is after any Interest Record Date but before the date of payment of such interest, the Company shall be required to pay any accrued and unpaid interest, including additional interest, if any, to the redeemed Holder only and not the Holder on any applicable Interest Record Date.

The Company shall give the notice to the Trustee provided for in this Section 3.1 by a Company Order, at least 40 days before the Redemption Date (unless a shorter notice shall be satisfactory to the Trustee) in accordance with Section 11.2 of this Indenture.

Section 3.2. Selection of Securities to Be Redeemed. If less than all the Securities are to be redeemed, unless the procedures of the Depositary provide otherwise, the Trustee shall select the Securities to be redeemed by lot or on a pro rata basis. The Trustee shall make the selection within five Business Days after it receives the notice provided for in Section 3.1 from outstanding Securities not previously called for redemption. The Trustee may select for redemption portions of the principal amount of Securities that have denominations larger than US$1,000.

Securities and portions of Securities that the Trustee selects shall be in principal amounts of US$1,000 or an integral multiple of US$1,000. Provisions of this Indenture that apply to Securities called for redemption also apply to portions of Securities called for redemption. The Trustee shall notify the Company promptly of the Securities or portions of the Securities to be redeemed.

Securities and portions of Securities that are to be redeemed are

convertible by the Holder until the close of business on the Business Day prior to the Redemption Date. If any Security selected for partial redemption is converted in part before termination of the conversion right with respect to the portion of the Security so selected, the converted portion of such Security shall be deemed (so far as may be) to be the portion selected for redemption. Securities which have been converted during a selection of Securities to be redeemed may be treated by the Trustee as outstanding for the purpose of such selection.

Section 3.3. Notice of Redemption. At least 30 days but not more than 60 days before a Redemption Date, the Company shall mail a Notice of Redemption by first-class mail, postage prepaid, to each Holder of Securities to be redeemed.

The notice shall identify the Securities to be redeemed and shall state:

(1)  the Redemption Date;

(2)  the Redemption Price;

(3)  the Conversion Rate;

20

<PAGE>

(4)  the name and address of the Paying Agent and Conversion Agent;

(5)  that Securities called for redemption may be converted at any time before the close of business on the second Business Day prior to the Redemption Date;

(6)  that Holders who want to convert their Securities must satisfy the requirements set forth in Section 8 of the Securities;

(7)  that Securities called for redemption must be surrendered to the Paying Agent to collect the Redemption Price;

(8)  if fewer than all of the outstanding Securities are to be redeemed, the certificate numbers, if any, and principal amounts of the particular Securities to be redeemed;

(9)  that, unless the Company defaults in making payment of such Redemption Price, interest, including additional interest, if any, on Securities called for redemption will cease to accrue interest on and after the Redemption Date;

(10) the CUSIP number(s) of the Securities;

(11) whether the Company will exercise its election to deliver Shares in lieu of some or all of the Redemption Price;

(12) the percentage of the Redemption Price to be paid in Shares and the method of calculating the Current Market Price of the Shares;

(13) the procedures that Holders must follow to withdraw any Redemption Notice with respect to the Securities; and

(14) any other information the Company wants to present.

At the Company's request, the Trustee shall give the Notice of Redemption in the Company's name and at the Company's expense, provided that the Company makes such request at least five Business Days (unless a shorter period shall be satisfactory to the Trustee) prior to the date by which such notice of redemption must be given to Holders in accordance with this Section 3.3.

Section 3.4. Effect of Notice of Redemption. Once notice of redemption is given, Securities called for redemption become due and payable on the Redemption Date and at the Redemption Price stated in the notice except for Securities which are converted in accordance with the terms of this Indenture. Upon surrender to the Paying Agent, such Securities shall be paid at the Redemption Price stated in the notice.

Section 3.5. Deposit of Redemption Price. Prior to 10:00 a.m. (New York City time), on the Redemption Date, the Company shall deposit with the Paying Agent (or if the Company or a Subsidiary or an Affiliate of either of them is the Paying Agent, shall segregate

21

<PAGE>

and hold in trust) an amount of cash (in immediately available funds if deposited on such Redemption Date) or shares of Applicable Stock, if permitted hereunder, sufficient as evidenced in writing by a certified public accountant to pay the Redemption Price of all Securities to be redeemed on that date other than Securities or portions of Securities called for redemption which on or prior thereto have been delivered by the Company to the Trustee for cancellation or have been converted. The Paying Agent shall as promptly as practicable return to the Company any money not required for that purpose because of conversion of Securities pursuant to Article 10. If such money is then held by the Company in trust and is not required for such purpose it shall be discharged from such trust.

Section 3.6. Securities Redeemed in Part. Upon surrender of a Security that is redeemed in part, the Company shall execute and the Trustee shall authenticate and deliver to the Holder a new Security in an authorized denomination equal in principal amount to the unredeemed portion of the Security surrendered.

Section 3.7. Purchase of Securities by the Company at Option of the Holder. (a) General. Securities shall be purchased by the Company pursuant to Section 6 of the Securities at the option of the Holder on July 15, 2008, July 15, 2013 and July 15, 2018 (each, a "PURCHASE DATE"), at a purchase price equal to the principal amount of those Securities plus accrued and unpaid interest, including additional interest, if any, on such Purchase Date (the "PURCHASE PRICE"), subject to the provisions of Section 3.9. Purchases of Securities hereunder shall be made, at the option of the Holder thereof, upon:

(1)    delivery to the Paying Agent by the Holder of a written notice of purchase (a "PURCHASE NOTICE") during the period beginning at any time from the opening of business on the date that is 20 Business Days prior to the relevant Purchase Date until the close of business on the third Business Day prior to such Purchase Date stating:

(A) the certificate number of the Security which the Holder will

deliver to be purchased or the appropriate Depositary procedures if Certificated Securities have not been issued,

(B) the portion of the principal amount of the Security which the Holder will deliver to be purchased, which portion must be in principal amounts of US$1,000 or an integral multiple of US$1,000,

(C) that such Security shall be purchased by the Company as of the Purchase Date pursuant to the terms and conditions specified in Section 6 of the Securities and in this Indenture, and

(D) in the event the Company elects, pursuant to Section 3.8(c), to pay the Purchase Price, in whole or in part, in Shares but such portion of the

22

<PAGE>

Purchase Price shall ultimately be paid to such Holder entirely in cash because any of the conditions to payment of the Purchase Price in Shares is not satisfied prior to the close of business on the relevant Purchase Date, as set forth in Section 3.8, whether such Holder elects (i) to withdraw such Purchase Notice as to some or all of the Securities to which such Purchase Notice relates (stating the principal amount and certificate numbers, if any, of the Securities as to which such withdrawal shall relate), or (ii) to receive cash in respect of the entire Purchase Price for all Securities (or portions thereof) to which such Purchase Notice relates; and

(2) delivery of such Security to the Paying Agent at any time after delivery of the Purchase Notice (together with all necessary endorsements) at the offices of the Paying Agent, such delivery being a condition to receipt by the Holder of the Purchase Price therefor; provided, however, that such Purchase Price shall be so paid pursuant to this Section 3.7 only if the Security so delivered to the Paying Agent shall conform in all respects to the description thereof in the related Purchase Notice.

If a Holder, in such Holder's Purchase Notice and in any written notice of withdrawal delivered by such Holder pursuant to the terms of Section 3.8, fails to indicate such Holder's choice with respect to the election set forth in clause (D) of Section 3.7(a)(1), such Holder shall be deemed to have elected to receive cash in respect of the entire Purchase Price for all Securities subject to such Purchase Notice in the circumstances set forth in such clause (D).

The Company shall purchase from the Holder thereof, pursuant to this Section 3.7, a portion of a Security, if the principal amount of such portion is US$1,000 or an integral multiple of US$1,000. Provisions of this Indenture that apply to the purchase of all of a Security also apply to the purchase of such portion of such Security.

Any purchase by the Company contemplated pursuant to the provisions of this Section 3.7 shall be consummated by the delivery of the consideration to be received by the Holder promptly following the later of the Purchase Date and the time of delivery of the Security.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Purchase Notice contemplated by this Section 3.7(a) shall have the right to withdraw such Purchase Notice at any time prior to the close of business on the Purchase Date by delivery of a written notice of withdrawal to the Paying Agent in accordance with Section 3.9.

The Paying Agent shall promptly notify the Company of the receipt by it of any Purchase Notice or written notice of withdrawal thereof.

<div align="center">23</div>

<PAGE>

Section 3.8. Offer to Purchase of Securities upon Change of Control. (a) (1) The Company shall be required to offer to purchase all of the Securities not previously purchased by the Company as of a date that is 30 days after notice of the occurrence of a Change of Control (subject to certain exceptions set forth below) pursuant to Section 3.8(b) at a purchase price equal to the principal amount of those Securities, plus accrued and unpaid interest and additional interest, if any, on those Securities (the "CHANGE OF CONTROL PURCHASE PRICE"), as of the date that is 30 days after the date of a notice of Change of Control delivered by the Company (the "CHANGE OF CONTROL PURCHASE DATE"), subject to satisfaction by or on behalf of the Holder of the requirements set forth in Section 3.8(c).

A "Change of Control" will be deemed to have occurred at such time after the Securities are originally issued when any of the following events shall occur:

(i) the acquisition by Mr. V. Prem Watsa (the "CONTROLLING SHAREHOLDER") of beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of purchase, merger or other acquisition transactions, of 70% or more of the aggregate of the Company's Multiple Voting Shares and Shares then outstanding, other than any acquisition by the Company, any of the Company's subsidiaries, or any of the Company's employee benefit plans (except that the Controlling Shareholder shall be deemed to have beneficial ownership of all securities he has the right to acquire, whether the right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition); or

(ii) the number of the Company's Series 1 Preferred Shares and the Company's Multiple Voting Shares collectively beneficially held, directly or indirectly, by the Controlling Shareholder (or any of his heirs, executors or administrators) falls below 1,197,480 shares; or

(iii) the acquisition by any person, including any syndicate or group deemed to be a "person" under Section 13(d) (3) of the Exchange Act of beneficial ownership, directly or indirectly through a purchase, merger or other acquisition transaction or series of purchase, merger or other acquisition transactions, of shares of the Capital Stock of the Company entitling that person to exercise 50% or more of the total voting power of all shares of the Capital Stock of the Company entitled to vote generally

in elections of directors, other than any acquisition by any of the
Company, any of its subsidiaries or any of the employee benefit plans of
the Company (except that any of those persons shall be deemed to have
beneficial ownership of all securities it has the right to acquire, whether
the right is currently exercisable or is exercisable only upon the
occurrence of a subsequent condition); or

    (iv) the Company consolidates or merges with or into any other
person, any merger of another person into the Company, or any conveyance,
transfer, sale, lease or other disposition, substantially as an entirety,
of all or substantially all of the Company's properties and assets to
another person, other than:

        (A) any transaction: (1) where the Company or one of its
        Affiliates is the surviving or continuing or resulting entity;
        (2)

                                  24

<PAGE>

        where more than 50% of the Board of Directors of the surviving
        or continuing or resulting entity were members of the Company's
        Board of Directors; (3) that does not result in any
        reclassification, conversion, exchange or cancellation of
        outstanding shares of the Company's Capital Stock; and (4)
        pursuant to which holders of the Company's Capital Stock
        immediately prior to the transaction have the entitlement to
        exercise, directly or indirectly, 50% or more of the total
        voting power of all shares of Capital Stock entitled to vote
        generally in elections of directors of the continuing or
        surviving Person immediately after giving effect to such
        issuance; and (B) any merger, share exchange, transfer of assets
        or similar transaction solely for the purpose of changing the
        Company's jurisdiction of incorporation and resulting in a
        reclassification, conversion or exchange of outstanding shares
        of Shares, if at all, solely into shares of Shares, ordinary
        shares or American Depositary Shares of the surviving Person or
        a direct or indirect parent of the surviving corporation.

(2) Notwithstanding the provisions of Section 3.8(a)(1), the Company shall not
be required to make an offer to purchase the Securities of the Holders upon a
Change of Control pursuant to this Section 3.8 if:

    (i)  the Sale Price per share of Shares for any five trading days within
        (1) the period of 10 consecutive trading days ending immediately
        after the later of the Change of Control or the public announcement
        of the Change of Control, in the case of a Change of Control under
        clause (i) or (ii) of Section 3.8(a)(1) above, or (2) the period of
        10 consecutive trading days ending immediately before the Change of
        Control, in the case of a Change of Control under clause (iii) of
        Section 3.8(a)(1) above, exceeds the Conversion Price of the
        Securities in effect on each of those five trading days; or

    (ii) 90% of the consideration in the transaction or transactions (other
        than cash payments for fractional shares and cash payments made in
        respect of dissenters' appraisal rights) constituting a Change of

Control consists of Shares, ordinary shares or American Depositary Shares traded or to be traded immediately following a Change of Control on a United States national securities exchange or the Nasdaq National Market, and, as a result of the transaction or transactions, the Securities become convertible into Shares, ordinary shares or American Depositary Shares (and any rights attached thereto).

For the purposes of this Section 3.8, (x) whether a person is a "beneficial owner" shall be determined in accordance with Rule 13d-3 under the Exchange Act and (y) the term "person" includes any syndicate or group that would be deemed to be a "person" under Section 13(d)(3) of the Exchange Act.

<div align="center">25</div>

<PAGE>

    (a) No later than 30 Business Days after the occurrence of a Change of Control, the Company shall mail a written notice of the Change of Control by first class mail to the Trustee and to each Holder (and to beneficial owners as required by applicable law). The notice shall include a form of Change of Control Purchase Notice to be completed by the Holder and shall briefly state, as applicable:

    (1)  the events causing a Change of Control and the date of such Change of Control;

    (2)  the date by which the Change of Control Purchase Notice pursuant to this Section 3.8 must be delivered to the Paying Agent in order for a Holder to exercise the repurchase rights;

    (3)  the Change of Control Purchase Date;

    (4)  the Change of Control Purchase Price;

    (5)  whether the Change of Control Purchase Price will be paid in cash or Applicable Stock, or a combination thereof;

    (6)  if the Company elects to pay Shares, the method of calculating the Market Price of the Shares;

    (7)  the name and address of the Paying Agent and the Conversion Agent;

    (8)  the Conversion Rate and any adjustments thereto;

    (9)  that the Securities as to which a Change of Control Purchase Notice has been given may be converted if they are otherwise convertible pursuant to Article X hereof only if the Change of Control Purchase Notice has been withdrawn in accordance with the terms of this Indenture;

    (10) that the Securities must be surrendered to the Paying Agent to collect payment;

    (11) that the Change of Control Purchase Price for any Security as to which a Change of Control Purchase Notice has been duly given and not withdrawn will be paid promptly following the later of the Change of Control Purchase Date and the time of surrender of such

Security as described in (8);

(12) the procedures the Holder must follow to exercise rights under this Section 3.8;

(13) the conversion rights, if any, of the Securities;

(14) the procedures for withdrawing a Change of Control Purchase Notice;

26

<PAGE>

(15) that, unless the Company defaults in making payment of such Change of Control Purchase Price, interest, if any, on Securities surrendered for purchase by the Company will cease to accrue on and after the Change of Control Purchase Date; and

(16) the CUSIP number(s) of the Securities.

(b) A Holder may accept the Change of Control purchase offer specified in Section 3.8(a) upon delivery of a written notice of purchase (a "CHANGE OF CONTROL PURCHASE NOTICE") to the Paying Agent at any time on or prior to the close of business on the Change of Control Purchase Date stating:

(1) the certificate number of the Security which the Holder will deliver to be purchased or the appropriate depositary procedures if Certificated Securities have not been issued;

(2) the portion of the principal amount of the Security which the Holder will deliver to be purchased, which portion must be US$1,000 or an integral multiple of US$1,000;

(3) that such Security shall be purchased pursuant to the terms and conditions specified in Section 6 of the Securities and in this Indenture; and

(4) in the event the Company elects, pursuant to Section 3.9, to pay the Change of Control Purchase Price, in whole or in part, in shares of Applicable Stock but such portion of the Change of Control Purchase Price shall ultimately be paid to such Holder entirely in cash because any of the conditions to payment of the Change of Control Purchase Price in shares of Applicable Stock is not satisfied prior to the close of business on the third Business Day prior to the relevant Change of Control Purchase Date, as set forth in Section 3.9, whether such Holder elects (i) to withdraw such Change of Control Purchase Notice as to some or all of the Securities to which such Change of Control Purchase Notice relates (stating the principal amount and certificate numbers, if any, of the Securities as to which such withdrawal shall relate), or (ii) to receive cash in respect of the entire Change of Control Purchase Price for all Securities (or portions thereof) to which such Change of Control Purchase Notice relates.

"APPLICABLE STOCK" means (i) the Shares and (ii) in the event of a merger, consolidation or other similar transaction involving the Company that is otherwise permitted hereunder in which the Company is not the surviving corporation, the common stock, ordinary shares or American Depositary Shares of

such surviving corporation or its direct or indirect parent corporation.

The delivery of such Security to the Paying Agent with the Change of Control Purchase Notice (together with all necessary endorsements) at the offices of the Paying Agent shall be a condition to the receipt by the Holder of the Change of Control Purchase Price

27

<PAGE>

therefor; provided, however, that such Change of Control Purchase Price shall be so paid pursuant to this Section 3.8 and Section 3.9 only if the Security so delivered to the Paying Agent shall conform in all respects to the description thereof set forth in the related Change of Control Purchase Notice.

If a Holder, in such Holder's Change of Control Purchase Notice and in any written notice of withdrawal delivered by such Holder pursuant to the terms of Section 3.10, fails to indicate such Holder's choice with respect to the election set forth in Section 3.8(c)(4), such Holder shall be deemed to have elected to receive cash in respect of the entire Change of Control Purchase Price for all Securities subject to such Change of Control Purchase Notice in the circumstances set forth in such Section 3.8(c)(4).

The Company shall purchase from the Holder thereof, pursuant to this Section 3.8 and Section 3.9, a portion of a Security if the principal amount of such portion is US$1,000 or an integral multiple of US$1,000. Provisions of this Indenture that apply to the purchase of all of a Security also apply to the purchase of such portion of such Security.

Any purchase by the Company contemplated pursuant to the provisions of this Section 3.8 and Section 3.9 shall be consummated by the delivery of the consideration to be received by the Holder on the Change of Control Purchase Date.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Change of Control Purchase Notice contemplated by this Section 3.8(c) shall have the right to withdraw such Change of Control Purchase Notice at any time prior to the close of business on the Change of Control Purchase Date by delivery of a written notice of withdrawal to the Paying Agent in accordance with Section 3.10.

The Paying Agent shall promptly notify the Company of the receipt by it of any Change of Control Purchase Notice or written withdrawal thereof.

Section 3.9. Company's Right to Elect Manner of Payment of Redemption Price, Purchase Price, Change of Control Purchase Price for Payment of Principal Amount at Stated Maturity. (a) The Securities to be purchased on any Redemption Date, Purchase Date or Change of Control Purchase Date or to be paid at Stated Maturity, as the case may be, pursuant to Section 3.1, 3.7(a), 3.8(a) and 4.1, respectively, may be paid for, in whole or in part, at the election of the Company, in U.S. legal tender ("CASH") or shares of Applicable Stock, or in any combination of cash and shares of Applicable Stock, subject to the conditions set forth in Sections 3.9(c) and (d). The Company shall designate, in the Company Notice delivered pursuant to Section 3.9(d), whether the Company will purchase the Securities for cash or shares of Applicable Stock, or, if a combination thereof, the percentages of the Redemption Price, Purchase Price, Change of Control Purchase Price or Payment of Principal Amount at Maturity, as

the case may be, of Securities in respect of which it will pay in cash or shares of Applicable Stock; provided that the Company will pay cash for fractional interests in shares of Applicable Stock. For purposes of determining the existence of potential fractional interests, all Securities subject to purchase by the Company held by a Holder shall be considered together (no matter how many separate certificates are to be presented). Each Holder whose Securities are purchased pursuant to Section 3.1, 3.7, or 3.8, or at Stated Maturity, as the case may be, shall receive the

<div align="center">28</div>

<PAGE>

same percentage of cash or shares of Applicable Stock in payment of the Redemption Price, Change of Control Purchase Price, Purchase Price or Principal Amount at Stated Maturity for such Securities, except (i) as provided in this Section 3.9(a) with regard to the payment of cash in lieu of fractional shares of Applicable Stock and (ii) in the event that the Company is unable to purchase the Securities of a Holder or Holders for shares of Applicable Stock because any necessary qualifications or registrations of the shares of Applicable Stock under applicable state securities laws cannot be obtained, the Company may purchase the Securities of such Holder or Holders for cash. The Company may not change its election with respect to the consideration (or components or percentages of components thereof) to be paid once the Company has given its Company Notice to Holders except pursuant to Section 3.9(b) or pursuant to Section 3.9(d) in the event of a failure to satisfy, prior to the close of business on the Business Day immediately preceding the Redemption Date, Purchase Date, Change of Control Purchase Date or Stated Maturity, as the case may be, any condition to the payment of the Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity, as the case may be, in whole or in part, in shares of Applicable Stock.

At least three Business Days before each Company Notice Date, the Company shall deliver an Officers' Certificate to the Trustee specifying:

(i)   the manner of payment selected by the Company,

(ii)  the information required by Section 3.9(d) in the Company Notice,

(iii) if the Company elects to pay the Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity, as the case may be, or a specified percentage thereof, in shares of Applicable Stock, that the conditions to such manner of payment set forth in Section 3.9(c) have been or will be complied with, and

(iv)  whether the Company desires the Trustee to give the Company Notice required by Section 3.9(d).

(b) Purchase with Cash. At the option of the Company, the Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity, as the case may be, of Securities in respect of which a Notice of Redemption pursuant to Section 3.3, Purchase Notice pursuant to Section 3.1, 3.7(a) or Change of Control Purchase Notice pursuant to Section 3.8(c), as the case may be, has been given, or a specified percentage thereof, may be paid by

the Company with cash equal to the aggregate Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity, as the case may be, of such Securities. The Redemption Price, Purchase Price or Change of Control Purchase Price, as the case may be, of Securities in respect of which a Purchase Notice pursuant to Section 3.7(a) or Change of Control Purchase Notice pursuant to Section 3.8(c), as the case may be, has been given shall, for all other Purchase Dates or Change of Control Purchase Dates, as the case may be, be paid in cash. The Company Notice, as provided in Section 3.9(d), shall be sent to Holders (and to beneficial owners as required by applicable law) not less than 20 Business Days prior to

29

<PAGE>

such Purchase Date or Change of Control Purchase Date, as the case may be (the "COMPANY NOTICE DATE").

        (c) Payment by Issuance of Shares of Applicable Stock. On each Redemption Date, Purchase Date, Change of Control Purchase Date and at Stated Maturity, as applicable, at the option of the Company, the Redemption Price, Purchase Price, Change of Control Purchase Price or Notice of Redemption pursuant to Section 3.3, as the case may be, of Securities in respect of which a Notice of Redemption pursuant to Section 3.3, Purchase Notice pursuant to Section 3.7(a), Change of Control Purchase Notice pursuant to Section 3.9(c) or, if the Company shall pay all or a portion of the Principal Amount at Stated Maturity in shares of Applicable Stock, the Company shall deliver a notice of payment in shares of Applicable Stock at least 30 days prior to Stated Maturity ("Payment Notice at Stated Maturity"), as the case may be, has been given, or a specified percentage thereof, may be paid by the Company by the issuance of a number of shares of Applicable Stock equal to the quotient obtained by dividing (i) the portion of the Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity, as the case may be, to be paid in shares of Applicable Stock by (ii) 98.25% of the Market Price determined by the Company in the Company Notice, subject to the next succeeding paragraph.

        The Company will not issue fractional shares of Applicable Stock in payment of the Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity, as the case may be. Instead, the Company will pay cash based on the current market price for all fractional shares. It is understood that if a Holder elects to have more than one Security purchased, the number of shares of Applicable Stock shall be based on the aggregate amount of Securities to be purchased.

        If the Company elects to purchase the Securities by the issuance of shares of Applicable Stock or in any combination of cash and Applicable Stock, the Company Notice, as provided in Section 3.9(d), shall be sent to the Holders (and to beneficial owners as required by applicable law) not later than the Company Notice Date.

        The Company's right to exercise its election to redeem, purchase or pay for Securities through the issuance of shares of Applicable Stock shall be conditioned upon:

            (i) the Company's not having given its Company Notice of an election to pay entirely in cash and its giving of timely Company Notice of an

election to purchase all or a specified percentage of the Securities with shares of Applicable Stock as provided herein;

(ii) the registration of such shares of Applicable Stock under the Securities Act and the Exchange Act, in each case, if required;

(iii) the listing of such shares of Applicable Stock on a United States national securities exchange or the quotation of such shares of Applicable Stock in an inter-dealer quotation system of any registered United States national securities association;

<div align="center">30</div>

<PAGE>

(iv) any necessary qualification or registration under applicable state securities laws or the availability of an exemption from such qualification and registration; and

(v) the receipt by the Trustee of an Officers' Certificate and an Opinion of Counsel each stating that (A) the terms of the issuance of the shares of Applicable Stock are in conformity with this Indenture and (B) the shares of Applicable Stock to be issued by the Company in payment of the Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity, as the case may be, in respect of Securities have been duly authorized and, when issued and delivered pursuant to the terms of this Indenture in payment of the Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity, as the case may be, in respect of the Securities, will be validly issued, fully paid and non-assessable and, to the best of such counsel's knowledge, free from preemptive rights, and, in the case of such Officers' Certificate, stating that the conditions above and the condition set forth in the second succeeding sentence have been satisfied and, in the case of such Opinion of Counsel, stating that the conditions in clauses (i) through (iv) above have been satisfied.

Such Officers' Certificate shall also set forth the number of shares of Applicable Stock to be issued for each US$1,000 principal amount of Securities and the Sale Price of a share of Applicable Stock on each trading day during the period commencing on the first trading day of the period during which the Market Price is calculated and ending on the third day prior to the applicable Purchase Date or Change of Control Purchase Date, as the case may be. If the foregoing conditions are not satisfied with respect to a Holder or Holders prior to the close of business on the last day prior to the Purchase Date or Change of Control Purchase Date, as the case may be, and the Company has elected to purchase the Securities pursuant to this Section 3.9 through the issuance of shares of Applicable Stock, the Company shall pay the entire Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity, as the case may be, of the Securities of such Holder or Holders in cash.

The "MARKET PRICE" means the average of the Sale Prices of the shares of Applicable Stock for the 20-trading day period immediately preceding and including the third day prior to the applicable Redemption Date, Purchase Date, Change of Control Purchase Date or at Stated Maturity, as the case may be, (if the third Business Day prior to the applicable Purchase Date is a trading day, or if not, then on the last trading day prior to the third Business Day), appropriately adjusted to take into account the occurrence, during the period

commencing on the first of the trading days during the 20-trading day period and ending on the Redemption Date, Purchase Date, Change of Control Purchase Date or at Stated Maturity, as the case may be, of any event described in Sections 10.3 or 10.4.

Upon determination of the actual number of shares of Applicable Stock to be issued upon redemption or repurchase of Securities, the Company shall be required to disseminate a press release containing this information or publish the information on the Company's Web site or through such other public medium as the Company may use at that time.

31

<PAGE>

(d) Notice of Election. In connection with any purchase of Securities pursuant to Section 5, 6 or 7 of the Securities, the Company shall give notice to Holders setting forth information specified in this Section 3.9(d) (the "COMPANY NOTICE").

In the event the Company has elected to pay the Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity, as the case may be (or a specified percentage thereof), with shares of Applicable Stock, the Company Notice shall:

(1)    state that each Holder will receive a number of shares of Applicable Stock with a value equal to 98.25% of the Market Price determined as of a specified date prior to the Redemption Date, Purchase Date, Change of Control Purchase Date or Stated Maturity, as the case may be, equal to such specified percentage of the Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity, as the case may be, of the Securities held by such Holder (except any cash amount to be paid in lieu of fractional shares);

(2)    set forth the method of calculating the Market Price of the shares of Applicable Stock; and

(3)    state that because the Market Price of shares of Applicable Stock will be determined prior to the Redemption Date, Purchase Date, Change of Control Purchase Date or Stated Maturity, as the case may be, Holders of the Securities will bear the market risk with respect to the value of the shares of Applicable Stock to be received from the date such Market Price is determined to the Redemption Date, Purchase Date, Change of Control Purchase Date or Stated Maturity, as the case may be.

In any case, each Company Notice shall include a form of Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Payment Notice at Stated Maturity, as the case may be, to be completed by a Holder and shall briefly state, as applicable:

(i)    the Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity, as the case may be, and the Conversion Rate;

(ii)   the name and address of the Paying Agent and the Conversion Agent;

(iii)  that Securities as to which a Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Payment Notice at Stated Maturity, as the case may be, has been given may be converted if they are otherwise convertible only in accordance with Article X hereof and Section 8 of the Securities if the applicable Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Payment Notice at Stated Maturity, as the case

<div align="center">32</div>

&lt;PAGE&gt;

may be, has been withdrawn in accordance with the terms of this Indenture;

(iv)   that Securities must be surrendered to the Paying Agent to collect payment;

(v)    that the Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity, as the case may be, for any security as to which a Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Payment Notice at Stated Maturity, as the case may be, has been given and not withdrawn will be paid promptly following the later of the Redemption Date, Purchase Date, Change of Control Purchase Date or Stated Maturity, as the case may be, and the time of surrender of such Security as described in (iv);

(vi)   the procedures the Holder must follow to exercise its put rights under Section 3.7 or 3.9, as the case may be, and a brief description of those rights;

(vii)  the conversion rights of the Securities;

(viii) the procedures for withdrawing a Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Payment Notice at Stated Maturity, as the case may be (including, without limitation, for a conditional withdrawal pursuant to the terms of Section 3.7(a)(1)(D), Section 3.9(c)(4)or Section 3.11);

(ix)   that, unless the Company defaults in making payment on Securities for which a Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Payment Notice at Stated Maturity, as the case may be, has been submitted, interest, if any, on such Securities will cease to accrue on the Redemption Date, Purchase Date, Change of Control Purchase Date or at Stated Maturity, as the case may be; and

(x)    the CUSIP number of the Securities.

At the Company's request, the Trustee shall give such Company Notice in the Company's name and at the Company's expense; provided, however, that, in all

cases, the text of such Company Notice shall be prepared by the Company.

(e) Covenants of the Company. All shares of the Shares delivered upon purchase of the Securities shall be newly issued shares or treasury shares, shall be duly authorized, validly issued, fully paid and nonassessable, and shall be free from preemptive rights and free of any lien or adverse claim.

33

<PAGE>

(f) Taxes. If a Holder of a purchased Security is paid in shares of Applicable Stock, the Company shall pay any documentary, stamp or similar issue or transfer tax due on such issue of Applicable Stock. However, the Holder shall pay any such tax which is due because the Holder requests the Applicable Stock to be issued in a name other than the Holder's name. The Paying Agent may refuse to deliver the certificates representing the shares of Applicable Stock being issued in a name other than the Holder's name until the Paying Agent receives a sum sufficient to pay any tax which will be due because the shares of Applicable Stock are to be issued in a name other than the Holder's name. Nothing herein shall preclude any income tax withholding required by law or regulations.

Section 3.10. Effect of Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Payment Notice at Stated Maturity. Upon receipt by the Paying Agent of the Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Payment Notice at Stated Maturity specified in Section 3.3, 3.7(a), Section 3.8(c) or 3.9, as applicable, the Holder of the Security in respect of which such Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Payment Notice at Stated Maturity, as the case may be, was given shall (unless such Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Payment Notice at Stated Maturity, as the case may be, is withdrawn as specified in the following two paragraphs) thereafter be entitled to receive solely the Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity, as the case may be, with respect to such Security. Such Redemption Price, Purchase Price, Change of Control Purchase Price or Principal Amount at Stated Maturity shall be paid to such Holder, subject to receipts of funds and/or securities by the Paying Agent, promptly following the later of (x) the Redemption Date, Purchase Date, the Change of Control Purchase Date or Stated Maturity, as the case may be, with respect to such Security (provided the conditions in Section 3.3, 3.7(a) or Section 3.8(c) or 3.9, as applicable, have been satisfied) and (y) the time of delivery of such Security to the Paying Agent by the Holder thereof in the manner required by Section 3.7(a) or Section 3.9(c), as applicable. Securities in respect of which a Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Payment Notice at Stated Maturity has been given by the Holder thereof may not be converted pursuant to Article X hereof on or after the date of the delivery of such Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Payment Notice at Stated Maturity unless such Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Payment Notice at Stated Maturity has first been validly withdrawn as specified in the following two paragraphs.

A Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Notice of Payment at Stated Maturity may be withdrawn by means of a written notice of withdrawal delivered to the office of the Paying Agent in accordance with the Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Notice of Payment at Stated Maturity, as the case may be, at any time prior to the close of business on the third Business Day prior to the

Redemption Date, Purchase Date, the close of business on the Business Day immediately preceding the Change of Control Purchase Date or Stated Maturity, as the case may be, specifying:

    (1)    the certificate number, if any, of the Security in respect of which such notice of withdrawal is being submitted,

<div align="center">34</div>

&lt;PAGE&gt;

    (2)    the principal amount of the Security with respect to which such notice of withdrawal is being submitted, and

    (3)    the principal amount, if any, of such Security which remains subject to the original Notice of Redemption, Purchase Notice, Change of Control Purchase Notice or Notice of Payment at Stated Maturity, as the case may be, and which has been or will be delivered for purchase by the Company.

A written notice of withdrawal of a Notice of Redemption, Purchase Notice or Notice of Payment at Stated Maturity may be in the form set forth in the preceding Section or may be in the form of (i) a conditional withdrawal contained in a Purchase Notice pursuant to the terms of Section 3.7(a)(1)(D) or (ii) a conditional withdrawal containing the information set forth in Section 3.7(a)(1)(D) and the preceding Section and contained in a written notice of withdrawal delivered to the Paying Agent as set forth in the preceding paragraph.

A written notice of withdrawal of a Change of Control Purchase Notice may be in the form set forth in the preceding Section or may be in the form of (i) a conditional withdrawal contained in a Purchase Notice pursuant to the terms of Section 3.9(c)(4) or (ii) a conditional withdrawal containing the information set forth in Section 3.9(c)(4) and the preceding Section and contained in a written notice of withdrawal delivered to the Paying Agent as set forth in the preceding paragraph.

There shall be no redemption purchase or payment of any Securities pursuant to Section 3.1, 3.7 or 3.9 if there has occurred (prior to, on or after, as the case may be, the giving, by the Holders of such Securities, of the required Notice of Redemption, Purchase Notice or Change of Control Purchase Notice, as the case may be) and is continuing an Event of Default (other than a default in the payment of the Redemption Price, Purchase Price or Change of Control Purchase Price, as the case may be, with respect to such Securities). The Paying Agent will promptly return to the respective Holders thereof any Securities (x) with respect to which a Notice of Redemption, Purchase Notice or Change of Control Purchase Notice, as the case may be, has been withdrawn in compliance with this Indenture, or (y) held by it during the continuance of an Event of Default (other than a default in the payment of the Redemption Price, Purchase Price or Change of Control Purchase Price, as the case may be, with respect to such Securities) in which case, upon such return, the Notice of Redemption, Purchase Notice or Change of Control Purchase Notice with respect thereto shall be deemed to have been withdrawn.

Section 3.11. Deposit of Purchase Price or Change of Control Purchase Price. Prior to 10:00 a.m. (New York City time) on the Business Day following the Purchase Date or the Change of Control Purchase Date, as the case may be, the Company shall deposit with the Trustee or with the Paying Agent (or, if the

Company or a Subsidiary or an Affiliate of either of them is acting as the
Paying Agent, shall segregate and hold in trust as provided in Section 2.4) an
amount of cash (in immediately available funds if deposited on such Business
Day) or shares of Applicable Stock, if permitted hereunder, sufficient as
evidenced in writing by a certified public accountant to pay the aggregate
Purchase Price or Change of Control Purchase Price, as the case may be, of all
the Securities or portions thereof which are to be purchased as of the Purchase
Date or Change of Control Purchase Date, as the case may be.

35

<PAGE>

        As soon as practicable after the Purchase Date or Change of Control
Purchase Date, as the case may be, the Company shall deliver to each Holder
entitled to receive shares of Applicable Stock through the Paying Agent, a
certificate for the number of full shares of Applicable Stock issuable in
payment of the Purchase Price or Change of Control Purchase Price, as the case
may be, and cash in lieu of any fractional interests. The person in whose name
the certificate for the shares of Applicable Stock is registered shall be
treated as a holder of record of Applicable Stock on the Business Day following
the Purchase Date or Change of Control Purchase Date, as the case may be.
Subject to Section 3.9(c), no payment or adjustment will be made for dividends
on the shares of Applicable Stock the record date for which occurred on or prior
to the Purchase Date or Change of Control Purchase Date, as the case may be.

        Section 3.12. Securities Purchased in Part. Any Certificated Security
which is to be purchased only in part shall be surrendered at the office of the
Paying Agent (with, if the Company or the Trustee so requires, due endorsement
by, or a written instrument of transfer in form satisfactory to the Company and
the Trustee duly executed by, the Holder thereof or such Holder's attorney duly
authorized in writing) and the Company shall execute and the Trustee shall
authenticate and deliver to the Holder of such Security, without service charge,
a new Security or Securities, of any authorized denomination as requested by
such Holder in aggregate principal amount equal to, and in exchange for, the
portion of the principal amount of the Security so surrendered which is not
purchased.

        Section 3.13. Covenant to Comply With Securities Laws Upon Purchase of
Securities. When complying with the provisions of Section 3.7 or 3.9 hereof
(provided that such offer or purchase constitutes an "issuer tender offer" for
purposes of Rule 13e-4 (which term, as used herein, includes any successor
provision thereto) under the Exchange Act at the time of such offer or
purchase), and subject to any exemptions available under applicable law, the
Company shall (i) comply with Rule 13e- 4 and Rule 14e-1 (or any successor
provision) under the Exchange Act, (ii) file the related Schedule TO (or any
U.S. successor schedule, form or report) under the Exchange Act, and (iii)
otherwise comply with all Federal, state and Canadian securities laws so as to
permit the rights and obligations under Sections 3.7 and 3.8 to be exercised in
the time and in the manner specified in Sections 3.7 and 3.8.

        Section 3.14. Repayment to the Company. The Trustee and the Paying Agent
shall return to the Company any cash or Shares that remain unclaimed as provided
in Section 12 of the Securities, together with interest or dividends, if any,
thereon (subject to the provisions of Section 7.1(f)), held by them for the
payment of the Purchase Price or Change of Control Purchase Price, as the case
may be; provided, however, that to the extent that the aggregate amount of cash
or Shares deposited by the Company pursuant to Section 3.11 exceeds the

aggregate Purchase Price or Change of Control Purchase Price, as the case may be, of the Securities or portions thereof which the Company is obligated to purchase as of the Purchase Date or Change of Control Purchase Date, as the case may be, then, unless otherwise agreed in writing with the Company, promptly after the Business Day following the Purchase Date or Change of Control Purchase Date, as the case may be, the Trustee shall return any such excess to the Company together with interest or dividends, if any, thereon (subject to the provisions of Section 7.1(f)).

36

<PAGE>

ARTICLE IV

COVENANTS

Section 4.1. Payment of Securities. The Company shall promptly make all payments in respect of the Securities on the dates and in the manner provided in the Securities or pursuant to this Indenture. Any amounts of cash or shares of Applicable Stock to be given to the Trustee or Paying Agent, shall be deposited with the Trustee or Paying Agent by 10:00 a.m., New York City time, by the Company. Principal amount plus accrued interest, if any, including additional interest, if any, Redemption Price, Purchase Price, Change of Control Purchase Price and cash interest, if any, shall be considered paid on the applicable date due if on such date (or, in the case of a Purchase Price or Change of Control Purchase Price, on the Business Day following the applicable Purchase Date or Change of Control Purchase Date, as the case may be) the Trustee or the Paying Agent holds, in accordance with this Indenture, cash or securities, if permitted hereunder, sufficient to pay all such amounts then due.

Section 4.2. SEC and Other Reports. The Company shall ensure delivery to the Trustee within 30 days after it files or furnishes such annual and quarterly reports with the SEC, and other reports (or copies of such portions of any of the foregoing as the SEC may by rules and regulations prescribe) which the Company is required to file or furnish with the SEC pursuant to Section 13 or 15(d) of the Exchange Act in accordance with TIA Section 314(a). In the event the Company is at any time no longer subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, it shall continue to provide the Trustee with reports containing substantially the same information as would have been required to be filed with the SEC pursuant to the Canada-U.S. Multijurisdictional Disclosure System on Form 40-F and Form 6-K had the Company continued to have been subject to such reporting requirements. In such event, such reports shall be provided within 15 days after the times the Company would have been required to provide reports had it continued to have been subject to such reporting requirements. The Company also shall comply with the other provisions of TIA Section 314(a). Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely conclusively on Officers' Certificates).

Section 4.3. Compliance Certificate. The Company shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company (beginning with the fiscal year ending on December 31, 2003) an Officers' Certificate, stating whether or not to the knowledge of the signers thereof, the Company is in default in the performance and observance of any of the terms,

provisions and conditions of this Indenture (without regard to any period of grace or requirement of notice provided hereunder) and if the Company shall be in Default, specifying all such Defaults and the nature and status thereof of which they may have knowledge.

Section 4.4. Further Instruments and Acts. Upon request of the Trustee, or as otherwise necessary, the Company will execute and deliver such further instruments and do such

37

<PAGE>

further acts as may be reasonably necessary or proper to carry out more effectively the purposes of this Indenture.

Section 4.5. Maintenance of Office or Agency. The Company will maintain in the Borough of Manhattan, The City of New York, an office or agency of the Trustee, Registrar, Paying Agent and Conversion Agent where Securities may be presented or surrendered for payment, where Securities may be surrendered for registration of transfer, exchange, purchase, redemption or conversion and where notices and demands to or upon the Company in respect of the Securities and this Indenture may be served. The office of The Bank of New York, 101 Barclay Street, Floor 21W, New York, New York 10286 (Attention: Corporate Trust Trustee Administration), shall initially be such office or agency for all of the aforesaid purposes. The Company shall give prompt written notice to the Trustee of the location, and of any change in the location, of any such office or agency (other than a change in the location of the office of the Trustee). If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the address of the Trustee set forth in Section 11.2.

The Company may also from time to time designate one or more other offices or agencies where the Securities may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; provided, however, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the Borough of Manhattan, The City of New York, for such purposes.

Section 4.6. Delivery of Certain Information. At any time when the Company is not subject to Section 13 or 15(d) of the Exchange Act, upon the request of a Holder or any beneficial owner of Securities or holder or beneficial owner of Shares issued upon conversion thereof, or in accordance with Section 3.8(c), the Company will promptly furnish or cause to be furnished Rule 144A Information (as defined below) to such Holder or any beneficial owner of Securities or holder or beneficial owner of Shares, or to a prospective purchaser of any such security designated by any such holder, as the case may be, to the extent required to permit compliance by such Holder or holder with Rule 144A under the Securities Act in connection with the resale of any such security. "Rule 144A Information" shall be such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act. Whether a person is a beneficial owner shall be determined by the Company to the Company's reasonable satisfaction.

Section 4.7. Payment of Additional Amounts. (a) All payments made by the

Company under or with respect to the Securities shall be made free and clear of and without withholding or deduction for or on account of any present or future tax, duty, levy, impost, assessment or other governmental charge (including penalties, interest and other liabilities related thereto) imposed or levied by or on behalf of (1) the Government of Canada or of any province or territory thereof or by any authority or agency therein or thereof having power to tax, (2) any jurisdiction from or through which payment on the Securities is made, or any political subdivision or governmental authority thereof or therein having the power to tax, or (3) any other jurisdiction in which the payor is organized or otherwise considered to be resident for tax purposes, or any political subdivision or governmental authority thereof or therein having the power to tax (hereinafter, the "TAXES"), unless the Company is required to withhold or deduct Taxes by law or by the interpretation or administration thereof. If the Company is required to

38

<PAGE>

withhold or deduct any amount for or on account of Taxes from any payment made under or with respect to the Securities, the Company shall pay (together with such payments) such additional amounts (the "ADDITIONAL AMOUNTS") as may be necessary so that the net amount received by each Securityholder (including Additional Amounts) after such withholding or deduction (including such deduction or withholding from Additional Amounts) shall not be less than the amount such Holder would have received if such Taxes had not been withheld or deducted; provided, however, that no Additional Amounts will be payable with respect to a payment made to a Holder (an "EXCLUDED HOLDER") (i) with which the Company does not deal at arm's-length (within the meaning of the Canadian Tax Act) at the time of making such payment, or (ii) which is subject to such Taxes by reason of its being connected with Canada or any province or territory thereof otherwise than solely by reason of the Holder's activity in connection with purchasing the Securities, by the mere holding of Securities or by reason of the receipt of payments thereunder. The Company will also (a) make such withholding or deduction and (b) remit the full amount deducted or withheld to the relevant authority in accordance with applicable law.

(b) The Company will furnish the Securityholders, within 30 days after the date the payment of any Taxes is due pursuant to applicable law, certified copies of tax receipts evidencing such payment by the Company or will, upon written request of each Holder (other than an Excluded Holder), reimburse each such Holder for the amount of (x) any Taxes so levied or imposed and paid by such Holder as a result of payments made under or with respect to the Securities, and (y) any Taxes so levied or imposed with respect to any reimbursement under the foregoing clause (x) or this clause (y) but excluding any such Taxes on such Holder's net income so that the net amount received by such Holder (net of payments made under or with respect to the Securities) after such reimbursement will not be less than the net amount the Holder would have received if Taxes on such reimbursement had not been imposed.

(c) At least 30 days prior to each date on which any payment under or with respect to the Securities is due and payable, if the Company will be obligated to pay Additional Amounts with respect to such payment, the Company will deliver to the Trustee an Officer's Certificate stating the fact that such Additional Amounts will be payable and the amounts so payable and will set forth such other information necessary to enable the Trustee to pay such Additional

Amounts to Holders on the payment date. Whenever in this Indenture there is mentioned, in any context, the payment of principal, premium, if any, Redemption Price, change of control offer, Purchase Price, interest or any other amount payable under or with respect to any Security, such mention shall be deemed to include mention of the payment of Additional Amounts to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof.

Section 4.8. Statement by Officers as to Default. The Company shall deliver to the Trustee, as soon as practicable and in any event within five Business Days after the Company becomes aware of the occurrence of any Event of Default or an event which, with notice or the lapse of time or both, would constitute an Event of Default, an Officers' Certificate setting forth the details of such Event of Default or default and the action which the Company proposes to take with respect thereto.

<center>39</center>

<PAGE>

<center>ARTICLE V</center>

<center>SUCCESSOR CORPORATION</center>

Section 5.1. When Company May Merge or Transfer Assets. The Company shall not consolidate with or merge with or into any other Person or convey, transfer, sell, lease or otherwise dispose of its properties and assets substantially as an entirety to any person, unless:

(a) either (1) the Company shall be the continuing corporation or (2) the Person (if other than the Company) formed by such consolidation or into which the Company is merged or the Person which acquires by conveyance, transfer or lease the properties and assets of the Company substantially as an entirety (i) shall be a corporation organized and validly existing under the laws of (A) the United States or any State thereof or the District of Columbia or (B) Canada or any province or territory thereof and (ii) shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, all of the obligations of the Company under the Securities and this Indenture;

(b) immediately after giving effect to such transaction, no Default shall have occurred and be continuing; and

(c) the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such (A) consolidation, merger, conveyance, transfer or lease and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture, comply with this Article 5 and that all conditions precedent herein provided for relating to such transaction have been satisfied and (B) in the case of a merger or consolidation in which the Company is not the continuing corporation and in which the successor to the Company is an entity organized under the laws of Canada or any province or territory thereof, that such merger will not result in any material adverse tax consequences to any Holders of the Securities.

For purposes of the foregoing, the transfer (by lease, assignment, sale or otherwise) of the properties and assets of one or more Subsidiaries (other than to the Company or another Subsidiary), which, if such assets were owned by

the Company, would constitute all or substantially all of the properties and assets of the Company, shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

The successor Person formed by such consolidation or into which the Company is merged or the successor Person to which such conveyance, transfer or lease is made shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture with the same effect as if such successor had been named as the Company herein; and thereafter, except in the case of a lease and obligations the Company may have under a supplemental indenture, the Company shall be discharged from all obligations and covenants under this Indenture and the Securities. Subject to Section 9.6, the Company, the Trustee and the successor Person shall enter into a supplemental indenture to evidence the succession and substitution of such successor Person and such discharge and release of the Company.

40

<PAGE>

## ARTICLE VI

## DEFAULTS AND REMEDIES

Section 6.1. Events of Default. So long as any Securities are outstanding, each of the following shall be an "Event of Default":

(1) the Company fails to convert any portion of the principal amount of any Security following the exercise by the Holder of the right to convert such Security into Shares pursuant to and in accordance with Article X hereof, subject to the Company's right to pay cash in lieu of Shares;

(2) the Company defaults in its obligation to repurchase any Security, or any portion thereof, upon the exercise by the Holder of such Holder's right to require the Company to purchase such Securities pursuant to and in accordance with Section 3.7 hereof or the Company defaults in its obligation to offer to purchase all Securities upon a Change of Control pursuant to and in accordance with Section 3.9 hereof;

(3) the Company defaults in its obligation to redeem any Security, or any portion thereof, called for redemption by the Company pursuant to and in accordance with Section 3.1 hereof;

(4) the Company defaults in the payment of the principal amount on any Security when the same becomes due and payable at its Stated Maturity or when otherwise due and payable;

(5) the Company defaults in the payment of any accrued and unpaid interest, including additional interest, if any, in each case when due and payable, and continuance of such default for a period of 30 days;

(6) the Company fails to comply with any of its agreements or covenants in the Securities or this Indenture (other than those referred to in clause (1) through (5) above) and such failure continues for 60 days after receipt by the Company of a Notice of Default;

(7) a failure to pay when due at Stated Maturity or a default, event of default or other similar condition or event (however described) that results

in the acceleration of maturity of any indebtedness for borrowed money of the Company or any Designated Subsidiary in an aggregate amount of US$25,000,000 or more, unless the acceleration is rescinded, stayed or annulled within 30 days after written notice of default is given to the Company by the Trustee or Holders of not less than 25% in aggregate principal amount of the Securities then outstanding;

(8) the Company or any Designated Subsidiary, or any group of two or more Subsidiaries that, taken as a whole, would constitute a Designated Subsidiary, pursuant to or under or within the meaning of any Bankruptcy Law:

<div align="center">41</div>

<PAGE>

    (A)  commences a voluntary case or proceeding;

    (B)  consents to the entry of any order for relief against it in an involuntary case or proceeding or the commencement of any case against it;

    (C)  consents to the appointment of a Custodian of it or for any substantial part of its property;

    (D)  makes a general assignment for the benefit of its creditors;

    (E)  files a petition in bankruptcy or answer or consent seeking reorganization or relief; or

    (F)  consents to the filing of such petition or the appointment of or taking possession by a Custodian;

(9) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

    (A)  is for relief against the Company or any Designated Subsidiary, or any group of two or more Subsidiaries that, taken as whole, would constitute a Designated Subsidiary, in an involuntary case or proceeding, or adjudicates the Company or any Designated Subsidiary, or any group of two or more Subsidiaries that, taken as whole, would constitute a Designated Subsidiary, insolvent or bankrupt;

    (B)  appoints a Custodian of the Company or any Designated Subsidiary, or any group of two or more Subsidiaries that, taken as whole, would constitute a Designated Subsidiary, or for any substantial part of its property; or

    (C)  orders the winding up or liquidation of the Company or any Designated Subsidiary, or any group of two or more Subsidiaries that, taken as whole, would constitute a Designated Subsidiary,

and the order of decree remains unstayed and in effect for 60 days; or

"Bankruptcy Law" means Title 11, United States Code, or any similar

Federal or State law for the relief of debtors.

"Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

(10) the commencement by the Company or any of its Subsidiaries that is a Designated Subsidiary or any group of two or more Subsidiaries that, taken as a whole,

42

<PAGE>

would constitute a Designated Subsidiary, of a voluntary case or proceeding under any applicable bankruptcy, insolvency, reorganization or other similar law or of any other case or proceeding to be adjudicated a bankrupt or insolvent, or the consent by the Company or any of its Subsidiaries that is a Designated Subsidiary or any group of two or more Subsidiaries that, taken as a whole, would constitute a Designated Subsidiary, to the entry of a decree or order for relief in respect of the Company or any of its Subsidiaries that is a Designated Subsidiary or any group of two or more Subsidiaries that, taken as a whole, would constitute a Designated Subsidiary, in an involuntary case or proceeding under any applicable bankruptcy, insolvency, reorganization or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against the Company, or the filing by the Company or any of its Subsidiaries that is a Designated Subsidiary or any group of two or more Subsidiaries that, taken as a whole, would constitute a Designated Subsidiary, of a petition or answer or consent seeking reorganization or relief under any applicable law, or the consent by the Company to the filing of such petition or to the appointment of or the taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Company or of any substantial part of its property, or the making by the Company or any of its Subsidiaries that is a Designated Subsidiary or any group of two or more Subsidiaries that, taken as a whole, would constitute a Designated Subsidiary, of an assignment for the benefit of creditors, or the admission by the Company or any of its Subsidiaries that is a Designated Subsidiary or any group of two or more Subsidiaries that, taken as a whole, would constitute a Designated Subsidiary, in writing of its inability to pay its debts generally as they become due, or the taking of corporate action by the Company or any of its Subsidiaries that is a Designated Subsidiary or any group of two or more Subsidiaries that, taken as a whole, would constitute a Designated Subsidiary, expressly in furtherance of any such action.

"DESIGNATED SUBSIDIARY" shall mean (i) each of Odyssey Re Holdings Corp., Crum & Forster Holdings Corp. and Northbridge Financial Corporation, in each case so long as it is a subsidiary (as defined in Rule 405 under the Securities Act) of the Company; and (ii) any future, direct or indirect, subsidiary of the Company whose assets constitute 25% or more of the total assets of the Company on a consolidated basis.

A Default under clause (6) above is not an Event of Default until the Trustee notifies the Company, or the Holders of at least 25% in aggregate principal amount of the Securities at the time outstanding notify the Company

and the Trustee, of the Default and the Company does not cure such Default (and such Default is not waived) within the time specified in clause (6) above after actual receipt of such notice. Any such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default."

The Trustee shall, within 90 days of the occurrence of a Default, give to the Holders of the Securities notice of all uncured Defaults known to it and written notice of any event which with the giving of notice or the lapse of time, or both, would become an Event of Default, its status and what action the Company is taking or proposes to take with respect thereto; provided, however, the Trustee shall be protected in withholding such notice if it, in good faith, determines that the withholding of such notice is in the best interest of such Holders, except in the case of a Default specified in clauses (1) through (8) above.

<div align="center">43</div>

&lt;PAGE&gt;

Section 6.2. Acceleration. If an Event of Default (other than an Event of Default specified in Section 6.1(9) or (10)) occurs and is continuing, the Trustee by notice to the Company, or the Holders of at least 25% in aggregate principal amount of the Securities at the time outstanding by notice to the Company and the Trustee, may declare the principal amount plus accrued and unpaid interest, including additional interest, if any, on all the Securities to be immediately due and payable. Upon such a declaration, such accelerated amount shall be due and payable immediately. If an Event of Default specified in Section 6.1(9) or (10) occurs and is continuing, the principal amount plus accrued and unpaid interest, including additional interest, if any, on all the Securities shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholders. The Holders of a majority in aggregate principal amount of the Securities at the time outstanding, by notice to the Trustee (and without notice to any other Securityholder) may rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default have been cured or waived except nonpayment of the principal amount plus accrued and unpaid interest, including additional interest, if any, that have become due solely as a result of acceleration and if all amounts due to the Trustee under Section 7.7 have been paid. No such rescission shall affect any subsequent Default or impair any right consequent thereto.

Section 6.3. Other Remedies. If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of the principal amount plus accrued and unpaid interest, including additional interest, if any, on the Securities or to enforce the performance of any provision of the Securities or this Indenture.

The Trustee may maintain a proceeding even if the Trustee does not possess any of the Securities or does not produce any of the Securities in the proceeding. A delay or omission by the Trustee or any Securityholder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of, or acquiescence in, the Event of Default. No remedy is exclusive of any other remedy. All available remedies are cumulative.

Section 6.4. Waiver of Past Defaults. The Holders of a majority in aggregate principal amount of the Securities at the time outstanding, by notice to the Trustee (and without notice to any other Securityholder), may waive an

existing Default and its consequences except (1) an Event of Default described in Section 6.1(1) or (2), (2) a Default in respect of a provision that under Section 9.2 cannot be amended without the consent of each Securityholder affected or (3) a Default which constitutes a failure to convert any Security in accordance with the terms of Article 10. When a Default is waived, it is deemed cured, but no such waiver shall extend to any subsequent or other Default or impair any consequent right. This Section 6.4 shall be in lieu of Section 316(a)1(B) of the TIA and such Section 316(a)1(B) is hereby expressly excluded from this Indenture, as permitted by the TIA.

    Section 6.5. Control by Majority. The Holders of a majority in aggregate principal amount of the Securities at the time outstanding may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture or that the Trustee determines in good faith is prejudicial to the rights of other Securityholders or would involve the Trustee in personal liability unless the

                                    44

<PAGE>

Trustee is offered indemnity satisfactory to it. This Section 6.5 shall be in lieu of Section 316(a)1(A) of the TIA and such Section 316(a)1(A) is hereby expressly excluded from this Indenture, as permitted by the TIA.

    Section 6.6. Limitation on Suits. A Securityholder may not pursue any remedy with respect to this Indenture or the Securities unless:

    (1)    the Holder gives to the Trustee written notice stating that an
           Event of Default is continuing;

    (2)    the Holders of at least 25% in aggregate principal amount of the
           Securities at the time outstanding make a written request to the
           Trustee to pursue the remedy;

    (3)    such Holder or Holders offer to the Trustee security or indemnity
           satisfactory to the Trustee against any loss, liability or
           expense;

    (4)    the Trustee does not comply with the request within 60 days after
           receipt of such notice, request and offer of security or
           indemnity; and

    (5)    the Holders of a majority in aggregate principal amount of the
           Securities at the time outstanding do not give the Trustee a
           direction inconsistent with the request during such 60-day period.

    A Securityholder may not use this Indenture to prejudice the rights of any other Securityholder or to obtain a preference or priority over any other Securityholder.

    Section 6.7. Rights of Holders to Receive Payment. Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of the principal amount, Redemption Price, Purchase Price, Change of Control Purchase Price or interest, including additional interest, if any, in respect of

the Securities held by such Holder, on or after the respective due dates expressed in the Securities or any Redemption Date, and to convert the Securities in accordance with Article X, or to bring suit for the enforcement of any such payment on or after such respective dates or the right to convert, shall not be impaired or affected adversely without the consent of such Holder.

Section 6.8. Collection Suit by Trustee. If an Event of Default described in Section 6.1(2), (3) or (4) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Company for the whole amount owing with respect to the Securities and the amounts provided for in Section 7.7.

Section 6.9. Trustee May File Proofs of Claim. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Company or any other obligor upon the Securities or the property of the Company or of such other obligor or their creditors, the Trustee (irrespective of whether the principal amount, Redemption Price, Purchase Price, Change of Control Purchase Price or interest, including additional interest, if any, in respect of the Securities shall then be due and payable as therein expressed or by declaration or otherwise and

45

<PAGE>

irrespective of whether the Trustee shall have made any demand on the Company for the payment of any such amount) shall be entitled and empowered, by intervention in such proceeding or otherwise,

    (a)    to file and prove a claim for the whole amount of the principal amount, Redemption Price, Purchase Price, Change of Control Purchase Price, or interest, including additional interest, if any, and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel or any other amounts due the Trustee under Section 7.7) and of the Holders allowed in such judicial proceeding, and

    (b)    to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.7.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Securities or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10. Priorities. If the Trustee collects any money pursuant to this Article 6, it shall pay out the money in the following order:

FIRST: to the Trustee for amounts due under Section 7.7;

SECOND: to Securityholders for amounts due and unpaid on the Securities for the principal amount, Redemption Price, Purchase Price, Change of Control Purchase Price or interest, including additional interest, if any, as the case may be, ratably, without preference or priority of any kind, according to such amounts due and payable on the Securities; and

THIRD: the balance, if any, to the Company.

The Trustee may fix a record date and payment date for any payment to Securityholders pursuant to this Section 6.10. At least 15 days before such record date, the Trustee shall mail to each Securityholder and the Company a notice that states the record date, the payment date and the amount to be paid.

Section 6.11. Undertaking for Costs. In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant (other than

46

<PAGE>

the Trustee) in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.7 or a suit by Holders of more than 10% in aggregate principal amount of the Securities at the time outstanding. This Section 6.11 shall be in lieu of Section 315(e) of the TIA and such Section 315(e) is hereby expressly excluded from this Indenture, as permitted by the TIA.

Section 6.12. Waiver of Stay, Extension or Usury Laws. The Company covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any usury or other law wherever enacted, now or at any time hereafter in force, which would prohibit or forgive the Company from paying all or any portion of the principal amount, Redemption Price, Purchase Price or Change of Control Purchase Price in respect of Securities, or any interest, including additional interest, if any, on such amounts, as contemplated herein, or which may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

ARTICLE VII

TRUSTEE

Section 7.1. Duties of Trustee. (a) If an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)     Except during the continuance of an Event of Default:

(1)     the Trustee need perform only those duties that are specifically set forth in this Indenture and no others; and

(2)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture, but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture, but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein.

47

<PAGE>

This Section 7.1(b) shall be in lieu of Section 315(a) of the TIA and such Section 315(a) is hereby expressly excluded from this Indenture, as permitted by the TIA.

(c) The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(1)     this Section (c) does not limit the effect of Section (b) of this Section 7.1;

(2)     the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3)     the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.5.

Subparagraphs (c)(1), (2) and (3) shall be in lieu of Sections 315(d)(1), 315(d)(2) and 315(d)(3) of the TIA and such Sections 315(d)(1), 315(d)(2) and 315(d)(3) are hereby expressly excluded from this Indenture, as permitted by the TIA.

(d) Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b), (c) and (e) of this Section 7.1.

(e) The Trustee may refuse to perform any duty or exercise any right or power or incur any financial liability unless it receives indemnity satisfactory to it against any loss, liability or expense.

(f) Money held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law. The Trustee (acting in any capacity hereunder) shall be under no liability for interest on any money received by it hereunder unless otherwise agreed in writing with the Company.

Section 7.2. Rights of Trustee. Subject to its duties and responsibilities under the TIA,

(a) the Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document (whether in original or facsimile form) believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b) whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, conclusively rely upon an Officers' Certificate;

(c) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not

48

<PAGE>

be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder;

(d) the Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith which it believes to be authorized or within its rights or powers conferred under this Indenture;

(e) the Trustee may consult with counsel selected by it and any advice or Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(f) the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Holders, pursuant to the provisions of this Indenture, unless such Holders shall have offered to the Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(g) any request or direction of the Company mentioned herein shall be sufficiently evidenced by a Company Request or Company Order and any resolution of the Board of Directors may be sufficiently evidenced by a Board Resolution;

(h) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into

such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney at the sole cost of the Company and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation;

(i) the Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Securities and this Indenture;

(j) the rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other person employed to act hereunder; and

(k) the Trustee may request that the Company deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

49

<PAGE>

Section 7.3. Individual Rights of Trustee. The Trustee in its individual or any other capacity may become the owner or pledgee of Securities and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee. Any Paying Agent, Registrar, Conversion Agent or co-registrar may do the same with like rights. However, the Trustee must comply with Sections 7.10 and 7.11.

Section 7.4. Trustee's Disclaimer. The Trustee makes no representation as to the validity or adequacy of this Indenture or the Securities, it shall not be accountable for the Company's use or application of the proceeds from the Securities, it shall not be responsible for any statement in the registration statement for the Securities under the Securities Act or in any offering document for the Securities, the Indenture or the Securities (other than its certificate of authentication), or the determination as to which beneficial owners are entitled to receive any notices hereunder.

Section 7.5. Notice of Defaults. If a Default occurs and if it is known to the Trustee, the Trustee shall give to each Securityholder notice of the Default within 90 days after it occurs or, if later, within 15 days after it is known to the Trustee, unless such Default shall have been cured or waived before the giving of such notice. Notwithstanding the preceding sentence, except in the case of a Default described in Section 6.1(1) or (2), the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interest of the Securityholders. The preceding sentence shall be in lieu of the proviso to Section 315(b) of the TIA and such proviso is hereby expressly excluded from this Indenture, as permitted by the TIA. The Trustee shall not be deemed to have knowledge of a Default unless a Responsible Officer of the Trustee has received written notice of such Default, which notice specifically references this

Indenture and the Securities.

Section 7.6. Reports by Trustee to Holders. Within 60 days after each May 1 beginning with the May 1 following the date of this Indenture, the Trustee shall mail to each Securityholder a brief report dated as of such May 1 that complies with TIA Section 313(a), if required by such Section 313(a). The Trustee also shall comply with TIA Section 313(b).

A copy of each report at the time of its mailing to Securityholders shall be filed with the SEC and each securities exchange, if any, on which the Securities are listed. The Company agrees to notify the Trustee promptly whenever the Securities become listed on any securities exchange and of any delisting thereof.

Section 7.7. Compensation and Indemnity. The Company agrees:

(a)     to pay to the Trustee from time to time such compensation as the Company and the Trustee shall from time to time agree in writing for all services rendered by it hereunder (which compensation shall not be limited (to the extent permitted by law) by any provision of law in regard to the compensation of a trustee of an express trust);

(b)     to reimburse the Trustee upon its request for all expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable compensation and the

                                        50
<PAGE>

        expenses, advances and disbursements of its agents and counsel), except any such expense, disbursement or advance as shall be determined to have been caused by its own negligence or willful misconduct; and

(c)     to fully indemnify the Trustee or any predecessor Trustee and their agents for, and to hold them harmless against, any and all loss, damage, claim, liability, cost or expense (including attorney's fees and expenses, and taxes (other than taxes based upon, measured by or determined by the income of the Trustee)) incurred without negligence or willful misconduct on its part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending itself against any claim (whether asserted by the Company or any Holder or any other person) or liability in connection with the exercise or performance of any of its powers or duties hereunder.

To secure the Company's payment obligations in this Section 7.7, the Trustee shall have a lien prior to the Securities on all money or property held or collected by the Trustee, except that held in trust to pay the principal amount, Redemption Price, Purchase Price, Change of Control Purchase Price or interest, including additional interest, if any, as the case may be, on

particular Securities.

The Company's payment obligations pursuant to this Section 7.7 shall survive the discharge of this Indenture and the resignation or removal of the Trustee. When the Trustee incurs expenses after the occurrence of a Default specified in Section 6.1(5) or (6), the expenses including the reasonable charges and expenses of its counsel, are intended to constitute expenses of administration under any bankruptcy law.

Section 7.8. Replacement of Trustee. The Trustee may resign by so notifying the Company; provided, however, no such resignation shall be effective until a successor Trustee has accepted its appointment pursuant to this Section 7.8. The Holders of a majority in aggregate principal amount of the Securities at the time outstanding may remove the Trustee by so notifying the Trustee and the Company. The Company shall remove the Trustee if:

(1) the Trustee fails to comply with Section 7.10;

(2) the Trustee is adjudged bankrupt or insolvent;

(3) a receiver or public officer takes charge of the Trustee or its property; or

(4) the Trustee otherwise becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company shall promptly appoint, by resolution of its Board of Directors, a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company satisfactory in form and substance to the retiring Trustee and the Company. Thereupon the resignation or removal of the retiring Trustee shall become

51

<PAGE>

effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to Securityholders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.7.

If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company or the Holders of a majority in aggregate principal amount of the Securities at the time outstanding may petition at the expense of the Company any court of competent jurisdiction at the expense of the Company for the appointment of a successor Trustee.

If the Trustee fails to comply with Section 7.10, any Securityholder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

Section 7.9. Successor Trustee by Merger. If the Trustee consolidates

with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

Section 7.10. Eligibility; Disqualification. The Trustee shall at all times satisfy the requirements of TIA Sections 310(a)(1) and 310(b). The Trustee (or its parent holding company) shall have a combined capital and surplus of at least US$50,000,000 as set forth in its most recent published annual report of condition. Nothing herein contained shall prevent the Trustee from filing with the Commission the application referred to in the penultimate paragraph of TIA Section 310(b).

Section 7.11. Preferential Collection of Claims Against Company. The Trustee shall comply with TIA Section 311(a), excluding any creditor relationship listed in TIA Section 311(b). A Trustee who has resigned or been removed shall be subject to TIA Section 311(a) to the extent indicated therein.

ARTICLE VIII

DISCHARGE OF INDENTURE

Section 8.1. Discharge of Liability on Securities. When (i) the Company delivers to the Trustee all outstanding Securities (other than Securities replaced or repaid pursuant to Section 2.7) for cancellation or (ii) all outstanding Securities have become due and payable and the Company deposits with the Trustee cash and/or Shares sufficient to pay all amounts due and owing on all outstanding Securities (other than Securities replaced pursuant to Section 2.7), and if in either case the Company pays all other sums payable hereunder by the Company, then this Indenture shall, subject to Section 7.7, cease to be of further effect. The Trustee shall join in the execution of a document prepared by the Company acknowledging satisfaction and discharge of this Indenture on demand of the Company accompanied by an Officers' Certificate and Opinion of Counsel and at the cost and expense of the Company.

52

<PAGE>

Section 8.2. Repayment to the Company. The Trustee and the Paying Agent shall return to the Company upon written request any money or securities held by them for the payment of any amount with respect to the Securities that remains unclaimed for two years, subject to applicable unclaimed property law. After return to the Company, Holders entitled to the money or securities must look to the Company for payment as general creditors unless an applicable abandoned property law designates another person and the Trustee and the Paying Agent shall have no further liability to the Securityholders with respect to such money or securities for that period commencing after the return thereof.

ARTICLE IX

AMENDMENTS

Section 9.1. Without Consent of Holders. The Company and the Trustee may amend this Indenture or the Securities without the consent of any Securityholder to:

(a) add to the covenants of the Company for the benefit of the Holders of Securities;

(b) surrender any right or power herein conferred upon the Company;

(c) add additional dates on which the Securities shall be purchased by the Company pursuant to Section 6 of the Securities at the option of the Holder;

(d) provide for conversion rights of Holders of Securities if any reclassification or change of the Shares or any consolidation, merger or sale of all or substantially all of the Company's assets occurs;

(e) provide for the assumption of the Company's obligations to the Holders of Securities in the case of a merger, consolidation, conveyance, transfer or lease pursuant to Article V hereof;

(f) increase the Conversion Rate; provided, however, that such increase in the Conversion Rate shall not adversely affect the interests of the Holders of Securities (after taking into account tax and other consequences of such increase);

(g) comply with the requirements of the SEC in order to effect or maintain the qualification of this Indenture under the TIA or the Canada Business Corporations Act;

(h) make any changes or modifications necessary in connection with the registration of the Securities under the Securities Act as contemplated in the Registration Rights Agreement; provided, however, that such action pursuant to this clause (g) does not, in the good faith opinion of the Board of Directors of the Company (as evidenced by a Board Resolution) and the Trustee, adversely affect the interests of the Holders of Securities in any material respect;

(i) cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein or which is otherwise defective, or to make

<center>53</center>

<PAGE>

any other provisions with respect to matters or questions arising under this Indenture which the Company may deem necessary or desirable and which shall not be inconsistent with the provisions of this Indenture; provided, however, that such action pursuant to this clause (h) does not, in the good faith opinion of the Board of Directors of the Company (as evidenced by a Board Resolution) and the Trustee, adversely affect the interests of the Holders of Securities in any material respect;

(j) add or modify any other provisions herein with respect to matters or questions arising hereunder which the Company and the Trustee may deem necessary or desirable and which will not adversely affect the interests of the Holders of Securities in any material respect; and

(k) eliminate the Company's ability to pay the Redemption Price, Purchase Price, Change of Control Offer Purchase Price or Principal Amount at Stated Maturity for the Securities in Shares on the Redemption Date, Purchase Date,

Change of Control Purchase Date or at Stated Maturity, as the case may be, after the date of that amendment.

Section 9.2. With Consent of Holders. Except as provided below in this Section 9.2, this Indenture or the Securities may be amended, modified or supplemented, and noncompliance in any particular instance with any provision of this Indenture or the Securities may be waived, in each case with the written consent of the Holders of at least a majority of the principal amount of the Securities at the time outstanding.

Without the written consent or the affirmative vote of each Holder of Securities affected thereby, an amendment, supplement or waiver under this Section 9.2 may not:

(a) change the maturity of the principal amount of, or any installment of interest, including additional interest, on, any Security;

(b) reduce the principal amount of, or interest, including additional interest, payable on, or the Redemption Price, Purchase Price or Change of Control Purchase Price of any Security;

(c) impair or adversely affect the conversion rights of any Holder of Securities;

(d) reduce the value of the Shares to which reference is made in determining whether an interest adjustment will be made on the Securities, or change the method by which this value is calculated;

(e) change the currency of any amount owed or owing under the Security or any interest thereon from U.S. Dollars;

(f) alter or otherwise modify the rate of interest, including additional interest, on any Security, or the manner of calculation thereof, or extend time for payment of any amounts due and payable to the Holders of the Securities;

<div align="center">54</div>

&lt;PAGE&gt;

(g) impair the right of any Holder to institute suit for the enforcement of any payment or with respect to, or conversion of, any Security;

(h) modify the obligation of the Company to maintain an agency in The City of New York pursuant to Section 4.5;

(i) adversely affect the purchase right of the Holders of the Securities as provided in Article III or the right of the Holders of the Securities to convert any Security as provided in Article X;

(j) modify the provisions of Article III in a manner adverse to the Holders of the Securities;

(k) modify any of the provisions of this Section, or reduce the principal amount of outstanding Securities required to waive a default, except to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each outstanding Security affected thereby; or

(1) reduce the percentage of the principal amount of the outstanding Securities the consent of whose Holders is required for any such supplemental indenture or the consent of whose Holders is required for any waiver provided for in this Indenture.

It shall not be necessary for the consent of the Holders under this Section 9.2 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.2 becomes effective, the Company shall mail to each Holder a notice briefly describing the amendment.

Nothing in this Section 9.2 shall impair the ability of the Company and the Trustee to amend this Indenture or the Securities without the consent of any Securityholder to provide for the assumption of the Company's obligations to the Holders of Securities in the case of a merger, consolidation, conveyance, transfer or lease pursuant to Article V hereof.

Section 9.3. Compliance with Trust Indenture Act. Every supplemental indenture executed pursuant to this Article shall comply with the TIA.

Section 9.4. Revocation and Effect of Consents, Waivers and Actions. Until an amendment, waiver or other action by Holders becomes effective, a consent thereto by a Holder of a Security hereunder is a continuing consent by the Holder and every subsequent Holder of that Security or portion of the Security that evidences the same obligation as the consenting Holder's Security, even if notation of the consent, waiver or action is not made on the Security. However, any such Holder or subsequent Holder may revoke the consent, waiver or action as to such Holder's Security or portion of the Security if the Trustee receives the notice of revocation before the date the amendment, waiver or action becomes effective. After an amendment, waiver or action becomes effective, it shall bind every Securityholder.

55

<PAGE>

Section 9.5. Notation on or Exchange of Securities. Securities authenticated and delivered after the execution of any supplemental indenture pursuant to this Article may, and shall if required by the Trustee, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Company shall so determine, new Securities so modified as to conform, in the opinion of the Trustee and the Board of Directors, to any such supplemental indenture may be prepared and executed by the Company and authenticated and delivered by the Trustee in exchange for outstanding Securities.

Section 9.6. Trustee to Sign Supplemental Indentures. The Trustee shall sign any supplemental indenture authorized pursuant to this Article 9 if the amendment contained therein does not affect the rights, duties, liabilities or immunities of the Trustee. If it does, the Trustee may, but need not, sign such supplemental indenture. In signing such supplemental indenture the Trustee shall receive, and (subject to the provisions of Section 7.1) shall be fully protected in relying upon, an Officers' Certificate and an Opinion of Counsel stating that such amendment is authorized or permitted by this Indenture.

Section 9.7. Effect of Supplemental Indentures. Upon the execution of any supplemental indenture under this Article, this Indenture shall be modified in

accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Securities theretofore or thereafter authenticated and delivered hereunder shall be bound thereby.

ARTICLE X

CONVERSIONS

Section 10.1. Conversion Privilege. (a) Subject to and upon compliance with the provisions of this Article X, a Holder of a Security shall have the right, at such Holder's option, to convert all or any portion (if the portion to be converted is $1,000 principal amount or an integral multiple thereof) of such Security into Shares at the Conversion Rate in effect on the date of conversion:

(1) during any fiscal quarter of the Company (a "FISCAL QUARTER"), if as of the last day of the immediately preceding Fiscal Quarter, the Sale Price of the Shares for at least 20 Trading Days in the 30 consecutive Trading Day period ending on the last day of such preceding Fiscal Quarter was more than 120% of the Conversion Price in effect on such 30th Trading Day;

(2) at any time prior to the close of business on the Business Day preceding the date fixed for redemption, if such Security has been called for redemption pursuant to Article III hereof;

(3) at any time following the occurrence and during the continuance of an Event of Default; or

(4) as provided in Section (b) of this Section 10.1.

56

<PAGE>

The Company or a designated agent shall determine on a daily basis whether the Securities shall be convertible as a result of the occurrence of an event specified in clauses (1) through (4) above and, if the Securities shall be so convertible, the Company shall promptly deliver to the Trustee and Conversion Agent written notice thereof. Whenever the Securities shall become convertible pursuant to Section 10.1, the Company or, at the Company's request, the Trustee in the name and at the expense of the Company, shall notify the Holders of the event triggering such convertibility in the manner provided in Section 11.2, and the Company shall also publicly announce such information and publish it on the Company's Web site. Any notice so given shall be conclusively presumed to have been duly given, whether or not the Holder receives such notice.

(b) In addition, in the event that:

(1) the Company makes a distribution described in Section 10.3(d) or (f), the Fair Market Value (as determined by the Board of Directors) of such distribution per Share exceeds 15% of the Sale Price of a Share on the Business Day immediately preceding the date of declaration of such distribution, then, in each case, the Securities may be surrendered for conversion at any time on and after the date that the Company gives notice to the Holders of such right, which shall be not less than 20 days prior to the Ex-Dividend Time for such distribution, until the earlier of the close of business on the Business Day immediately preceding the Ex-Dividend Time or the date the Company announces that such distribution will not take place; or

(2) the Company consolidates with or merges into another Person, or transfers, sells, leases or otherwise disposes of all or substantially all of its assets, or is a party to a binding share exchange pursuant to which the Shares would be converted into cash, securities or other property as set forth in Section 10.4 hereof, then the Securities may be surrendered for conversion at any time from and after the date which is 15 days prior to the date announced by the Company as the anticipated effective time of such transaction until 15 days after the actual date of such transaction, and, at such effective time, the right to convert the Securities into Shares shall be changed, as set forth in Section 10.4, into a right to convert into the kind and amount of such cash, securities or other property which the Holder of such Securities would have received if such Holder had converted the Securities immediately prior to such transaction. However, if such event or transaction occurs before July 15, 2008, the consideration into which the Securities will be convertible will be limited to Shares or other prescribed securities (within the meaning of the Canada Income Tax Act).

"EX-DIVIDEND TIME" means, with respect to any issuance or distribution on Shares, the first date on which the Shares trade regular way on the principal securities market on which the Shares are then traded without the right to receive such issuance or distribution.

Section 10.2. Conversion Procedure; Conversion Rate; Fractional Shares.

(a) Each Security shall be convertible at the office of the Conversion Agent into fully paid and nonassessable Shares (calculated to the nearest 1/10,000th of a Share). The rate at which Shares shall be delivered upon conversion (the "CONVERSION RATE") shall be

57

<PAGE>

initially 4.7057 Shares for each $1,000 principal amount of Securities. The Conversion Rate shall be adjusted in certain instances as provided in Section 10.3 hereof, but shall not be adjusted for any accrued and unpaid interest, or additional interest, if any. Upon conversion, no payment shall be made by the Company with respect to any accrued and unpaid interest or additional interest, if any. Instead, such amount shall be deemed paid by the Shares delivered upon conversion of any Security. In addition, no payment or adjustment shall be made in respect of dividends on the Shares on a converted Security. The Company shall not issue any fraction of Share in connection with any conversion of Securities, but instead shall, subject to Section 10.3(h) hereof, make a cash payment (calculated to the nearest cent) equal to such fraction multiplied by the Sale Price of the Shares on the last Trading Day prior to the date of conversion. Notwithstanding the foregoing, a Security in respect of which a Holder has delivered a Purchase Notice or Change of Control Purchase Notice may be converted only if such notice of exercise is withdrawn in accordance with the Section 3.12 hereof.

(b) Before any Holder of a Security shall be entitled to convert the same into Shares, such Holder shall, in the case of Securities issued in global form, comply with the procedures of the Depositary in effect at that time, and in the case of definitive Securities, surrender such Securities, duly endorsed to the Company or in blank, at the office of the Conversion Agent, and shall give written notice to the Company in form on reverse of such definitive Security (a

"NOTICE OF CONVERSION") at said office or place that such Holder elects to convert the same and shall state in writing therein the principal amount of Securities to be converted and the name or names (with addresses) in which such Holder wishes the certificate or certificates for Shares to be issued.

Before any such conversion, a Holder also shall pay all taxes or duties, if any, as provided in Section 10.5.

If more than one Security shall be surrendered for conversion at one time by the same Holder, the number of full Shares which shall be deliverable upon conversion shall be computed on the basis of the aggregate principal amount of the Securities (or specified portions thereof to the extent permitted thereby) so surrendered. Subject to the next succeeding sentence, the Company will, as soon as practicable thereafter, issue and deliver at said office or place to such Holder of a Security, or to such Holder's nominee or nominees, certificates for the number of full Shares to which such Holder shall be entitled as aforesaid, together, subject to the last sentence of Section 10.2(a) above, with cash in lieu of any fraction of a share to which such Holder would otherwise be entitled. The Company shall not be required to deliver certificates for Shares while the stock transfer books for such stock or the security register are duly closed for any purpose, but certificates for Shares shall be issued and delivered as soon as practicable after the opening of such books or security register.

(c) A Security shall be deemed to have been converted as of the close of business on the date of the surrender of such Securities for conversion, accompanied by the Notice of Conversion, as provided above, and the person or persons entitled to receive the Shares issuable upon such conversion shall be treated for all purposes as the record Holder or Holders of such Shares as of the close of business on such date.

58

<PAGE>

(d) In case any Security shall be surrendered for partial conversion, the Company shall execute and the Trustee shall authenticate and deliver to or upon the written order of the Holder of the Security so surrendered, without charge to such Holder (subject to the provisions of Section 10.5 hereof), a new Security or Securities in authorized denominations in an aggregate principal amount equal to the unconverted portion of the surrendered Securities.

(e) By delivering to the Holder the number of Shares issuable upon conversion, together with cash in lieu of any fractional shares as provided in Section 10.2(b) hereof, the Company will satisfy its obligation with respect to the Security, and upon such delivery accrued and unpaid interest, and additional interest, if any, with respect to such Security will be deemed to be paid in full rather than canceled, extinguished or forfeited.

(f) If a Holder delivers a Notice of Conversion after the Interest Record Date for a payment of interest but prior to the corresponding Interest Payment Date, such Holder must pay to the Company, at the time such Holder surrenders Securities for Conversion, an amount equal to the interest and additional interest, that has accrued and will be paid on the related Interest Payment Date. This Section 10.2(f) shall not apply to a Holder that converts Securities that are called by the Company for redemption pursuant to Section 3.1 after an Interest Record Date for a payment of Interest but prior to the corresponding Interest Payment Date.

Section 10.3. Adjustment of Conversion Rate. The Conversion Rate shall be adjusted from time to time by the Company as follows:

(a) In case the Company shall hereafter pay a dividend or make a distribution to all holders of the outstanding Shares in Shares (regardless of whether such dividend or distribution is received and accepted by any holder of outstanding Shares), the Conversion Rate shall be increased so that the same shall equal the rate determined by dividing the Conversion Rate in effect at the opening of business on the date following the Record Date by a fraction,

(i) the numerator of which shall be the number of Shares outstanding at the close of business on the date fixed for such determination; and

(ii) the denominator of which shall be the sum of such number of Shares and the total number of Shares constituting such dividend or other distribution,

such increase to become effective immediately after the opening of business on the day following the Record Date. For the purpose of this paragraph (a), the number of Shares at any time outstanding shall not include Shares held in the treasury of the Company. The Company will not pay any dividend or make any distribution on Shares held in the treasury of the Company. If any dividend or distribution of the type described in this Section 10.3(a) is declared but not so paid or made, the Conversion Rate shall again be adjusted to the Conversion Rate that would then be in effect if such dividend or distribution had not been declared.

(b) In case the Company shall issue rights or warrants to all holders of its outstanding Shares entitling them for a period expiring within forty-five (45) days after the Record Date, to subscribe for or purchase Shares at a price per share less than the Current Market Price (as defined below) on the Record Date, the Conversion Rate shall be adjusted so that the

59

<PAGE>

same shall equal the rate determined by dividing the Conversion Rate in effect immediately prior to the Record Date,

(i) the numerator of which shall be the number of Shares outstanding at the close of business on the Record Date plus the number of Shares that the aggregate offering price of the total number of Shares so offered would purchase at such Current Market Price, and

(ii) the denominator of which shall be the number of Shares outstanding on the Record Date plus the total number of additional Shares offered for subscription or purchase.

Such adjustment shall be successively made whenever any such rights or warrants are issued, and shall become effective immediately after the opening of business on the day following any such Record Date. To the extent that Shares are not delivered pursuant to such rights or warrants, upon the expiration or termination of such rights or warrants, the Conversion Rate shall be readjusted to the Conversion Rate that would then be in effect had the adjustments made upon the issuance of such rights or warrants been made on the basis of delivery

of only the number of Shares actually delivered. In the event that such rights or warrants are not so issued, the Conversion Rate shall again be adjusted to be the Conversion Rate that would then be in effect if such date fixed for the determination of shareholders entitled to receive such rights or warrants had not been fixed. In determining whether any rights or warrants entitle the holders to subscribe for or purchase Shares at less than such Current Market Price, and in determining the aggregate offering price of such Shares, there shall be taken into account any consideration received by the Company for such rights or warrants and any amount payable on exercise or conversion thereof, the value of such consideration, if other than cash, to be determined by the Board of Directors.

(c) In case outstanding Shares shall be subdivided into a greater number of Shares, the Conversion Rate in effect at the opening of business on the day following the day upon which such subdivision becomes effective shall be proportionately increased, and conversely, in case outstanding Shares shall be combined into a smaller number of Shares, the Conversion Rate in effect at the opening of business on the day following the day upon which such combination becomes effective shall be proportionately reduced, such increase or reduction, as the case may be, to become effective immediately after the opening of business on the day following the day upon which such subdivision or combination becomes effective.

(d) In case the Company shall, by dividend or otherwise, distribute to all holders of its Shares of any class of Capital Stock of the Company or evidences of its indebtedness or assets (including securities, but excluding any rights or warrants referred to in Section 10.3(e), dividends or distributions of stock referred to in Section 10.3(a), 10.3(b) and excluding any dividend or distribution paid exclusively in cash referred to in Section 10.3(f)) (any of the foregoing hereinafter in this Section 10.3(d) called the "DISTRIBUTED ASSETS"), then, in each such case (unless the Company elects to reserve such Distributed Assets for distribution to the Holders upon the conversion of the Securities so that any such holder converting Securities will receive upon such conversion, in addition to the Shares to which such holder is entitled, the amount and kind of such Distributed Assets which such holder would have received if such

60

<PAGE>

holder had converted its Securities into Shares immediately prior to the Record Date for such distribution of the Distributed Assets), the Conversion Rate shall be adjusted so that the same shall be equal to the rate determined by dividing the Conversion Rate in effect on the Record Date with respect to such distribution by a fraction,

(i) the numerator of which shall be the Current Market Price per Share on such Record Date less the Fair Market Value (as determined by the Board of Directors, whose determination shall be conclusive, and described in a resolution of the Board of Directors) on the Record Date of the portion of the Distributed Assets so distributed applicable to one Share; and

(ii) the denominator of which shall be the Current Market Price per Share,

such adjustment to become effective immediately prior to the opening of business on the day following such Record Date; provided, however, that in the event (1) the then fair market value (as so determined) of the portion of the Distributed Assets so distributed applicable to one Share is equal to or greater than the Current Market Price of the Shares on the Record Date or (2) the Current Market Price of Shares on the Record Date exceeds the then fair market value (as so determined) of the portion of the Distributed Assets so distributed applicable to one Share by less than $1.00, in lieu of the foregoing adjustment, adequate provision shall be made so that each Holder shall have the right to receive upon conversion the amount of Distributed Assets such holder would have received had such holder converted each Security on the Record Date. In the event that such dividend or distribution is not so paid or made, the Conversion Rate shall again be adjusted to be the Conversion Rate that would then be in effect if such dividend or distribution had not been declared. If the Board of Directors determines the fair market value of any distribution for purposes of this Section 10.3(d) by reference to the actual or when issued trading market for any securities, it must in doing so consider the prices in such market over the same period used in computing the Current Market Price of the Shares. However, if such event or transaction occurs before July 15, 2008, the consideration into which the Securities will be convertible will be limited to Shares or other prescribed securities (within the meaning of the Canada Income Tax Act).

Rights or warrants distributed by the Company to all holders of Shares entitling the holders thereof to subscribe for or purchase shares of the Company's Capital Stock other than Shares, except as set forth in the second paragraph following this paragraph (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events ("TRIGGER EVENT"): (i) are deemed to be transferred with such Shares; (ii) are not exercisable; and (iii) are also issued in respect of future issuances of Shares, shall be deemed not to have been distributed for purposes of this Section 10.3 (and no adjustment to the Conversion Rate under this Section 10.3 will be required) until the occurrence of the earliest Trigger Event, whereupon such rights and warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Conversion Rate shall be made under this Section 10.3(d). If any such right or warrant, including any such existing rights or warrants distributed prior to the date of this Indenture, are subject to events, upon the occurrence of which such rights or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of

61

<PAGE>

distribution and record date with respect to new rights or warrants with such rights (and a termination or expiration of the existing rights or warrants without exercise by any of the holders thereof). In addition, in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in the preceding sentence) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Conversion Rate under this Section 10.3 was made, (1) in the case of any such rights or warrants that shall have been redeemed or repurchased without exercise by any holders thereof, the Conversion Rate shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per share redemption or repurchase

price received by a holder or holders of Shares with respect to such rights or warrants (assuming such holder had retained such rights or warrants), made to all holders of Shares as of the date of such redemption or repurchase, and (2) in the case of such rights or warrants that shall have expired or been terminated without exercise by any holders thereof, the Conversion Rate shall be readjusted as if such rights and warrants had not been issued.

No adjustment of the Conversion Rate shall be made pursuant to this Section 10.3(d) in respect of rights or warrants distributed or deemed distributed on any Trigger Event to the extent that such rights or warrants are actually distributed, or reserved by the Company for distribution to holders of Securities upon conversion by such holders of Securities to Shares.

For purposes of this Section 10.3(d) and Sections 10.3(a) and (b), any dividend or distribution to which this Section 10.3(d) is applicable that also includes Shares, or rights or warrants to subscribe for or purchase Shares (or both), shall be deemed instead to be (1) a dividend or distribution of the evidences of indebtedness, assets or shares of capital stock other than such Shares or rights or warrants (and any Conversion Rate adjustment required by this Section 10.3(d) with respect to such dividend or distribution shall then be made) immediately followed by (2) a dividend or distribution of such Shares or such rights or warrants (and any further Conversion Rate adjustment required by Sections 10.3(a) and (b) with respect to such dividend or distribution shall then be made), except (A) the Record Date of such dividend or distribution shall be substituted as "the date fixed for the determination of shareholders entitled to receive such dividend or other distribution", "the date fixed for the determination of shareholders entitled to receive such rights or warrants" and "the date fixed for such determination" within the meaning of Sections 10.3(a) and (b), and (B) any Shares included in such dividend or distribution shall not be deemed "outstanding at the close of business on the date fixed for such determination" within the meaning of Section 10.3(a).

(e) In case a tender offer or exchange offer made by the Company or any of its Subsidiaries for all or any portion of the Shares shall expire and such tender offer or exchange offer (as amended upon the expiration thereof) shall require the payment to shareholders (based on the acceptance (up to any maximum specified in the terms of the tender offer or exchange offer) of Shares tendered) of an aggregate consideration having a Fair Market Value (as determined in good faith by the Board of Directors) that combined together with:

(i) the aggregate amount of the cash, plus the Fair Market Value, as of the expiration of such tender offer or exchange offer, of any other consideration payable in respect of any other tender offers or exchange offers, by the Company

<PAGE>

or any of its Subsidiaries for all or any portion of the Shares expiring within the 12 months preceding the expiration of such tender offer or exchange offer and in respect of which no adjustment pursuant to this Section 10.3(e) has been made; and

(ii) the aggregate amount of any distributions to all holders of Shares made exclusively in cash within 12 months preceding the expiration

of such tender offer and in respect of which no adjustment pursuant to Section 10.3(f) has been made (excluding cash consideration payable in respect of any open market repurchase program referred to in this Section 10.3(e));

exceeds 10% of the product of the Sale Price of the Shares as of the last time (the "EXPIRATION TIME") tenders could have been made pursuant to such tender offer (as it may be amended), times the number of Shares outstanding (including any tendered shares) on the Expiration Time, then, and in each such case, immediately prior to the opening of business on the day after the date of the Expiration Time, the Conversion Rate shall be adjusted so that the same shall equal the price determined by multiplying the Conversion Rate in effect immediately prior to the close of business on the date of the Expiration Time by a fraction:

(i) the numerator of which shall be the sum of (x) the Fair Market Value (determined as aforesaid) of the aggregate consideration payable to shareholders based on the acceptance (up to any maximum specified in the terms of the tender or exchange offer) of all Shares validly tendered or exchanged and not withdrawn as of the Expiration Time (the Shares deemed so accepted up to any such maximum, being referred to as the "PURCHASED SHARES") and (y) the product of (1) the number of Shares outstanding less any Purchased Shares at the Expiration Time and (2) the last reported Sale Price of the Shares (determined as provided in the definition of Current Market Price) on the Trading Day next succeeding the Expiration Time, and

(ii) the denominator of which shall be the number of Shares outstanding (including any tendered or exchanged shares) at the Expiration Time multiplied by last reported Sale Price of the Shares (determined as provided in the definition of the Current Market Price) on the Trading Day next succeeding the Expiration Time,

such reduction (if any) shall become effective immediately prior to the opening of business on the day following the Expiration Time. In the event that the Company is obligated to purchase Shares pursuant to any such tender offer, but the Company is permanently prevented by applicable law from effecting any such purchases or all or a portion of such purchases are rescinded, the Conversion Rate shall again be adjusted to be the Conversion Rate which would then be in effect if such (or such portion of the) tender offer had not been made. If the application of this Section 10.3(e) to any tender offer would result in an increase in the Conversion Rate, no adjustment shall be made for such tender offer under this Section 10.3(e).

(f) In case the Company shall, by dividend or otherwise, distribute to all holders of its Shares cash (regardless of whether such dividend or distribution is received and

63

<PAGE>

accepted by any holder of outstanding Shares) (excluding any dividend or distribution in connection with the liquidation, dissolution or winding up of the Company, whether voluntary or involuntary), to the extent that the aggregate amount of any such cash distributions and dividends in any 12-month period

exceeds, with respect to the period:

       (A)    prior to July 15, 2008, Cdn$3.00 per Share (or if such distribution or dividend is declared in U.S. dollars, as determined using the noon buying rate in The City of New York for cable transfers in Canadian dollars as certified for customs purposes by the Federal Reserve Bank of New York on the date such distribution or dividend is declared); or

       (B)    on or after July 15, 2008, 4.0% of the Current Market Price (as defined in Section 10.3(g)) of the Shares,

in each case as determined on the Record Date for such distribution or dividend, then, in such case, the Conversion Rate shall be increased so that the same shall equal the rate determined by multiplying the Conversion Rate in effect on the applicable Record Date by a fraction,

    (i) the numerator of which shall be the Current Market Price on such Record Date; and

    (ii) the denominator of which shall be the Current Market Price on such Record Date less the amount of the excess distribution as applicable to one Share,

such adjustment to be effective immediately prior to the opening of business on the day following the Record Date. If such dividend or distribution is not so paid or made, the Conversion Rate shall again be adjusted to be the Conversion Rate that would then be in effect if such dividend or distribution had not been declared. If any adjustment is required to be made as set forth in this Section 10.3(f), such adjustment shall be based upon the amount by which such distribution exceeds the amount permitted to be excluded pursuant hereto.

    (g) For purposes of this Section 10.3, the following terms shall have the meaning indicated:

    (i) "CURRENT MARKET PRICE" shall mean the average of the daily Sale Prices per Share for the three consecutive Trading Days ending on the earlier of the Record Date and the day before the ex date with respect to the issuance, distribution, subdivision or combination requiring such computation immediately prior to the date in question. For purpose of this paragraph, the term "ex" date, (1) when used with respect to any issuance or distribution, means the first date on which the Shares trade, regular way, on the relevant exchange or in the relevant market from which the Sale Price was obtained without the right to receive such issuance or distribution, and (2) when used with respect to any subdivision or combination of Shares, means the first date on which the Shares trade, regular way, on such exchange or in such market from which the Sale Price was obtained without the right to receive such distribution.

<div align="center">64</div>

&lt;PAGE&gt;

    In the event that another issuance, distribution, subdivision, combination or tender or exchange offer to which Section 10.3 applies occurs during the period applicable for calculating "Current Market Price" pursuant to the definition in the preceding paragraph, "Current Market Price" shall be

calculated for such period in a manner determined by the Board of Directors to reflect the impact of such issuance, distribution, subdivision, combination or tender or exchange offer on the Sale Price of the Shares during such period.

> (ii) "FAIR MARKET VALUE" shall mean the amount which a willing buyer would pay a willing seller in an arm's-length transaction.

> (iii) "RECORD DATE" shall mean, with respect to any dividend, distribution or other transaction or event in which the holders of Shares have the right to receive any cash, securities or other property or in which the Shares (or other applicable security) are exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of shareholders entitled to receive such cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

(h) The Company may make such increases in the Conversion Rate, in addition to those required by Sections 10.3(a), (b), (c), (d), (e) or (f) as the Board of Directors considers to be advisable; provided, however, that such increase in the Conversion Rate shall not adversely affect the interests of the Holders of Securities (after taking into account tax and other consequences of such increase).

To the extent permitted by applicable law, the Company from time to time may increase the Conversion Rate by any amount for any period of time if the period is at least twenty (20) days, the increase is irrevocable during the period and the Board of Directors shall have made a determination that such increase would be in the best interests of the Company, which determination shall be conclusive. Whenever the Conversion Rate is increased pursuant to the preceding sentence, the Company shall mail to holders of record of the Securities a notice of the increase at least fifteen (15) days prior to the date the increased Conversion Rate takes effect, and such notice shall state the increased Conversion Rate and the period during which it will be in effect.

(i) No adjustment in the Conversion Rate shall be required unless such adjustment would require an increase or decrease of at least one percent (1%) in such rate; provided, however, that any adjustments that by reason of this Section 10.3(i) are not required to be made shall be carried forward and taken into account in any subsequent adjustment. All calculations under this Article X shall be made by the Company and shall be made to the nearest cent or to the nearest one-ten-thousandth (1/10,000) of a share, as the case may be, with one half-cent and 0.00005 of a share, respectively, being rounded upward. No adjustment need be made for rights to purchase Shares pursuant to a Company plan for reinvestment of dividends or interest. To the extent the Securities become convertible into cash, assets, property or securities (other than capital stock of the Company), no adjustment need be made thereafter as to the cash, assets, property or such securities.

65

<PAGE>

(j) Whenever the Conversion Rate is adjusted as herein provided, the Company shall promptly file with the Trustee and any conversion agent other than the Trustee an Officers' Certificate setting forth the Conversion Rate after such adjustment and setting forth a brief statement of the facts requiring such adjustment. Unless and until a Responsible Officer of the Trustee shall have received such Officers' Certificate, the Trustee shall not be deemed to have

knowledge of any adjustment of the Conversion Rate and may assume that the last
Conversion Rate of which it has knowledge is still in effect. Promptly after
delivery of such certificate, the Company shall prepare a notice of such
adjustment of the Conversion Rate setting forth the adjusted Conversion Rate and
the date on which each adjustment becomes effective and shall mail such notice
of such adjustment of the Conversion Rate to the holder of each Security at his
last address appearing on the Security register provided for in Section 2.3 of
this Indenture, within twenty (20) days after execution thereof. Failure to
deliver such notice shall not affect the legality or validity of any such
adjustment.

        (k) In any case in which this Section 10.3 provides that an adjustment
shall become effective immediately after (1) a record date or Record Date for an
event, (2) the date fixed for the determination of shareholders entitled to
receive a dividend or distribution pursuant to Section 10.3(a), (3) a date fixed
for the determination of shareholders entitled to receive rights or warrants
pursuant to Section 10.3(b), or (4) the Expiration Time for any tender offer
pursuant to Section 10.3(e), (each a "DETERMINATION DATE"), the Company may
elect to defer until the occurrence of the relevant Adjustment Event (as
hereinafter defined) (x) issuing to the holder of any Security converted after
such Determination Date and before the occurrence of such Adjustment Event, the
additional Shares or other securities issuable upon such conversion by reason of
the adjustment required by such Adjustment Event over and above the Shares
issuable upon such conversion before giving effect to such adjustment and (y)
paying to such holder any amount in cash in lieu of any fraction pursuant to
Section 10.3(a). For purposes of this Section 10.3(k), the term "ADJUSTMENT
EVENT" shall mean:

                (i) in any case referred to in clause (1) hereof, the occurrence of
        such event,

                (ii) in any case referred to in clause (2) hereof, the date any such
        dividend or distribution is paid or made,

                (iii) in any case referred to in clause (3) hereof, the date of
        expiration of such rights or warrants, and

                (iv) in any case referred to in clause (4) hereof, the date a sale or
        exchange of Shares pursuant to such tender or exchange offer is
        consummated and becomes irrevocable.

        (l) For purposes of this Section 10.3, the number of Shares at any time
outstanding shall not include Shares held in the treasury of the Company, but
shall include the Shares held by any Person in which the Company holds a direct
or indirect interest (including, but not limited to, The Sixty Two Investment
Company Limited), regardless of whether the dividend or distribution is received
and accepted by such Person, and shall include Shares

                                        66

<PAGE>

issuable in respect of scrip certificates issued in lieu of fractions of Shares.
The Company will not pay any dividend or make any distribution on Shares held in
the treasury of the Company.

        Section 10.4. Effect of Reclassification, Consolidation, Merger or Sale.

If any of the following events occurs, namely (i) any reclassification or change of the outstanding Shares (other than a subdivision or combination to which Section 10.3(c) applies), (ii) any consolidation, merger or binding share exchange of the Company with another Person as a result of which holders of Shares shall be entitled to receive Shares, other securities or other property or assets (including cash) with respect to or in exchange for such Shares, or (iii) any sale or conveyance of the properties and assets of the Company substantially as an entirety to any other Person as a result of which holders of Shares shall be entitled to receive Shares, other securities or other property or assets (including cash) with respect to or in exchange for such Shares, and (i) the Company is not the surviving or resulting entity, (ii) the transaction is not with an Affiliate of the Company and (iii) after the transaction, either more than 50% of the surviving or resulting entity's total voting power is not held by the Company's pre-transaction shareholders or more than 50% of the surviving or resulting entity's directors were not directors of the Company, then the Company or the successor or purchasing Person, as the case may be, shall execute with the Trustee a supplemental indenture (which shall comply with the Trust Indenture Act as in force at the date of execution of such supplemental indenture) providing that each Security shall be convertible into the kind and amount of Shares, other securities or other property or assets (including cash) receivable upon such reclassification, change, consolidation, merger, binding share exchange, sale or conveyance by a holder of a number of Shares issuable upon conversion of such Securities (assuming, for such purposes, a sufficient number of authorized Shares are available to convert all such Securities) immediately prior to such reclassification, change, consolidation, merger, binding share exchange, sale or conveyance assuming such holder of Shares did not exercise his rights of election, if any, as to the kind or amount of Shares, other securities or other property or assets (including cash) receivable upon such reclassification, change, consolidation, merger, binding share exchange, combination, sale or conveyance (provided that, if the kind or amount of Shares, other securities or other property or assets (including cash) receivable upon such reclassification, change, consolidation, merger, binding share exchange, combination, sale or conveyance is not the same for each Share in respect of which such rights of election shall not have been exercised ("NON-ELECTING SHARE"), then for the purposes of this Section 10.4 the kind and amount of Shares, other securities or other property or assets (including cash) receivable upon such reclassification, change, consolidation, merger, statutory share exchange, combination, sale or conveyance for each nonelecting share shall be deemed to be the kind and amount so receivable per share by a plurality of the nonelecting shares). Such supplemental indenture shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article X. However, if such event or transaction occurs before July 15, 2008, the consideration into which the Securities will be convertible will be limited to Shares or other prescribed securities (within the meaning of the Canada Income Tax Act).

The Company shall cause notice of the execution of such supplemental indenture to be mailed to each Holder, at its address appearing on the Security register provided for in Section 2.3 of this Indenture, within twenty (20) days after execution thereof. Failure to deliver such notice shall not affect the legality or validity of such supplemental indenture.

67

<PAGE>

The above provisions of this Section shall similarly apply to successive reclassifications, changes, consolidations, mergers, statutory share exchanges,

combinations, sales and conveyances.

If this Section 10.4 applies to any event or occurrence, Section 10.3 shall not apply.

Section 10.5. Taxes on Shares Issued. The issue of Share certificates on conversions of Securities shall be made without charge to the converting Holder for any tax in respect of the issue thereof. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of Shares in any name other than that of the holder of any Securities converted, and the Company shall not be required to issue or deliver any such Share certificate unless and until the Person or Persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 10.6. Reservation of Shares, Shares to Be Fully Paid; Compliance with Governmental Requirements; Listing of Shares. (a) The Company shall provide, free from preemptive rights, out of its authorized but unissued Shares or Shares held in treasury, sufficient Shares to provide for the conversion of the Securities from time to time as such Securities are presented for conversion.

(b) Before taking any action which would cause an adjustment increasing the Conversion Rate to an amount that would cause the Conversion Price to be reduced below the then par value, if any, of the Shares issuable upon conversion of the Securities, the Company will take all corporate action which may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue such Shares at such adjusted Conversion Rate.

(c) (i) The Company covenants that all Shares which may be issued upon conversion of Securities or in payment of the Redemption Price, Purchase Price, the Change of Control Purchase Price or Principal Amount at Stated Maturity will upon issue be fully paid and non-assessable by the Company and free from all taxes, liens and charges with respect to the issue thereof.

(ii) The Company covenants that, if any Shares to be provided for the purpose of conversion of Securities hereunder or for payment of the Redemption Price, Purchase Price, the Change of Control Purchase Price or Principal Amount at Stated Maturity require registration with or approval of any governmental authority under any federal or state law before such Shares may be validly issued upon conversion, the Company will in good faith and as expeditiously as possible, to the extent then permitted by the rules and interpretations of the SEC (or any successor thereto), endeavor to secure such registration or approval, as the case may be.

(iii) The Company further covenants that, so long as the Shares are listed on the NYSE or any other U.S. national securities exchange or automated quotation system, the Company will, if permitted by the rules of such exchange or automated quotation system, list and keep listed, so long as the Shares shall be so

68

<PAGE>

listed on such exchange or automated quotation system, all Shares
issuable upon conversion of the Security or in payment of the Redemption
Price, Purchase Price, the Change of Control Purchase Price or Principal
Amount at Stated Maturity; provided, however, that, if the rules of such
exchange or automated quotation system permit the Company to defer the
listing of such Shares until the first conversion of the Securities into
Shares or the first payment of the Redemption Price, Purchase Price, the
Change of Control Purchase Price or Principal Amount at Stated Maturity
in Shares in accordance with the provisions of this Indenture, the
Company covenants to list such Shares issuable upon conversion of the
Securities or in payment of the Redemption Price, Purchase Price, the
Change of Control Purchase Price or Principal Amount at Stated Maturity
in accordance with the requirements of such exchange or automated
quotation system at such time.

Section 10.7. Responsibility of Trustee. The Trustee and any other
conversion agent shall not at any time be under any duty or responsibility to
any holder of Securities to determine the Conversion Rate or whether any facts
exist which may require any adjustment of the Conversion Rate, or with respect
to the nature or extent or calculation of any such adjustment when made, or with
respect to the method employed, or herein or in any supplemental indenture
provided to be employed, in making the same. The Trustee and any other
conversion agent shall not be accountable with respect to the validity or value
(or the kind or amount) of any Shares, or of any securities or property, which
may at any time be issued or delivered upon the conversion of any Security; and
the Trustee and any other conversion agent make no representations with respect
thereto. Neither the Trustee nor any conversion agent shall be responsible for
any failure of the Company to issue, transfer or deliver any Shares or stock
certificates or other securities or property or cash upon the surrender of any
Security for the purpose of conversion or to comply with any of the duties,
responsibilities or covenants of the Company contained in this Article X.
Without limiting the generality of the foregoing, neither the Trustee nor any
conversion agent shall be under any responsibility to determine the correctness
of any provisions contained in any supplemental indenture entered into pursuant
to Section 10.4 relating either to the kind or amount of Shares or securities or
property (including cash) receivable by Holders upon the conversion of their
Securities after any event referred to in such Section 10.4 or to any adjustment
to be made with respect thereto, but, subject to the provisions of Section 7.1,
may accept as conclusive evidence of the correctness of any such provisions, and
shall be protected in relying upon, the Officers' Certificate (which the Company
shall be obligated to file with the Trustee prior to the execution of any such
supplemental indenture) with respect thereto.

Section 10.8. Notice To Holders Prior To Certain Actions. In case:

(a) the Company shall declare a dividend (or any other distribution) on
its Shares that would require an adjustment in the Conversion Rate pursuant to
Section 10.3; or

(b) the Company shall authorize the granting to the holders of all or
substantially all of its Shares of rights or warrants to subscribe for or
purchase any share of any class or any other rights or warrants; or

(c) of any reclassification or reorganization of the Shares of the
Company (other than a subdivision or combination of its outstanding Shares, or a
change in par value, or

69

<PAGE>

from par value to no par value, or from no par value to par value), or of any
consolidation, merger or statutory share exchange to which the Company is a
party and for which approval of any shareholders of the Company is required, or
of the sale or transfer of all or substantially all of the assets of the
Company; or

          (d) of the voluntary or involuntary dissolution, liquidation or winding
up of the Company;

the Company shall cause to be filed with the Trustee and to be mailed to each
Holder of Securities at his address appearing on the register provided for in
Section 10.3 of this Indenture, as promptly as possible but in any event at
least twenty (20) days prior to the applicable date hereinafter specified, a
notice stating (x) the date on which a record is to be taken for the purpose of
such dividend, distribution of rights or warrants, or, if a record is not to be
taken, the date as of which the holders of Shares of record to be entitled to
such dividend, distribution or rights are to be determined, or (y) the date on
which such reclassification, consolidation, merger, or statutory share exchange,
sale, transfer, dissolution, liquidation or winding up is expected to become
effective or occur, and the date as of which it is expected that holders of
Shares of record shall be entitled to exchange their Shares for securities or
other property deliverable upon such reclassification, consolidation, merger, or
statutory share exchange, sale, transfer, dissolution, liquidation or winding
up. Failure to give such notice, or any defect therein, shall not affect the
legality or validity of such dividend, distribution, reclassification,
consolidation, merger, or statutory share exchange, sale, transfer, dissolution,
liquidation or winding up.

          Section 10.9. Payment of Cash in Lieu of Shares. If a Holder elects to
convert all or any portion of a Security into Shares as set forth in this
Section 10 and the Company receives such Holder's conversion notice on or prior
to the day that is 20 days prior to the Stated Maturity (the "FINAL NOTICE
DATE"), the Company may choose to satisfy all or any portion of its conversion
obligation (the "CONVERSION OBLIGATION") in cash. Upon such election, the
Company will notify such Holder through the Trustee of the dollar amount to be
satisfied in cash (which must be expressed either as 100% of the Conversion
Obligation or as a fixed dollar amount) at any time on or before the date that
is two Business Days following receipt of written notice of conversion as
specified in Section 10.8 (such period, the "CASH SETTLEMENT NOTICE PERIOD"). If
the Company elects to pay cash for any portion of the shares otherwise issuable
to the Holder, the Holder may retract the conversion notice at any time during
the two Business Day period beginning on the day after the final day of the Cash
Settlement Notice Period (a "CONVERSION RETRACTION PERIOD"); no such retraction
can be made (and a conversion notice shall be irrevocable) if the Company does
not elect to deliver cash in lieu of shares (other than cash in lieu of
fractional shares). If the conversion notice has not been retracted, then
settlement (in cash and/or shares) will occur on the Business Day following the
final day of the 20 Trading Day period beginning on the day after the final day
of the Conversion Retraction Period (the "CASH SETTLEMENT AVERAGING PERIOD").
Settlement amounts will be computed as follows:

          (i) if the Company elects to satisfy the entire Conversion Obligation

in Shares, the Company will deliver to such Holder a number of Shares equal to (a) the aggregate original principal amount at maturity of the Securities to be converted divided by 1,000, multiplied by (b) the Conversion Rate;

70

<PAGE>

(ii) if the Company elects to satisfy the entire Conversion Obligation in cash, the Company will deliver to such Holder cash in an amount equal to the product of:

(B) a number equal to (x) the aggregate original principal amount at maturity of Securities to be converted divided by 1,000, multiplied by (y) the Conversion Rate, and

(C) the average Sales Price of the Shares during the Cash Settlement Averaging Period; and

(iii) if the Company elects to satisfy a fixed portion (other than 100%) of the Conversion Obligation in cash (the "CASH AMOUNT"), the Company will deliver to such Holder the Cash Amount and a number of Shares equal to the greater of (1) zero and (2) the excess, if any, of the number of Shares calculated as set forth in clause (i) above over the number of Shares equal to the sum, for each day of the Cash Settlement Averaging Period, of (x) 5% of the Cash Amount, divided by (y) the Sale Price of the Shares on such day.

Notwithstanding the foregoing, a Security in respect of which a Holder has delivered a Change in Control Purchase Notice exercising such Holder's option to require the Company to repurchase such Security may be converted as described in this Section 10.9 only if such notice of exercise is withdrawn as required in Section 10.1 hereof.

If a Holder elects to convert all or any portion of a Security into Shares as set forth in Section 10.1 and the Company receives such Holder's Conversion Notice after the Final Notice Date, if the Company chooses to satisfy all or any portion of the Conversion Obligation in cash, the Company will have previously notified the Holders through the Trustee of the dollar amount to be satisfied in cash at any time on or before the Final Notice Date. Upon such election, the Company will have notified the Holders through the Trustee of the dollar amount to be satisfied in cash (which must be expressed either as 100% or as a fixed dollar amount) at any time on or before the Final Notice Date. Settlement amounts and settlement dates will be computed in the same manner as set forth above except that the "Cash Settlement Averaging Period" shall be the 20 Trading Day period beginning on the day after receipt of the Conversion Notice (or in the event the Company receives the Conversion Notice on the Business Day prior to the Final Maturity Date, the 20 Trading Day period beginning on the day after the Final Maturity Date). Settlement (in cash and/or Shares) will occur on the Business Day following the final day of such Cash Settlement Averaging Period.

Section 10.10. Unconditional Right Of Holders To Convert. Notwithstanding any other provision in this Indenture, the Holder of any Security shall have the right, which is absolute and unconditional, to convert its Security in accordance with this Article X and subject to Section 10.9 and to bring an action for the enforcement of any such right to convert, and such rights shall

not be impaired or affected without the consent of such Holder.

<div align="center">71</div>

&lt;PAGE&gt;

<div align="center">ARTICLE XI</div>

<div align="center">MISCELLANEOUS</div>

Section 11.1. Trust Indenture Act Controls. If any provision of this Indenture limits, qualifies, or conflicts with another provision which is required to be included in this Indenture by the TIA, the required provision shall control.

Section 11.2. Notices. Any request, demand, authorization, notice, waiver, consent or communication shall be in writing and delivered in person or mailed by first-class mail, postage prepaid, addressed as follows or transmitted by facsimile transmission (confirmed by guaranteed overnight courier) to the following facsimile numbers:

        if to the Company:

        Fairfax Financial Holdings Limited
        95 Wellington Street West
        Suite 800
        Toronto, Ontario M5J 2N7
        Canada
        Attn:  Vice President, Corporate Affairs
        Facsimile No. (416) 367-2201

        if to the Trustee:

        The Bank of New York
        101 Barclay Street
        Floor 21W
        New York, New York 10286
        Telephone No. (212) 815-5206
        Facsimile No. (212) 815-5802
        Attention:  Corporate Trust Administration

The Company or the Trustee by notice given to the other in the manner provided above may designate additional or different addresses for subsequent notices or communications.

Any notice or communication given to a Securityholder shall be mailed to the Securityholder, by first-class mail, postage prepaid, at the Securityholder's address as it appears on the registration books of the Registrar and shall be sufficiently given if so mailed within the time prescribed.

Failure to mail a notice or communication to a Securityholder or any defect in it shall not affect its sufficiency with respect to other Securityholders. If a notice or communication is mailed in the manner provided above, it is duly given, whether or not received by the addressee.

<div align="center">72</div>

&lt;PAGE&gt;

If the Company mails a notice or communication to the Securityholders, it shall mail a copy to the Trustee and each Registrar, Paying Agent, Conversion Agent or co-registrar.

Section 11.3. Communication by Holders with Other Holders. Securityholders may communicate pursuant to TIA Section 312(b) with other Securityholders with respect to their rights under this Indenture or the Securities. The Company, the Trustee, the Registrar, the Paying Agent, the Conversion Agent and anyone else shall have the protection of TIA Section 312(c).

Section 11.4. Certificate and Opinion as to Conditions Precedent. Upon any request or application by the Company to the Trustee to take any action under this Indenture, the Company shall furnish to the Trustee:

    (1) an Officers' Certificate stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

    (2) an Opinion of Counsel stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

Section 11.5. Statements Required in Certificate or Opinion. Each Officers' Certificate or Opinion of Counsel with respect to compliance with a covenant or condition provided for in this Indenture shall include:

    (1) a statement that each person making such Officers' Certificate or Opinion of Counsel has read such covenant or condition;

    (2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officers' Certificate or Opinion of Counsel are based;

    (3) a statement that, in the opinion of each such person, he has made such examination or investigation as is necessary to enable such person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

    (4) a statement that, in the opinion of such person, such covenant or condition has been complied with.

Section 11.6. Separability Clause. In case any provision in this Indenture or in the Securities shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 11.7. Rules by Trustee, Paying Agent, Conversion Agent and Registrar. The Trustee may make reasonable rules for action by or a meeting of Securityholders. The Registrar, the Conversion Agent and the Paying Agent may make reasonable rules for their functions.

73

<PAGE>

Section 11.8. Legal Holidays. A "Legal Holiday" is any day other than a Business Day. If any specified date (including a date for giving notice) is a

Legal Holiday, the action shall be taken on the next succeeding day that is not a Legal Holiday, and, if the action to be taken on such date is a payment in respect of the Securities, no interest, if any, shall accrue for the intervening period.

Section 11.9. GOVERNING LAW. THIS INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

Section 11.10. Agent for Service; Submission to Jurisdiction; Waiver of Immunities. By the execution and delivery of this Indenture, the Company (i) hereby irrevocably designates and appoints CT Corporation System (or any successor entity), 111 8th Avenue, 13th Floor, New York, NY 10011 as its authorized agent upon which process may be served in any suit, action or proceeding arising out of or relating to the Securities or this Indenture that may be instituted in any state or federal court located in the Borough of Manhattan, The City of New York, State of New York, or brought by the Trustee (whether in its individual capacity or in its capacity as Trustee hereunder), (ii) submits to the jurisdiction of any such court in any such suit, action or proceeding, and (iii) agrees that service of process upon CT Corporation System and written notice of said service to it (mailed or delivered to Eric P. Salsberg, Vice President, Corporate Affairs, at its principal office in Toronto, Canada as specified in Section 11.2 hereof) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding. The Company further agrees to take any and all action, including the execution and filing of any and all such documents and instruments, as may be necessary to continue such designation and appointment of CT Corporation System in full force and effect so long as this Indenture shall be in full force and effect.

To the extent that the Company has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, the Company hereby irrevocably waives such immunity in respect of its obligations under this Indenture and the Securities, to the extent permitted by law.

Section 11.11. No Recourse Against Others. No recourse under or upon any obligation, covenant or agreement contained in this Indenture, or in any Security, or because of any indebtedness evidenced thereby, shall be had against any incorporator, as such, or against any past, present or future shareholder, officer or director, as such, of the Company or of any successor, either directly or through the Company or any successor, under any rule of law, statute or constitutional provision or by the enforcement of any assessment or by any legal or equitable proceeding or otherwise, all such liability being expressly waived and released by the acceptance of the Securities by the Holders and as part of the consideration for the issue of the Securities.

Section 11.12. Successors. All agreements of the Company in this Indenture and the Securities shall bind its successor. All agreements of the Trustee in this Indenture shall bind its successor.

74

<PAGE>

Section 11.13. Multiple Originals. The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement. One signed copy is enough to prove this Indenture.

Section 11.14. Repurchase of Securities by the Company. The Company may repurchase Securities issued under this Indenture in a manner not inconsistent with this Indenture or the terms of the Securities and in accordance with applicable law.

                                        75
<PAGE>


IN WITNESS WHEREOF, the undersigned, being duly authorized, have executed this Indenture on behalf of the respective parties hereto as of the date first above written.


                        FAIRFAX FINANCIAL HOLDINGS LIMITED


                        By: /s/ Eric P. Salsberg
                            ----------------------------------
                            Name:  Eric P. Salsberg
                            Title:  Vice President, Corporate Affairs


                        THE BANK OF NEW YORK
                        As Trustee

                        By: /s/ Peter Pavlyshin
                            ----------------------------------
                            Name:  Peter Pavlyshin
                            Title:  Assistant Vice President

                                        76
<PAGE>



                                    EXHIBIT A

                        [FORM OF FACE OF GLOBAL SECURITY]

        UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (AND ANY PAYMENT HEREON IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

        TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS TO NOMINEES OF THE DEPOSITORY TRUST COMPANY, OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE

LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN
ARTICLE TWO OF THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

THE SECURITY EVIDENCED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER
THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT OF
1933"), OR ANY STATE SECURITIES LAWS, AND MAY NOT BE OFFERED OR SOLD EXCEPT AS
SET FORTH IN THE FOLLOWING SENTENCE BY ACQUISITION HEREOF, THE HOLDER:

(1) REPRESENTS THAT IT IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN
    RULE 144A UNDER THE SECURITIES ACT OF 1933;

(2) AGREES THAT IT WILL NOT WITHIN TWO YEARS AFTER THE ORIGINAL ISSUANCE
    OF THIS SECURITY RESELL OR OTHERWISE TRANSFER THE SECURITY EVIDENCED
    HEREBY OR THE SUBORDINATE VOTING SHARES ISSUABLE UPON CONVERSION OF
    SUCH SECURITY EXCEPT (A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF,
    (B) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A
    UNDER THE SECURITIES ACT OF 1933, (C) PURSUANT TO THE EXEMPTION FROM
    REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OF 1933
    (IF AVAILABLE), (D) TO ANY INSTITUTIONAL INVESTOR THAT IS AN
    ACCREDITED INVESTOR WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) OR
    (7) OF REGULATION D UNDER THE SECURITIES ACT PURSUANT TO AN EXEMPTION
    FROM

<PAGE>

REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE), OR (E)
PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED
EFFECTIVE UNDER THE SECURITIES ACT OF 1933 AND WHICH CONTINUES TO
BE EFFECTIVE AT THE TIME OF SUCH TRANSFER;

(3) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THE SECURITIES
    IN CANADA TO OR FOR THE BENEFIT OF A CANADIAN RESIDENT EXCEPT IN
    ACCORDANCE WITH APPLICABLE CANADIAN SECURITIES LAWS; AND

(4) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THE SECURITY
    EVIDENCED HEREBY IS TRANSFERRED (OTHER THAN A TRANSFER PURSUANT TO
    CLAUSE 2(C) OR 2(E) ABOVE), A NOTICE SUBSTANTIALLY TO THE EFFECT OF
    THIS LEGEND.

The foregoing legend may be removed from this Security on satisfaction of
the conditions specified in the Indenture.

A-2

<PAGE>

FAIRFAX FINANCIAL HOLDINGS LIMITED

5% Convertible Senior Debentures due 2023

No. 1                                    CUSIP:  303901 AK 8

Issue Date:  July 14, 2003              Principal Amount:  US$[          ]

        FAIRFAX FINANCIAL HOLDINGS LIMITED, a company duly organized and existing under the laws of Canada, promises to pay to Cede & Co. or registered assigns, the principal amount of [ ] dollars (US$[ ]) on July 15, 2023.

        Interest Payment Dates: January 15 and July 15, commencing January 15, 2004.

        Record Dates: January 1 and July 1.

        Reference is hereby made to the further provisions of this Security set forth on the reverse side of this Security, which further provisions shall for all purposes have the same effect as if set forth at this place.

        IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:  July 14, 2003              FAIRFAX FINANCIAL HOLDINGS LIMITED


                                    By:
                                        --------------------------------------
                                    Title:
                                        --------------------------------------


TRUSTEE'S CERTIFICATE OF AUTHENTICATION

THE BANK OF NEW YORK,
as Trustee, certifies that this is one
of the Securities referred to in the
within-mentioned Indenture.


By: _____
         Authorized Signatory

Dated:  July 14, 2003


                                    A-3
<PAGE>

                    [FORM OF REVERSE OF GLOBAL SECURITY]

                    5% Convertible Senior Debentures due 2023


        This Security is one of a duly authorized issue of 5% Convertible Senior Debentures due 2023 (the "Securities") of Fairfax Financial Holdings Limited, a company duly organized and existing under the laws of Canada (including any successor corporation under the Indenture hereinafter referred to, the "Company"), issued under an Indenture, dated as of July 14, 2003 (the "Indenture"), between the Company and The Bank of New York, as trustee (the "Trustee"). The terms of the Security include those stated in the Indenture, those made part of the Indenture by reference to the United States Trust

Indenture Act of 1939, as amended ("TIA"), and those set forth in this Security. This Security is subject to all such terms, and Holders are referred to the Indenture and the TIA for a statement of all such terms. To the extent permitted by applicable law, in the event of any inconsistency between the terms of this Security and the terms of the Indenture, the terms of the Indenture shall control. Capitalized terms used but not defined herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.    Interest.

The Securities shall bear interest on the principal amount thereof at a rate of 5% per year. The Company shall also pay additional interest as set forth in the Registration Rights Agreement.

Interest will be payable semi-annually on each Interest Payment Date to Holders at the close of business on the preceding Interest Record Date. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

The Company will not pay interest to the Securityholder of record on the Interest Record Date if the Company elects to redeem or Securityholders elect to require the Company to repurchase, the Securities on a date that is after a Interest Record Date but on or prior to the corresponding Interest Payment Date. In that instance, the Company will pay accrued and unpaid interest on the Securities being redeemed to, but not including, the Redemption Date or the Repurchase Date, as the case may be, to the same person to whom it will pay the principal of those Securities.

If the principal amount of any Security, or any accrued and unpaid interest, or additional interest, if any, is not paid when due (whether upon acceleration pursuant to Section 6.2 of the Indenture, upon the date set for payment of the Redemption Price pursuant to Section 5 hereof, upon the date set for payment of the Purchase Price or Change in Control Purchase Price pursuant to Section 6 hereof, upon the Stated Maturity of the Securities, upon the Interest Payment Dates or upon the Additional Interest Payment Dates as defined in the Registration Rights Agreement), then in each such case the overdue amount shall, to the extent permitted by law, bear cash interest at the rate of 5% per annum, compounded semiannually, which interest shall accrue from the date such overdue amount was originally due to the date payment of such

A-4

<PAGE>

amount, including interest thereon, has been made or duly provided for. All such interest shall be payable in cash on demand but if not so demanded shall be paid quarterly to the Holders on the last day of each quarter.

2.    Method of Payment.

Except as provided below, interest will be paid (i) on the Global Securities to DTC in immediately available funds, (ii) on any definitive Securities having an aggregate principal amount of US$5,000,000 or less, by check mailed to the Holders of such Securities; and (iii) on any definitive Securities having an aggregate principal amount of more than US$5,000,000, by wire transfer in immediately available funds at the election of the Holders of these Securities.

At Stated Maturity the Company will pay interest on definitive Securities at the Company's office or agency in The City of New York, which initially will be the Corporate Trust Office of the trustee in The City of New York.

Principal on definitive Securities will be payable, upon Stated Maturity or when due, at the office or agency of the Company in The City of New York, maintained for such purpose, initially the Corporate Trust Office of the Trustee in The City of New York.

Subject to the terms and conditions of the Indenture, the Company will make payments in cash, Shares or a combination thereof, as the case may be, in respect of Redemption Prices, Purchase Prices, Change of Control Purchase Prices and at Stated Maturity to Holders who surrender Securities to a Paying Agent to collect such payments in respect of the Securities. The Company will pay cash amounts in money of the United States that at the time of payment is legal tender for payment of public and private debts. However, the Company may make such cash payments by check payable in such money.

3.      Paying Agent, Conversion Agent and Registrar.

Initially, The Bank of New York (the "Trustee") will act as Paying Agent, Conversion Agent and Registrar. The Company may appoint and change any Paying Agent, Conversion Agent or Registrar without notice, other than notice to the Trustee; provided that the Company will maintain at least one Paying Agent in the State of New York, The City of New York, Borough of Manhattan, which shall initially be an office or agency of the Trustee. The Company or any of its Subsidiaries or any of their Affiliates may act as Paying Agent, Conversion Agent or Registrar.

4.      Indenture.

The Securities are general unsecured obligations of the Company limited to up to US$200,000,000 aggregate principal amount. The Indenture does not limit other indebtedness of the Company, secured or unsecured.

5.      Redemption at the Option of the Company.

No sinking fund is provided for the Securities.

A-5

<PAGE>

(a) Prior to July 15, 2008, the Securities will be redeemable at the option of the Company, in whole or in part, upon not less than 30 nor more than 60 days' notice by mail, at the Redemption Price, plus accrued and unpaid interest and additional interest, if any, thereon up to, but not including, the Redemption Date for such Securities if:

(i) the Sale Price has exceeded US$293.12 for at least 20 Trading Days in any consecutive period of 30 Trading Days ending on the Trading Day prior to the mailing of the notice of redemption described in Section 7 below; and

(ii) the shelf registration statement covering resales of the Securities and the Shares into which the Securities are convertible is effective and available for use and is expected to remain effective and

available for use for the 30 days following such Redemption Date, unless registration is no longer required pursuant to the terms of the Registration Rights Agreement.

(b) The Securities are redeemable at the option of the Company, in whole or in part, at any time or from time to time, on or after July 15, 2008, upon not less than 30 nor more than 60 days' notice by mail, at the Redemption Price, plus accrued and unpaid interest and additional interest, if any, thereon up to, but not including, the Redemption Date for such Securities.

6.     Purchase By the Company at the Option of the Holder.


Subject to the terms and conditions of the Indenture, the Company shall become obligated to purchase, at the option of the Holder, all or any portion of the Securities held by such Holder on July 15, 2008, July 15, 2013 and July 15, 2018 in integral multiples of US$1,000 at a Purchase Price equal to the principal amount of those Securities plus accrued and unpaid interest, including additional interest, if any, of such Security on the Purchase Date. To exercise such right, a Holder shall deliver to the Company a Purchase Notice containing the information set forth in the Indenture, at any time from the opening of business on the date that is 20 Business Days prior to such Purchase Date until the close of business on the third Business Day prior to such Purchase Date, and shall deliver the Securities to the Paying Agent as set forth in the Indenture.

The Purchase Price may be paid, at the option of the Company, in cash or by the issuance and delivery of shares of Applicable Stock, or in any combination thereof, subject to the terms and conditions of the Indenture.

At the option of the Holder and subject to the terms and conditions of the Indenture, the Company shall become obligated to offer to purchase the Securities held by such Holder within 30 days (which purchase shall occur 30 days after the date of such offer) after the occurrence of a Change of Control of the Company for a Change of Control Purchase Price equal to the principal amount plus accrued and unpaid interest, including additional interest, if any, of such Security on the Change of Control Purchase Date. The Change of Control Purchase Price may be paid, at the option of the Company, in cash or by the issuance and delivery of shares of Applicable Stock, or in any combination thereof, subject to the terms and conditions of the Indenture.


A-6

<PAGE>


Holders have the right to withdraw any Purchase Notice or Change of Control Purchase Notice, as the case may be, by delivering to the Paying Agent a written notice of withdrawal in accordance with the provisions of the Indenture.

If cash and/or Applicable Stock sufficient to pay the Purchase Price or Change of Control Purchase Price, as the case may be, of all Securities or portions thereof to be purchased as of the Purchase Date or the Change of Control Purchase Date, as the case may be, is deposited with the Paying Agent, on the Business Day following the Purchase Date or the Change of Control Purchase Date, interest will cease to accrue on such Securities (or portions thereof) immediately after such Purchase Date or Change of Control Purchase Date, and the Holder thereof shall have no other rights as such other than the

right to receive the Purchase Price or Change of Control Purchase Price upon surrender of such Security.

7.    Notice of Redemption.

Notice of redemption pursuant to Section 5 of this Security will be mailed at least 30 days but not more than 60 days before the Redemption Date to each Holder of Securities to be redeemed at the Holder's registered address. If money sufficient to pay the Redemption Price of all Securities (or portions thereof) to be redeemed on the Redemption Date is deposited with the Paying Agent prior to or on the Redemption Date, immediately after such Redemption Date interest ceases to accrue on such Securities or portions thereof. Securities in denominations larger than US$1,000 of principal amount may be redeemed in part but only in integral multiples of US$1,000 of principal amount.

8.    Conversion.

Subject to and in compliance with the provisions of the Indenture (including, without limitation, the conditions to conversion of this Security set forth in Section 10.1 thereof), a Holder is entitled, at such Holder's option, to convert the Holder's Security (or any portion of the principal amount thereof that is US$1,000 or an integral multiple US$1,000), into fully paid and nonassessable Shares at the Conversion Price in effect at the time of conversion.

The Company will notify Holders of any event triggering the right to convert the Securities as specified above in accordance with the Indenture.

A Security in respect of which a Holder has delivered a Purchase Notice or Change of Control Purchase Notice, as the case may be, exercising the option of such Holder to require the Company to purchase such Security may be converted only if such Purchase Notice or Change of Control Purchase Notice, as the case may be, is withdrawn in accordance with the terms of the Indenture.

The initial Conversion Rate is 4.7057 Shares per $1,000 principal amount, subject to adjustment in certain events described in the Indenture. The Conversion Rate shall not be adjusted for any accrued and unpaid interest, or additional interest. Upon conversion, no payment shall be made by the Company with respect to accrued and unpaid interest or additional interest, if any. Instead, such amount shall be deemed paid by the Shares delivered upon conversion of any Security. In addition, no payment or adjustment shall be made in respect of dividends on the Shares, except as set forth in the Indenture.

A-7

<PAGE>

To surrender a Security for conversion, a Holder must (1) complete and manually sign the conversion notice below (or complete and manually sign a facsimile of such notice) and deliver such notice to the Conversion Agent, (2) surrender the Security to the Conversion Agent, (3) furnish appropriate endorsements and transfer documents and (4) pay any transfer or similar tax, if required.

No fractional Shares shall be issued upon conversion of any Security.

Instead of any fractional Share that would otherwise be issued upon conversion of such Security, the Company shall pay a cash adjustment as provided in the Indenture.

No payment or adjustment will be made for dividends on the shares of Shares, except as provided in the Indenture.

Upon conversion, the Company may choose to deliver, in lieu of Shares, cash or a combination of cash and Shares in accordance with the Indenture.

If the Company (i) is a party to a consolidation, merger, statutory share exchange or combination, (ii) reclassifies the Shares or (iii) conveys, transfers or leases its properties and assets substantially as an entirety to any Person, the right to convert a Security into Shares may be changed into a right to convert it into securities, cash or other assets of the Company or such other Person, in each case in accordance with the Indenture.

9.    Conversion Arrangement on Call for Redemption.

Any Securities called for redemption, unless surrendered for conversion before the close of business on the day that is two Business Days prior to the Redemption Date, may be deemed to be purchased from the Holders of such Securities at an amount not less than the Redemption Price, by one or more investment bankers or other purchasers who may agree with the Company to purchase such Securities from the Holders, to convert them into Shares and to make payment for such Securities to the Trustee in trust for such Holders.

10.    Denominations; Transfer; Exchange.

The Securities are in fully registered form, without coupons, in denominations of US$1,000 of principal amount and integral multiples of US$1,000. A Holder may transfer or exchange Securities in accordance with the Indenture. The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes and fees required by law or permitted by the Indenture. The Registrar need not transfer or exchange any Securities selected for redemption (except, in the case of a Security to be redeemed in part, the portion of the Security not to be redeemed) or any Securities in respect of which a Purchase Notice or Change of Control Purchase Notice has been given and not withdrawn (except, in the case of a Security to be purchased in part, the portion of the Security not to be purchased) or any Securities for a period of 15 days before the mailing of a notice of redemption of Securities to be redeemed.

A-8

<PAGE>

11.    Paying Agent, Conversion Agent, Registrar and Calculation Agent.

Initially, the Trustee will act as Paying Agent, Conversion Agent, Registrar and Calculation Agent. The Company may appoint and change any Paying Agent, Conversion Agent, Registrar or Calculation Agent without notice, other than notice to the Trustee; provided that the Company will maintain at least one Paying Agent in the Borough of Manhattan, The City of New York, State of New

York, which shall initially be an office or agency of the Trustee. The Company or any of its Subsidiaries or any of their Affiliates may act as Paying Agent, Conversion Agent, Registrar or Calculation Agent.

12.    Persons Deemed Owners.


      The registered Holder of this Security may be treated as the owner of this Security for all purposes.

13.    Unclaimed Money or Securities.


      The Trustee and the Paying Agent shall return to the Company upon written request any money or securities held by them for the payment of any amount with respect to the Securities that remains unclaimed for two years, subject to applicable unclaimed property law. After return to the Company, Holders entitled to the money or securities must look to the Company for payment as general creditors unless an applicable abandoned property law designates another person.

14.    Amendment; Waiver.


      Subject to certain exceptions set forth in the Indenture, (i) the Indenture or the Securities may be amended with the written consent of the Holders of at least a majority in aggregate principal amount of the outstanding Securities and (ii) certain Defaults may be waived with the written consent of the Holders of a majority in aggregate principal amount of the outstanding Securities. Subject to certain exceptions set forth in the Indenture, without the consent of any Securityholder, the Company and the Trustee may amend the Indenture or the Securities (i) to add to the covenants of the Company for the benefit of the Holders of Securities, (ii) to surrender any right or power conferred upon the Company in the Indenture, (iii) to provide for conversion rights of Holders of Securities if any reclassification or change of the Company's Shares or any consolidation, merger or sale of the Company's assets substantially as an entirety occurs, (iv) to provide for the assumption of the Company's obligations to the Holders of Securities in the case of a merger, consolidation, conveyance, transfer or lease pursuant to Article V of the Indenture, (v) to increase the Conversion Rate; provided, however, that such increase in the Conversion Rate shall not adversely affect the interest of the Holders of Securities (after taking into account tax and other consequences of such increase), (vi) to comply with the requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA, (vii) to make any changes or modifications necessary in connection with the registration of the Securities under the Securities Act as contemplated in the Registration Rights Agreement; provided, however, that such action pursuant to this clause does not, in the good faith opinion of the Board of Directors of the Company (as evidenced by a Board Resolution) and the Trustee, adversely affect the interests of the Holders of Securities in any material respect, (viii) to cure

A-9

<PAGE>

any ambiguity, to correct or supplement any provision in the Indenture which may be inconsistent with any other provision therein or which is otherwise defective, or to make any other provisions with respect to matters or questions

arising under the Indenture which the Company may deem necessary or desirable and which shall not be inconsistent with the provisions of the Indenture; provided, however, that such action pursuant to this clause does not, in the good faith opinion of the Board of Directors of the Company (as evidenced by a Board Resolution) and the Trustee, adversely affect the interests of the Holders of Securities in any material respect, and (ix) to add or modify any other provisions in the Indenture with respect to matters or questions arising hereunder which the Company and the Trustee may deem necessary or desirable and which will not adversely affect the interests of the Holders of Securities in any material respect.

15.    Defaults and Remedies.

        If any Event of Default with respect to Securities shall occur and be continuing, the principal of all the Securities may be declared due and payable in the manner and with the effect provided in the Indenture.

16.    Trustee Dealings with the Company.

        Subject to certain limitations imposed by the TIA, the Trustee under the Indenture, in its individual or any other capacity, may become the owner or pledgee of Securities and may otherwise deal with and collect obligations owed to it by the Company or its Affiliates and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee.

17.    Calculations in Respect of Securities.

        The Company or its agents will be responsible for making all calculations called for under the Securities including, but not limited to, determination of the market prices for the Securities and of the Shares and the amounts of interest and additional interest, if any, on the Securities. Any calculations made in good faith and without manifest error will be final and binding on Holders of the Securities. The Company or its agents will be required to deliver to the Trustee a schedule of its calculations and the Trustee will be entitled to conclusively rely upon the accuracy of such calculations without independent verification.

18.    No Recourse Against Others.

        No recourse under or upon any obligation, covenant or agreement contained in the Indenture, or in this Security, or because of any indebtedness evidenced thereby, shall be had against any incorporator, as such, or against any past, present or future shareholder, officer or director, as such, of the Company or of any successor, either directly or through the Company or any successor, under any rule of law, statute or constitutional provision or by the enforcement of any assessment or by any legal or equitable proceeding or otherwise, all such liability being expressly waived and released by the acceptance of the Securities by the Holders and as part of the consideration for the issue of the Securities.

<PAGE>

19.    Authentication.


      This Security shall not be valid until an authorized signatory of the
Trustee manually signs the Trustee's Certificate of Authentication on the other
side of this Security.

20.    Abbreviations.


      Customary abbreviations may be used in the name of a Securityholder or an
assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the
entireties), JT TEN (=joint tenants with right of survivorship and not as
tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors
Act).

21.    GOVERNING LAW.


      THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THIS SECURITY.

      The Company will furnish to any Securityholder upon written request and
without charge a copy of the Indenture which has in it the text of this Security
in larger type. Requests may be made to:

      Fairfax Financial Holdings Limited
      95 Wellington Street West
      Suite 800
      Toronto, Ontario M5J 2N7
      Canada
      Attn:  Vice President, Corporate Affairs
      Facsimile No. (416) 367-2201

22.    Registration Rights.


      The Holders of the Securities are entitled to the benefits of a Resale
Registration Rights Agreement, dated as of July 14, 2003, among the Company and
the Initial Purchasers named therein, including the receipt of liquidated
damages upon a registration default (as defined in such agreement) and which are
referred to herein and in the Indenture as "additional interest".

                              A-11
<PAGE>

<TABLE>
<CAPTION>

ASSIGNMENT FORM                                             CONVERSION NOTICE
------------------------------------------------- ------- ----------------------
----------------------
<S>                                                        <C>
To assign this Security, fill in the form below:          To convert this
Security into Shares of

```
                                                    the Company, check the
box [    ]
------------------------------------------------ ------- ----------------------
----------------------
I or we assign and transfer this Security to     To convert only part
of this Security,
_____
amount to be converted                           state the principal

US$1,000 or an integral                          (which must be
_____
(Insert assignee's soc. sec. or tax ID no.)      multiple of US$1,000):

certificate made out                             If you want the stock
_____
name fill in the form                            in another person's

_____                         below:
_____

_____
_____
(Print or type assignee's name, address and zip  (Insert the other
person's soc. sec. tax
code)                                            ID no.)

and irrevocably appoint
_____

_____ agent to transfer this
_____
Security on the books of the Company.  The
agent may substitute another to act for him.
_____


_____


_____
                                                 (Print or type other
person's name,
------------------------------------------------ ------- ----------------------   address and zip code)
----------------------
</TABLE>



Date:  _____  Your Signature: _____
_____
   (Sign exactly as your name appears on the other side of this Security)

Signature Guaranteed

_____
```

```
Participant in a Recognized Signature
Guarantee Medallion Program

By:_____
              Authorized Signatory
```

A-12
<PAGE>

SCHEDULE OF INCREASES AND DECREASES OF GLOBAL SECURITY

Initial Principal Amount of Global Security: _____(US$_____).

<TABLE>
<CAPTION>

| Date | Amount of Increase | Amount of Decrease in |
|---|---|---|
| Principal Amount of | Notation by | |
| | in Principal Amount | Principal Amount of    Global |
| Security | Registrar or | |
| | of Global Security | Global Security    After |
| Increase or | Security Custodian | |
| Decrease | | |
| ------------------------ | ---------------------- | ----------------------- ------- |
| --------------- ---------------------- | | |
| <S> | <C> | <C>    <C> |
| <C> | | |

</TABLE>

A-13
<PAGE>

EXHIBIT B
[FORM OF FACE OF CERTIFICATED SECURITY]

THE SECURITY EVIDENCED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT OF 1933") OR ANY STATE SECURITIES LAWS, AND MAY NOT BE OFFERED OR SOLD EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE BY ACQUISITION HEREOF, THE HOLDER:

    (5)    REPRESENTS THAT IT IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT OF 1933;

    (6)    AGREES THAT IT WILL NOT WITHIN TWO YEARS AFTER THE ORIGINAL ISSUANCE OF THIS SECURITY RESELL OR OTHERWISE TRANSFER THE SECURITY EVIDENCED HEREBY OR THE SUBORDINATE VOTING SHARES ISSUABLE UPON CONVERSION OF SUCH SECURITY EXCEPT (A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, (B) TO A QUALIFIED

INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT OF 1933, (C) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OF 1933 (IF AVAILABLE), (D) TO ANY INSTITUTIONAL INVESTOR THAT IS AN ACCREDITED INVESTOR WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) OR (7) OF REGULATION D UNDER THE SECURITIES ACT PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE), OR (E) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT OF 1933 AND WHICH CONTINUES TO BE EFFECTIVE AT THE TIME OF SUCH TRANSFER; AND

(7)   AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THE SECURITY EVIDENCED HEREBY IS TRANSFERRED (OTHER THAN A TRANSFER PURSUANT TO CLAUSE 2(C) OR 2(E) ABOVE), A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.

The foregoing legend may be removed from this Security on satisfaction of the conditions specified in the Indenture.

<PAGE>

                    FAIRFAX FINANCIAL HOLDINGS LIMITED

                  5% Convertible Senior Debentures due 2023

No. [    ]                                      CUSIP:  303901 AK 8
Issue Date: [    ]
Issue Price:  [    ]

     FAIRFAX FINANCIAL HOLDINGS LIMITED, a company duly organized and existing under the laws of Canada, promises to pay to _____, or registered assigns, the principal amount of [      ] (US$[      ]) on July 15, 2023.

     Interest Payment Dates: January 15 and July 15, commencing January 15, 2004.

     Record Dates: January 1 and July 1.

     Reference is hereby made to the further provisions of this Security set forth on the reverse side of this Security, which further provisions shall for all purposes have the same effect as if set forth at this place.

     IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:                          FAIRFAX FINANCIAL HOLDINGS LIMITED

                                By:_____
                                     Title:

TRUSTEE'S CERTIFICATE OF  AUTHENTICATION

THE BANK OF NEW YORK, as Trustee, certifies that this is one of the Securities referred to in the within-mentioned Indenture.

By _____
      Authorized Signatory

Dated:


                                    B-2
<PAGE>

[FORM OF REVERSE OF CERTIFICATED SECURITY IS IDENTICAL TO EXHIBIT A]



<PAGE>

                                                            EXHIBIT C

                    5% Convertible Senior Debentures due 2023

                            Transfer Certificate

        In connection with any transfer of any of the Securities within the period prior to the expiration of the holding period applicable to the sales thereof under Rule 144(k) under the United States Securities Act of 1933, as amended (the "Securities Act") (or any successor provision), the undersigned registered owner of this Security hereby certifies with respect to US$_____ principal amount of the above-captioned Securities presented or surrendered on the date hereof (the "Surrendered Securities") for registration of transfer, or for exchange or conversion where the securities issuable upon such exchange or conversion are to be registered in a name other than that of the undersigned registered owner (each such transaction being a "transfer"), that such transfer complies with the restrictive legend set forth on the face of the Surrendered Securities for the reason checked below:

                [_]   A transfer of the Surrendered Securities is made to the
                      Company or any subsidiaries; or

                [_]   The transfer of the Surrendered Securities complies with
                      Rule 144A under the Securities Act; or

                [_]   The transfer of the Surrendered Securities complies with
                      Rule 501(a)(1), (2), (3) or (7) of Regulation D under the
                      Securities Act; or

                [_]   The transfer of the Surrendered Securities is pursuant to
                      an effective registration statement under the Securities
                      Act; or

                [_]   The transfer of the Surrendered Securities is pursuant to

another available exemption from the registration
requirement of the Securities Act;

and unless the box below is checked, the undersigned confirms that, to
the undersigned's knowledge, such Securities are not being transferred to an
"affiliate" of the Company as defined in Rule 144 under the Securities Act (an
"Affiliate").

[_]    The transferee is an Affiliate of the Company.

DATE: _____
                    Signature(s)


<PAGE>

(If the registered owner is a corporation, partnership or fiduciary, the
title of the person signing on behalf of such registered owner must be stated.)


Signature Guaranteed
---------------------------------------
Participant in a Recognized Signature


                    C-2


</TEXT>
</DOCUMENT>

EXHIBIT B

# FAIRFAX *News Release*

*Stock Symbol: FFH (TSX and NYSE)*

**TORONTO, January 4, 2007**

## FAIRFAX DECLARES ANNUAL DIVIDEND

Fairfax Financial Holdings Limited (TSX and NYSE: FFH) announces that it has declared a dividend of US$2.75 per share on its outstanding multiple voting and subordinate voting shares, payable on February 8, 2007 to shareholders of record on January 25, 2007. Applicable Canadian withholding tax will be applied to dividends payable to non-residents of Canada.

The amount of this dividend was determined taking into account the current operating results of Fairfax and its insurance and reinsurance companies and the cash position at the Fairfax holding company.

Fairfax Financial Holdings Limited is a financial services holding company which, through its subsidiaries, is engaged in property and casualty insurance and reinsurance, investment management and insurance claims management.

-30-

For further information contact:       Greg Taylor, Chief Financial Officer, at (416) 367-4941

EXHIBIT C

# FAIRFAX *News Release*

*Stock Symbol: FFH (TSX and NYSE)*

**TORONTO, January 2, 2008**

### FAIRFAX DECLARES ANNUAL DIVIDEND

Fairfax Financial Holdings Limited (TSX and NYSE: FFH) announces that it has declared a dividend of US$5.00 per share on its outstanding multiple voting and subordinate voting shares, payable on February 11, 2008 to shareholders of record on January 14, 2008.  Applicable Canadian withholding tax will be applied to dividends payable to non-residents of Canada.

The amount of this dividend was determined taking into account the current operating results of Fairfax and its insurance and reinsurance companies and the cash position at the Fairfax holding company, and is consequently not necessarily indicative of the amount of any annual dividends which may be paid in the future.

Fairfax Financial Holdings Limited is a financial services holding company which, through its subsidiaries, is engaged in property and casualty insurance and reinsurance and investment management.

-30-

For further information contact:        Greg Taylor, Chief Financial Officer, at (416) 367-4941

EXHIBIT D

# FAIRFAX *News Release*

*Stock Symbol:  FFH (TSX and NYSE)*

**TORONTO, January 2, 2008**

### FAIRFAX ANNOUNCES CONVERSION RIGHTS OF
### 5% CONVERTIBLE NOTES DUE 2023

Fairfax Financial Holdings Limited (TSX and NYSE: FFH) announced today that, under the terms of the indenture (the "Indenture") governing its 5% convertible senior debentures due 2023 (the "Notes"), each holder of the Notes has the right to convert their Notes into Fairfax's subordinate voting shares during the first quarter of 2008.  As of the last day of the fourth quarter of 2007, the sale price of Fairfax's subordinate voting shares had exceeded 120% of the conversion price of US$212.51 for at least 20 trading days during the 30 consecutive trading day period ending on the last day of the fourth quarter of 2007.  As a result of this event, the Notes are convertible into subordinate voting shares during the first quarter of 2008.  The full terms of the conversion rights of the holders of the Notes are set forth in the Indenture.  Holders of the Notes may obtain information on how to convert their Notes by contacting The Bank of New York, the Trustee and Conversion Agent for the Notes, at:

<div align="center">

The Bank of New York
Attention: Lesley Daley
Global Finance Americas
101 Barclay Street, Floor 4 East
New York, New York 10286
Tel: (212) 815-2719
Fax: (212) 815-5802

</div>

Fairfax Financial Holdings Limited is a financial services holding company which, through its subsidiaries, is engaged in property and casualty insurance and reinsurance and investment management.

<div align="center">

-30-

</div>

For further information contact: Greg Taylor, Chief Financial Officer, at (416) 367-4941

EXHIBIT E

# FAIRFAX *News Release*

*Stock Symbol:  FFH (TSX and NYSE)*

**TORONTO, January 9, 2008**

## FAIRFAX ANNOUNCES REDEMPTION OF 5% CONVERTIBLE SENIOR DEBENTURES DUE 2023

Fairfax Financial Holdings Limited (TSX and NYSE: FFH) announced today that it has called for redemption all of its outstanding 5% Convertible Senior Debentures due 2023 (the "Notes"). The redemption date will be February 13, 2008, and the redemption price, which will be paid in cash, will be 100% of the principal amount of the Notes redeemed, plus accrued and unpaid interest to, but not including, the redemption date.

Holders of the Notes may exercise their rights of conversion with respect to the Notes at a conversion rate of 4.7057 subordinate voting shares of Fairfax per US$1,000 principal amount of Notes (equal to a conversion price of approximately US$212.51 per subordinate voting share) through the close of business on February 12, 2008 (the business day preceding the redemption date), pursuant to the terms of the Notes and the indenture under which the Notes were issued.

The Bank of New York, the trustee under the indenture governing the Notes, is also acting as paying agent and conversion agent.

Fairfax Financial Holdings Limited is a financial services holding company which, through its subsidiaries, is engaged in property and casualty insurance and reinsurance, investment management and insurance claims management.

-30-

For further information contact: Greg Taylor, Chief Financial Officer, at (416) 367-4941

EXHIBIT F

# ANTHONY OSTLUND & BAER, P.A.

### ATTORNEYS AT LAW

JOHN B. ORENSTEIN
Email: jorenstein@aoblaw.com

January 10, 2008

**By Fax ((416) 367-4946)**

Greg Taylor
Fairfax Financial Holdings Limited
Suite 800
95 Wellington Street West
Toronto, Ontario
Canada M5J 2N7

Re:    5% Convertible Senior Debentures Due 2023 (the "Notes") of Fairfax Financial Holdings
       Limited (the "Company")

Dear Mr. Taylor:

We represent holders of approximately $60 million of the above-referenced Notes.[1]  We write
concerning the Company's recent declaration of its annual dividend.

The Indenture governing the Notes provides for a Conversion Rate adjustment if the Company
distributes cash, by dividend or otherwise, "to the extent that the aggregate amount of any such
cash distributions and dividends in any 12-month period exceeds, with respect to the period"
$3.00 (Can.) per share.  (Indenture, § 10.3(f).)  The Indenture expressly provides that whether
distributions causing an adjustment have occurred is "determined on the Record Date for such
distribution or dividend."  (*Id.*)

The record date of the dividend declared last year was January 25, 2007.  The record date of the
most recently declared dividend is January 14, 2008, which is within 12 months of the prior
dividend.  The "aggregate amount" of these dividends exceeds $3 (Can.) per share.  Furthermore,
the required increase in the Conversion Rate exceeds the 1% threshold provided in section
10.3(i).  Consequently, an adjustment is required.

The Company has taken care to avoid the occurrence of record dates within 12 months of one
another in the past, apparently mindful of the plain meaning of the Indenture provision.
Nevertheless, our understanding is that the Company refuses to acknowledge its obligation to
increase the Conversion Rate.  The issue is urgent, as you know, in light of the Company's

---

[1] The holders are Whitebox Advisors, OTA LLC and Silverback Asset Management or their affiliates or managed
accounts.

Greg Taylor
January 10, 2008
Page 2

announcement of the redemption of the Notes. Holders effectively must exercise their conversion rights now or lose them entirely.

We strongly suggest that the Company reconsider its position. It is unfair to holders to force a conversion, as the Company has in effect done, while at the same time requiring holders to accept shares at a lower rate than the Indenture requires. We believe there are grounds to seek judicial intervention immediately pursuant to section 10.10.

Please let us know as soon as possible how the Company intends to proceed. If we do not hear from the Company by the close of business January 15, we will pursue such remedies as we deem appropriate.

Sincerely,

ANTHONY OSTLUND & BAER, P.A.

By: _____
    John B. Orenstein

JBO/djb

cc:    Brian Lutz (by pdf)
       Dan Magid (by pdf)
       Paul Masters (by pdf)
       Andy Redleaf (by pdf)
       Bank of New York (by fax)

EXHIBIT G

# SHEARMAN & STERLING LLP

COMMERCE COURT WEST | SUITE 4405, P.O. BOX 247 | TORONTO | ONTARIO | M5L 1E8

WWW.SHEARMAN.COM | T +1.416.360.8484 | F +1.416.360.2958

scenta@shearman.com
(416) 360-5131

January 15, 2008

Mr. John B. Orenstein
Anthony Ostlund & Baer, P.A.
90 South Seventh Street
Suite 3600
Minneapolis, MN 55402

5% Convertible Senior Debentures due 2023 of
Fairfax Financial Holdings Limited

Dear Mr. Orenstein:

Shearman & Sterling LLP represents Fairfax Financial Holdings Limited (the "Company"). I am writing to you in response to your letter, dated January 10, 2008, to Greg Taylor relating to the terms of the indenture (the "Indenture"), between the Company and The Bank of New York, as trustee, dated as of July 14, 2003, governing the Company's 5% Convertible Senior Debentures due 2023 (the "Notes"). The Notes are convertible into subordinate voting shares ("Shares") of the Company pursuant to the terms of the Indenture.

In 2007, the Company declared a dividend (the "2007 dividend") of U.S.$2.75 per Share payable on February 8, 2007 to shareholders of record on January 25, 2007. In 2008, the Company declared a dividend (the "2008 dividend") of U.S.$5.00 per Share payable on February 11, 2008 to shareholders of record on January 14, 2008.

Section 10.3(f) of the Indenture provides that "[i]n case the Company shall, by dividend or otherwise, distribute to all holders of its Shares cash..., to the extent that the aggregate amount of any such cash distributions and dividends in any 12-month period exceeds," an amount of cash specified in the Indenture, then the Conversion Rate (as defined in the Indenture) shall be increased by an amount determined as set forth in the Indenture. At present, the relevant specified amount of cash that may be distributed in any 12-month period is Cdn$3.00 per Share. Because the payment date in respect of the 2008 dividend (February 11, 2008) does not fall in the same 12-month period as the payment date in respect of the 2007 dividend (February 8,

ABU DHABI | BEIJING | BRUSSELS | DÜSSELDORF | FRANKFURT | HONG KONG | LONDON | MANNHEIM | MENLO PARK | MUNICH
NEW YORK | PARIS | ROME | SAN FRANCISCO | SÃO PAULO | SHANGHAI | SINGAPORE | TOKYO | TORONTO | WASHINGTON, DC

SHEARMAN & STERLING LLP IS A LIMITED LIABILITY PARTNERSHIP ORGANIZED IN THE UNITED STATES UNDER THE LAWS OF THE STATE OF DELAWARE, WHICH LAWS LIMIT THE PERSONAL LIABILITY OF PARTNERS.
COUNTRY OF PRIMARY QUALIFICATION. UNITED STATES OF AMERICA NOT QUALIFIED TO PRACTICE ONTARIO LAW

Page 2

2007), the distributions will not be made in the same 12-month period and the 2008 dividend and the 2007 dividend are not aggregated pursuant to Section 10.3(f) of the Indenture.

Although the 2008 dividend exceeds Cdn$3.00, no adjustment is required to be made to the Conversion Rate in respect of the 2008 dividend due to the operation of Section 10.3(i) of the Indenture, which provides in relevant part that "[n]o adjustment in the Conversion Rate shall be required unless such adjustment would require an increase or decrease of at least one percent (1%) in such rate; provided, however, that any adjustments that by reason of this Section 10.3(i) are not required to be made shall be carried forward and taken into account in any subsequent adjustment".

You state in your letter that "The Indenture expressly provides that whether distributions causing an adjustment have occurred is 'determined on the Record Date for such distribution or dividend'". The determination as to whether the Company will distribute to its shareholders more cash than it is permitted to distribute without increasing the Conversion Rate must be determined on the Record Date of the relevant dividend because if an adjustment to the Conversion Rate would be required, then, pursuant to Section 10.3(f), such adjustment would become "effective immediately prior to the opening of business on the day following the Record Date". For example, if the 2008 Dividend had been declared in the amount of U.S.$10.00 per Share (instead of U.S.$5.00 per Share), then an adjustment to the Conversion Rate would have been required pursuant to Section 10.3(f), and, in such case, such Conversion Rate adjustment would have become effective prior to the opening of business on January 15, 2008, the day following the Record Date of the 2008 dividend.

That the determination as to whether an adjustment to the Conversion Rate is required must be made on the Record Date does not alter the clear meaning of the language in Section 10.3(f), which provides that an adjustment to the Conversion Rate will only be triggered if the Company, by dividend or otherwise, **distributes** to its shareholders more than Cdn$3.00 per Share in cash in any 12-month period. The 2007 dividend and the 2008 dividend will not be distributed in the same 12-month period, as the dates on which the cash dividends are distributed are more than 12 months apart.

Yours very truly,

*S. Centa*

Stephen C. Centa

cc:    Greg Taylor, *Fairfax Financial Holdings Limited*
       Christopher J. Cummings, *Shearman & Sterling LLP*
       Jonathan Greenblatt, *Shearman & Sterling LLP*